UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

Case No.: _____

DAVID WARREN,

                                Plaintiff,

               - against -

THE CITY OF NEW YORK; JOHN ROE, as
Administrator of the Estate of Detective
GEORGE DELGROSSO, JACK ROE, as
Administrator of the Estate of Detective JAMES
KENNEDY, JOHN BANE, WALLACE ZEINS,
MICHAEL PACCIONE, THOMAS
CRUTHERS, JAMES COWAN, STEPHEN
BAVOLAR, JOE ROE, as Administrator of the
Estate of Detective RICHARD CHARTRAND,
RICK ROE, as Administrator of the Estate of
Detective RUDOLPH STUBBS, CANDICE
BRIDGWOOD, as Administrator of the Estate of
Detective HARRY BRIDGWOOD, MICHAEL
GOLDSTEIN, SUSAN AXELROD, DAVID
DRUCKER, BONNIE SARD, WILLIAM
DARROW, CHARLES KING, CONSUELA
FERNANDEZ, CHRISTINE KEENAN, TERRI
ROSENBLATT, PETER SALERNO, JEFF
SALTA, and JOHN/JANE DOES #1-10 being
unknown employees of the City of New York, in
their individual and official capacities,

                           Defendants.
-----------------------------------------------------------x

**COMPLAINT AND
JURY DEMAND**

Plaintiff **DAVID WARREN**, by his attorneys, LAW OFFICES OF JAMES HENNING

& ASSOCIATES, PLLC, respectfully alleges, upon information and belief, as follows:

## INTRODUCTION

1) In December 1986, David Warren and Eric Smokes were teenaged best friends dating the

women they would each eventually marry. Neither of them had ever been convicted of a

crime. David was attending high school and had his whole life to look forward to. When

1

David and Eric accompanied friends from Brooklyn to celebrate the New Year in Manhattan, they had no idea the trip would alter the course of their lives.

2) While David, Eric, and their friends were many blocks away, Jean Casse was attacked, robbed, and mortally wounded on 52nd Street.

3) George Delgrosso, a corrupt detective, was assigned to lead the investigation into Casse's murder. It was his first time leading a homicide investigation since being promoted to detective. Delgrosso called the case "a loser" and did not believe he would catch the perpetrators until he met 17-year-old James Walker on January 2nd. Walker was an emotionally handicapped crack addict in custody for a Manhattan robbery. When the police asked him about Casse's murder, he gave false information in the hope of obtaining a deal on his own charges. Suddenly, Delgrosso saw a route to close his seemingly unsolvable first homicide case. Unlike the three accomplices he was arrested with, Walker avoided prison for his felony charges in exchange for falsely accusing David and Eric.

4) Delgrosso followed Walker's false and incentivized information to Eric and, by extension, David. Indeed, David was first "implicated" in the crimes charged merely because he was Eric's best friend. Then, Delgrosso, other police officers, and prosecutors from the New York County District Attorney's Office ("DANY") engaged in an inexcusable rush to judgment, driven by confirmation bias and with reckless disregard for the truth. They **created** false witnesses against David and Eric through a campaign of misconduct. Absent police and prosecutorial misconduct including the coercion and incentivization of witnesses and the suppression of favorable evidence, **none** of the evidence that was presented against David and Eric would have existed. Three of the four witnesses who identified them only did so

after being threatened with charges for Casse's murder, the fourth testified only after being threatened with additional years in prison.

5) No physical or biological evidence connected David or Eric to Casse's robbery or murder. Despite being denied bail and confined to the horrific conditions of Riker's Island for over six months before their trial, David and Eric maintained their innocence. At just 16-years-old, David had the integrity to refuse extremely favorable plea bargains that would have required him to lie. All the while, police and prosecutors sought to falsely impugn their alibi, fabricated evidence against them, and concealed evidence that would have demonstrated their innocence and undermined the false evidence against them.

6) In July 1987, David and Eric were convicted on false evidence after what essentially amounted to a show trial. After the verdict was read, the Trial Judge told David's counsel, Pamela Jordan, that she "did an excellent job with what [she] had." What neither Jordan nor Eric's counsel had was a wealth of favorable information and evidence that was concealed by police and prosecutors, including proof of the extraordinary amount of misconduct used to obtain their clients' convictions.

7) At sentencing, **David maintained his innocence**. **Prophetically, Ms. Jordan told the Court that David did not commit the crimes he was convicted of and said, "I think that you will have an opportunity at some point to have that information come forward."**

8) That information did eventually come forward despite the efforts of police and prosecutors who fought to conceal it. From 1987 through 2023, the police and prosecutors responsible for wrongfully convicting David and Eric, as well as their colleagues and other employees and agents of the DANY and the New York City Police Department ("NYPD") defended this reprehensible miscarriage of justice through continued misconduct and indifference to truth

3

and the law. They lied, concealed evidence and allowed it to deteriorate, declined to investigate credible proof of innocence and, indeed, celebrated their work in convicting two innocent teenagers for a crime they did not commit.

9) By 2022, efforts the current District Attorney referred to as "unyielding advocacy" he was "inspired by" had generated a cornucopia of evidence that David and Eric were innocent and had been unjustly convicted through police and prosecutorial misconduct and resulted in an appeal the DANY knew it was likely to lose. Rather than risk an appellate decision exposing the Office's culture of misconduct and strident defense of two unconstitutional convictions, in 2023, with four witnesses—including three of four identification witnesses—having recanted, **the DANY finally conceded that "the only legally correct and just outcome" was to vacate, albeit on the Office's own terms.**

10) After vehemently defending the convictions of David Warren and Eric Smokes for over thirty-five years, the DANY moved to vacate them on newly discovered evidence and expressed a sudden interest in moving quickly and without further litigation. However, this concession was not, as the DANY implied, unrelated to police or prosecutorial misconduct or constitutional violations. Nor was the Office's interest in avoiding delay or litigation based on any concern for the interests of David or Eric. David's childhood sweetheart and wife, Kim Williams, tragically passed away while the DANY delayed his exoneration. The Office knew that David and Eric had not been wrongfully convicted by accident, and that police and prosecutors committed misconduct throughout their 1987 prosecution and for years thereafter in defense of their unjust convictions. The DANY simply refused to acknowledge clear evidence of that misconduct and persisted in shielding police and prosecutors the Office knew were guilty of wrongdoing, including people that remain with the DANY to date.

4

11) The actions of the DANY employees responsible for wrongfully convicting David and Eric, defending their unjust convictions, and concealing and denying the malfeasance that caused them, were born of a culture of misconduct and impunity that has festered at the DANY since at least 1975 and continues through the present day as a product of woefully deficient training, supervision and disciplinary policies, a culture of perceived infallibility that encouraged prosecutors to obtain and defend convictions at all costs, and a reckless disregard for the constitutional rights of criminal suspects and defendants which have, to date, resulted in the reversal or vacatur of *dozens* of criminal convictions. **From 1975-2024, courts vacated or reversed *at least* one hundred and fifty (150) convictions obtained by DANY prosecutors on decisions finding prosecutorial misconduct**, including *in dozens of homicide cases*. These included appellate decisions involving Detective Delgrosso and prosecutors who participated in the 1987 prosecution of David and Eric. Many other decisions found misconduct by DANY prosecutors without vacating or reversing convictions.

12) Similarly, the police investigation into Jean Casse's murder was led by a corrupt detective who had already been disciplined by the NYPD for lying to other officers about his own criminal behavior and was conducted during a period of unbridled corruption throughout the ranks of the Department. Misconduct by rogue officers like George Delgrosso and his colleagues was routine before, during, and after David and Eric were arrested and prosecuted as a result if the NYPD's indifference to longstanding recruitment, training, supervision, and disciplinary deficiencies that regularly affected the constitutional rights of criminal suspects and defendants. NYPD leadership allowed these deficiencies to persist and ignored, concealed, or tacitly encouraged the misconduct and constitutional violations that resulted

from them. In addition to Delgrosso, *at least* three other detectives directly involved in framing David and Eric have been cited for misconduct in judicial decisions.

13) David spent over twenty years fighting from behind bars to prove his innocence and then many additional years fighting to clear his name after he was paroled. He lost his youth and faith in the criminal justice system. On January 31, 2024, over 36 ½ years after they were wrongfully convicted, David and Eric finally received a measure of justice.

14) Just over four years earlier, in January 2020, Judge Stephen Antignani had issued a one hundred- and twenty-three-page decision, based largely on misconduct including false testimony by police and prosecutors, false evidence they put forth, and the absence of evidence they concealed, denying David and Eric justice once again. On January 31, 2024, Judge Antignani admitted that his 2020 decision was "wrong," vacated their convictions, and said that they could "leave with the confidence that [they were] not criminals." David crystallized the truth for the Court when he interjected, "[w]e never were."[1]

15) One thing Judge Antignani was not wrong about was his acknowledgement that the long overdue decision would "never give [David and Eric] back the years they lost." Those years are gone forever. They were stolen from David and Eric by City officials ironically entrusted to protect them and serve the ends of justice. The lives of David, Eric, and Jean Casse, and the truth, did not matter to these officials. Nor did bringing Casse's true killer to justice. These craven malfeasors valued career advancement, personal accolades, the reputations of their offices, and "winning" over the lives of two innocent men of color and taking a murderer off of the street. Furthermore, they remain unapologetic, defensive, and, indeed, proud of their conduct. By stark contrast, a deliberating juror who voted to convict David and

---

[1] The transcript of the January 31, 2024, exoneration proceedings is incorporated herein by reference.

Eric in 1987 came forward to support their innocence and attend their exoneration. Within a week, Jean Casse's grandson wrote to David and Eric to express his relief at their exoneration, congratulate them, and wish them the best.

16) David brings the present action to seek monetary compensation for the extraordinary damages he has suffered, exemplary damages to deter similar misconduct from being committed by the City's law enforcement officials in the future, and accountability for and exposure of the official misconduct and abuses of power that led to his wrongful arrest, prosecution, conviction, and incarceration and robbed him of over twenty years of his life, as well as the defense of his conviction, which caused his constitutional injuries to needlessly continue, and which misconduct and abused policymakers for and employees of the City continue to conceal as of the filing of the instant Complaint.

## JURISDICTION AND VENUE

17) This action arises under 42 U.S.C. §§ 1983 and 1988, Monell v. Department of Social Services, 436 U.S. 658 (1978), and under the common law of the State of New York.

18) Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

19) Venue is proper under 28 U.S.C. § 1391.

20) On or about February 26, 2024, Plaintiff served the City of New York timely notice of the present claim, in accordance with N.Y. Gen. Mun. Law § 50-e. A hearing pursuant to Mun. Law § 50-h was held on June 5, 2024.

21) More than 90 days have elapsed since submission of Plaintiff's notice of claim and his 50-h hearing and Defendant City has not settled the instant claim.

22) Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

## **THE PARTIES**

23) Plaintiff DAVID WARREN is a resident of the State of New York and of the United States, and resides in BROOKLYN, New York.

24) Defendant JOHN ROE, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious name "JOHN ROE" is Administrator of the Estate of GEORGE DELGROSSO (Shield No.: 2459), now deceased. Delgrosso was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

25) Defendant JACK ROE, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious name "JACK ROE" is Administrator of the Estate of JAMES KENNEDY (Shield No.: 1356), now deceased. Kennedy was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

26) Defendant JOHN BANE (Shield No.: 1337), was at all times relevant an officer employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

27) Defendant WALLACE ZEINS (Shield No.: 222), was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

28) Defendant MICHAEL PACCIONE (Tax ID: 872159), was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

29) Defendant THOMAS CRUTHERS (Shield No.: 1390), was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

30) Defendant JAMES COWAN (Tax ID: 839719), was at all times relevant a lieutenant employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

31) Defendant STEPHEN BAVOLAR (Tax ID: 869658), was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

32) Defendant JOE ROE, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious name "JOE ROE" is Administrator of the Estate of RICHARD CHARTRAND (Tax ID: 833244), now deceased. Chartrand was at all times relevant a detective employed by the NYPD, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

33) Defendant RICK ROE, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious name "RICK ROE" is Administrator of the Estate of RUDOLPH STUBBS (Tax ID: 868335), now deceased. Stubbs was at all times relevant a detective employed by the NYPD, acting within

the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

34) Defendant CANDICE BRIDGWOOD is the Administrator of the Estate of HARRY BRIDGWOOD (Shield No.: 3834), now deceased. Bridgwood was at all times relevant a detective employed by the NYPD or a detective investigator employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

35) Defendant MICHAEL GOLDSTEIN, was at all times relevant an assistant district attorney ("ADA") employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

36) Defendant SUSAN AXELROD, was at all times relevant an ADA employed by the DANY, acting within the scope of her authority and under color of State law, unless otherwise specified. She is named in her individual and official capacities.

37) Defendant DAVID DRUCKER, was at all times relevant an ADA employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

38) Defendant BONNIE SARD, was at all times relevant an ADA employed by the DANY, acting within the scope of her authority and under color of State law, unless otherwise specified. She is named in her individual and official capacities.

39) Defendant WILLIAM DARROW, was at all times relevant an ADA employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

40) Defendant CHARLES KING, was at all times relevant an ADA employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

41) Defendant CONSUELA FERNANDEZ, was at all times relevant an ADA employed by the DANY, acting within the scope of her authority and under color of State law, unless otherwise specified. She is named in her individual and official capacities.

42) Defendant CHRISTINE KEENAN, was at all times relevant an ADA employed by the DANY, acting within the scope of her authority and under color of State law, unless otherwise specified. She is named in her individual and official capacities.

43) Defendant TERRI ROSENBLATT, was at all times relevant an ADA employed by the DANY, acting within the scope of her authority and under color of State law, unless otherwise specified. She is named in her individual and official capacities.

44) Defendant PETER SALERNO (Shield No.: 4501), was at all times relevant a detective investigator employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

45) Defendant JEFF SALTA (Shield No.: 154), was at all times relevant a detective investigator employed by the DANY, acting within the scope of his authority and under color of State law, unless otherwise specified. He is named in his individual and official capacities.

46) Defendants DOE OFFICERS AND ADAs #1-10, whose actual names Plaintiff has been unable to ascertain despite reasonable efforts to do so but who are sued herein by the fictitious designation of "Doe," represent those officers and ADAs employed by the City and acting under color of law and in their individual and official capacities, unless otherwise specified.

47) The NYPD is an agency of the City.

48) Employees of the NYPD are agents and employees of the City.

49) The City is legally responsible for torts that NYPD employees commit within the scope of their employment and under color of law.

50) The DANY is an agency of the City.

51) The District Attorney and other employees of the DANY are agents and employees of the City.

52) The City is legally responsible for torts that employees of the DANY commit within the scope of their employment and/or under color of law.

## PROCEDURAL HISTORY FROM CONVICTION TO EXONERATION

53) On July 15, 1987, after a jury trial for robbery and murder, David Warren was convicted of one count of Murder in the Second Degree, one count of Robbery in the First Degree, and one count of Robbery in the Second Degree.

54) On August 20, 1987, Warren was sentenced to concurrent terms of fifteen years to life, eight and a third to twenty-five years to life, and five to fifteen years.

55) Warren's conviction was affirmed on June 26, 1990. People v. Warren, 162 A.D.2d 361 (1st Dept. 1990). Leave to appeal was denied at 76 N.Y.2d 897.

56) On April 6, 1992, Warren moved under CPL 440.10(1)(h) to vacate his conviction. The Trial Court denied the motion on June 15, 1992. Leave to appeal was denied on July 6, 1993.

57) Warren petitioned for a writ of habeas corpus on April 24, 1997. His petition was dismissed without prejudice on June 4, 1997. He filed another petition on February 22, 1999, that was denied on grounds of timeliness. Warren v. Garvin, 1999 U.S. Dist. LEXIS 10535. The

Second Circuit affirmed on July 11, 2000. Warren v. Garvin, 219 F.3d 111 (2d. Cir. 2000).

Leave to appeal was denied on October 30, 2000. Warren v. Garvin, 531 U.S. 968 (2000).

58) Warren was paroled on December 19, 2007.

59) On July 17, 2017, Smokes and Warren moved to vacate their convictions and charges under CPL 440.10 on grounds of newly discovered evidence and actual innocence.

60) On June 28, 2018, the People consented to a hearing. The hearing commenced before Judge Stephen Antignani on November 14, 2018, testimony concluded on May 14, 2019, and the last written submission was made on December 20, 2019. After mid-hearing disclosures by the People, the motion was supplemented to include claims of prosecutorial misconduct and constitutional violations.

61) On January 14, 2020, Judge Antignani denied the motion in its entirety.

62) On June 25, 2020, the First Department granted leave to appeal Judge Antignani's decision.

63) In 2022, the DANY's Post-Conviction Justice Unit ("PCJU") commenced a review of the convictions of Smokes and Warren. Smokes and Warren agreed to hold their appeal in abeyance pending the outcome of the review.

64) On October 6, 2023, PCJU Chief Terri Rosenblatt submitted a letter to Judge Antignani in advance of "an anticipated motion" stating that "the People believe that the only legally correct and just outcome is to move to vacate these convictions."

65) On November 15, 2023, Smokes and Warren submitted a motion to vacate their convictions. The People rested on their letter.

66) On January 31, 2024, Judge Antignani vacated the convictions of Smokes and Warren on grounds of newly discovered evidence under CPL 440.10(1)(g) and dismissed their indictment based on an application by the People.

## THE CRIME

67) Just after midnight on January 1, 1987, employees at Ben Benson's at 123 West 52nd Street saw "pandemonium [break] out" outside the restaurant as "twenty or thirty black kids…create[ed] havoc, pushing, knocking people around." Elderly French-tourists Jean and Renee Casse were walking arm in arm towards Times Square. **At some time *before* 12:04 AM**, a black male punched Jean in the face, causing him to fall directly backwards and crack his skull on the sidewalk. Renee did not see the punch but felt Jean's arm slip from her own and fell. When she rose, she saw Jean lying supine on the ground bleeding as a man knelt on top of him, holding his neck and hitting his head on the sidewalk. Renee threw herself over the assailant and pulled at him until he released Jean, reached into Jean's pants, took his wallet, and fled. Renee described him as 6 feet tall and 175 pounds.

68) James Head, a waiter at Ben Benson's, saw Jean fall straight back and land "flush on his head." Head and Gerard Merson, the maître d, rushed outside and chased several males away from the Casse's including a "tall skinny kid." Richard Farrar, another waiter, told investigating officers that he saw a woman in a white coat being accosted.

69) Dan Melkonian and Eloise Yellen saw Jean get punched and reported their observations to the police on January 1st. As he and Yellen walked on 52nd Street, Melkonian saw a group of young people "striking just about anything in their sight," and the woman in the white coat being accosted. Melkonian was directly in line with Jean when he saw the man punch him, causing him to fall directly backward on his head. Melkonian was 5'11" and observed that the puncher was taller than he was and approximately 6'1"-6'2". Yellen also described the puncher as 6'1"-6'2" and said that he was "tall" and "skinny."

70) Head requested assistance in a 911 call that was ***received at* 12:04 AM**. Two EMT's were at 52nd Street and Seventh Avenue when they received the run. They responded, "through heavy

pedestrian traffic," arrived on scene at 12:10 AM, and were there for "[n]o more than three minutes" before transporting Jean to the hospital.

71) Jean died on the morning of the 1st from injuries including a fractured skull and broken neck.

## THE INVESTIGATION

72) No one was apprehended at the scene. The undisputed eyewitnesses (Renee Casse, Melkonian, Yellen, Head, Merson, and Farrar) told police they could not make identifications. The NYPD established a hotline to solicit information and announced that police "desperately need[ed] witnesses…to identify the attacking youth."

73) Detective George Delgrosso was assigned to investigate the crime when he reported to the Midtown North Precinct on January 1st. When Jean Casse died, the case became the first homicide investigation Delgrosso was assigned to lead as a detective. Delgrosso called the case "a loser," claimed there "were no witnesses at the scene," and did not believe the perpetrators would be caught until he met James Walker.

### Tunnel Vision: Delgrosso Meets Walker and Never Looks Back.

74) All NYPD precincts were directed to ask anyone in custody for robbery about the murder. 17-year-old James Walker was a crack addict who had been arrested *at least* five times in 1986, including four times for robbery. At 3 PM on the 2nd, Walker and three accomplices were arrested for attempted robbery on 47th Street in Manhattan. At the Midtown North Precinct, Detective Michael Paccione pressed Walker for information about Casse's murder. Hoping to obtain a deal on his own charges, Walker falsely claimed that, earlier that day at the Albee Square Mall in Brooklyn, someone named "Smokey" said he couldn't go into Manhattan because he thought he "caught a body when the ball fell."[2] Walker reportedly told

---

[2] Throughout his documented accounts, Walker placed this conversation at 11:30 AM, noon, and 12:30 PM.

Detective Delgrosso that Smokey and "other guys" met at the Mall on Thursdays and Fridays to rob people in Manhattan.[3] Paccione and Delgrosso *knew* Walker was looking for a deal and said they would help him *if* he gave them information. Delgrosso "didn't want to tick [Walker] off" because he was "cooperating" and he was "all that [Delgrosso] had to work with." He called Walker "the only lead [police] had," did not check his alibi for Casse's murder, "wasn't interested" in his criminal history, and said there was "no reason" to ask about the crime he was in custody for.

75) By Delgrosso's own admission, he followed Walker's lead to Eric Smokes.

76) Walker did not know "Smokey's" real name, address, or phone number, and there was no NYPD record for anyone known as Smokey. On the 3rd, Delgrosso directed Detectives Paccione and Stephen Bavolar to make Walker look through NYPD files to identify Smokey. Walker didn't find a photo of Smokey, but selected several photos of people he said were "associates" of Smokey, including 16-year-old David Warren (a/k/a "Young"). **Delgrosso first heard Warren's name when Walker said he was Smokey's best friend**.

77) There is no evidence that, as of this point, Walker said that **he** had committed **any** robberies with *either* "Smokey" **or** Warren, nor any reliable evidence that Walker's accomplices in the attempted robbery corroborated what he told police.

78) At 6 PM on the 3rd, officers including Detective Wallace Zeins, supervisor of the Midtown North Detective Squad, had Walker make a controlled call to Warren to surreptitiously elicit "Smokey's" whereabouts. Although Walker told police Smokey said he could not go into Manhattan a day earlier, he repeatedly asked Warren if he and Smokey were going into Manhattan. There was no reference to Smokey's supposed admission or Casse's murder.

---

[3] A memo disclosed in 2023 by the DANY shows that Walker told prosecutors these meetings occurred on Wednesdays and Thursdays. At trial, he testified that they occurred on Thursdays.

79) In another recorded call, an officer called the unpublished number Walker got from Warren and impersonated a phone company employee in an attempt to elicit "Smokey's" address.[4] Ultimately, Zeins and Lieutenant James Cowan, commanding officer of the Midtown North Detective Unit, issued a demand to the phone company for information on the number, which was registered to the mother of 19-year-old Eric Smokes. Although Walker had portrayed Smokes as a prolific robber, Delgrosso found that he had *no criminal record*. In addition, Smokes was gainfully employed and was 5'10", 230 lbs., and stocky, *not* tall or skinny.

[**Exhibit A**: Smokes Arrest Photo].

### Investigators Dismiss the First of an Untold Number of Leads to Alternate Perpetrators.

80) At 9 PM on the 3rd, Detective Richard Chartrand received an anonymous call at the Midtown North Precinct. The caller told Chartrand that he was the lookout during the robbery and murder of Jean Casse, gave Chartrand the name and address of the murderer, Lee Koonce, and said Koonce could be found at the address smoking crack and with Casse's wallet. Chartrand threatened the caller and ***no investigation was conducted into the caller's information***. In 2019, George Delgrosso testified that the caller wasn't credited because he said that only he and Koonce were on the block when the crime occurred and that Casse's "wallet" was stolen when, according to Delgrosso, a "billfold" was stolen. However, Chartrand's DD5 demonstrates that the caller said people were walking in the street when the crime occurred. Several witnesses for the People at trial, including Renee Casse, testified that Jean's "wallet" was stolen. There was no legitimate reason to disregard this significant information that was volunteered to police before Smokes or Warren were even questioned.

---

[4] Neither of these recordings were disclosed until 2023.

81) Later on the 3rd, Detectives Zeins, Paccione, and Bavolar took James Walker to Brooklyn in a surveillance van to locate Smokes. Zeins had issued a report permitting officers to stop Smokes because he "might be involved in a homicide." Around 10 PM, Walker saw Smokes and his girlfriend, Tammie Jenkins. Zeins and Bavolar exited the van in plainclothes, stopped Smokes at gunpoint, ordered Jenkins to leave, and took Smokes to the 75th Precinct to be interrogated.

82) **When Smokes was taken for interrogation, there was *no* information even allegedly connecting Warren to Casse's murder. The *only* information police had concerning Warren was that he was Smokes' best friend**.

83) At the precinct, Delgrosso took a Polaroid of Smokes without his permission to display for identification. **Delgrosso had never spoken with Smokes but had *already* concluded he was either responsible for Casse's murder or "running off at the mouth."** (emphasis added). Delgrosso had accepted Walker's uncorroborated information **as fact**.

84) With assistance from Zeins, Officer John Bane, and others, Delgrosso interrogated Smokes without counsel or <u>Miranda</u> warnings. Smokes had never been interrogated before. He told the police that he was in Manhattan on New Year's with Warren, Niles Williams, Barry Hall, Todd Carson, and Michael Berry, and that they were together the entire time they were in Manhattan, never went above 48th Street and did not commit any crimes. Delgrosso had not mentioned where Casse was attacked before Smokes said this.

85) Delgrosso made Smokes give him Warren's address. At Zeins' direction, Bane drafted a baseless report stating that Warren was a possible perpetrator of Casse's murder and authorizing police to pick him up. Delgrosso left Smokes with Zeins and other officers and went with Bane to take Warren in for interrogation.

86) Delgrosso knew that Warren was 16. He and Bane arrived at Warren's home after midnight on the 4th and, without informing his mother that they wanted to interrogate her son about a murder, told her they needed to take him to the precinct.[5] After separating Warren from his mother, Delgrosso and Bane frisked him. Warren was 5'8" and 140 pounds.

87) Delgrosso told Warren that Smokes was at the precinct making statements and urged him to do the same. Then, he and other officers interrogated Warren without reading him Miranda warnings. Delgrosso knew that Warren had counsel on a pending charge. Indeed, the photo selected by Walker was a mug shot from Warren's arrest. Delgrosso did not inform Warren's counsel that he was being interrogated. **Warren *independently* gave Delgrosso an account of who he was with and where he went in Manhattan on New Year's that *matched* what Smokes said earlier.** Delgrosso falsely told Warren that police already had information connecting him to Casse's robbery and murder and "knew it would be true," that his photo would be shown to witnesses and "after he was identified" he would be arrested, but if he cooperated, even if he was identified, Delgrosso would speak to a prosecutor for him. Warren had never been interrogated before. **Faced with an ultimatum that would have made an isolated and guilty teenager confess, *Warren maintained that he and Smokes were innocent*.**

88) *Smokes also maintained that he and Warren were innocent*. However, to put an end to the interrogation, he offered Zeins and Delgrosso hearsay information that someone he knew as "I.B." had committed a robbery.

89) Smokes and Warren were released on the morning of the 4th after Smokes' father arrived at the precinct. Their interrogations were not recorded and neither teenager endorsed the

---

[5] At Warren's apartment, Delgrosso also questioned Niles Williams. Williams was wary of police and initially told Delgrosso he was home on New Year's, then acknowledged he was in Manhattan.

statements Delgrosso attributed to him. Delgrosso destroyed the notes he took during the interrogations. Although his DD5's purport to be transcribed accounts of the interrogations, he typed them from memory at some later point.

90) At some point on the 3rd, Detectives Delgrosso and Chartrand visited the Medical Examiner's Office and Chartrand conferred with ADA Cyrus Vance.

91) On January 6th, Detectives Delgrosso and James Kennedy went to 222 Throop Avenue in Brooklyn in response to a tip about Casse's murder. The source and substance of the tip was not documented and the tip itself was not revealed until 2018 when the detectives' memo books were disclosed to Smokes and Warren. [**Exhibit B**: Delgrosso and Kennedy Memo Books]. Kennedy's memo book did not include any entry concerning the tip. Delgrosso's included only the time and date of their response to the tip.

92) On the 7th, Detective Rudolph Stubbs documented information he supposedly received by phone from "an individual identifying herself as Sheila Moody." [**Exhibit C**: DD5 #22]. Moody reportedly told Stubbs that her son, Robert Anthony, "mentioned" Casse's murder to her and "told her that he looked down at the body" but indicated he was not involved.

93) Delgrosso's 2019 testimony revealed that Stubbs and Moody were dating. In 2023, Delgrosso told the PCJU that this "should be in his DD5." However, the information was not in Stubbs' DD5 and Delgrosso did not make a DD5 documenting how Anthony came to be considered a witness. Delgrosso told the PCJU that one reason Anthony "was identified as a person of interest" was that Moody found newspaper clippings related to the crime in his bedroom. This information was not disclosed in 1987.[6]

---

[6] Delgrosso conveyed information to Robert Jackall that he and the People suppressed from Smokes and Warren. In 2005, Jackall published "Street Stories: The World of Police Detectives," based on "years of fieldwork with the

**Investigators Create the First False Identification Witnesses.**

94) After meeting Walker, Delgrosso never considered a scenario of Casse's robbery and murder than did not include the involvement of Smokes and Warren. At the pretrial hearing, Delgrosso claimed he was trying to verify James Walker's information on January 8th. This was not true. **He had already decided that Eric and David were guilty.** Moving forward, Delgrosso, his colleagues, and prosecutors would suppress and/or disregard information that did not fit this conclusion. Having permitted Walker to steer the investigation towards Smokes and—by extension—Warren, Delgrosso still needed witnesses to directly inculpate them in the crime. On January 8, 1987, Delgrosso, other officers and, indeed, prosecutors, **created** witnesses through evidence feeding, coercion, and incentivization. They confronted young men with their pre-determined conclusion that Smokes and Warren committed the crime, which they claimed to know for certain. During unrecorded interrogations, **young men of color were forced to *become* false witnesses against Smokes and Warren because investigators made them believe that if they refused, *they* would be charged with Casse's murder**.

95) On the night of January 7th, Detective Zeins informed Detective Kennedy that a "prospective witness," 16-year-old Robert Anthony, was in custody at the Midtown North Precinct. Kennedy was called in to interrogate Anthony. He had received a stack of twenty-five photos of "potential perpetrators" from Delgrosso. The stack included photos of Smokes, Warren,

---

[NYPD] and [DANY]." Chapter three, "When the Ball Fell," purports to be an account of the investigation into Casse's murder and the prosecution of Smokes and Warren. Jackall acknowledged Delgrosso and Susan Axelrod in the book and said that Axelrod let him use her copy of the trial transcript. Jackall wrote that Anthony's mother was dating a detective and found news clippings about Casse's murder in Anthony's room. Smokes and Warren didn't learn that this information was factual until Delgrosso's 2019 testimony and 2023 statements to the PCJU, respectively. Jackall also wrote that Delgrosso told Detective Harry Bridgwood to look into the file for Casse's murder during the investigation that resulted in Jerry Sanders' 1989 conviction for murder. In 2023, the PCJU found previously undisclosed evidence that was exculpatory to Smokes and Warren in the DANY file for Sanders' case.

people Walker had identified as "associates" of Smokes, and people who were arrested for crimes in Manhattan on New Year's Eve and Day. The photos included mugshots and Polaroids, such as the Polaroid Delgrosso took of Smokes and Polaroids that Kennedy and other officers took of people in custody on the 1st for robberies and muggings. There was no attempt to make the "array" non-suggestive before it was shown and Delgrosso had written "Smokey" on Smokes' photo. [**Exhibit D**: Polaroid of Smokes (front and back)].

96) At or around midnight on the 8th, Delgrosso and Kennedy began to interrogate Anthony without counsel or <u>Miranda</u> warnings. Casse's murder wasn't referenced until Anthony was isolated at the precinct. Before the detectives wrote anything down, they fed Anthony information from actual witnesses, the news, and Walker. *They told Anthony* "[a]bout the mall" and people going there to commit robberies. The detectives separated the photos of Smokes and Warren from the stack and told Anthony that they were known for committing crimes like the robbery and murder of Casse, hence why the police had their photos. The detectives told Anthony that Smokes and Warren had already been implicated in the murder, and they *knew* that Anthony was present during the crime. Anthony repeatedly told them that he didn't witness the crime and wanted to go home. In response, they threatened to charge him for "withholding evidence." While pressing Anthony to make false identifications, the detectives threatened to show his photo to witnesses and to charge him with Casse's murder. **The message was clear: help us frame these guys or we'll frame you. It was so clear that Anthony remembered it three decades later when he testified that the detectives "just wanted to frame anybody."** (emphasis added).

97) Anthony named people he was with in Manhattan on New Year's *to prove he was innocent of Casse's murder*, **not** to support any eyewitness account of the crime. The people included his

teenaged cousins Alfonso and Andre Houston ("the Houston brothers"), and neighbor Tyrone Bess, who lived in adjoining buildings in Brooklyn's Fort Greene Projects.

98) Anthony's unadulterated statements to the police on the 8th demonstrate that **they told him Warren's name** *and* the information from Richard Farrar and Dan Melkonian about the woman in the white coat. Furthermore, Anthony was at 47th Street and Seventh Avenue ***at midnight***, making it essentially impossible for him to have seen Casse's murder five crowded City blocks away *within* the next four minutes. [**Exhibit E**: Robert Anthony Notes].

99) While Anthony was isolated at the precinct, coerced, and fed information by Kennedy and other officers, Detectives Delgrosso and Thomas Cruthers went to pick up the Houston brothers and Bess. Delgrosso and Cruthers told these young men that they were being brought in to verify Anthony's alibi. However, once at the precinct, like Anthony, they were interrogated as suspects, coerced, fed information, and told to make identifications or be charged with murder. The detectives interrogated them without counsel or Miranda warnings. Like Anthony, each of them initially said that they did not see Casse's robbery or murder before they were fed information, coerced, and incentivized. The detectives told each of them that the others were already making identifications and statements and urged them to do the same or be charged. Bess was offered deals on his pending charges. Although he was represented, the detectives refused his requests for counsel. In 2023, Delgrosso admitted telling Anthony, Bess, and the Houston brothers that if they had committed any robberies, they should tell the detectives so they could "take care of it."

100)    At the same time, Anthony was told that Bess and his cousins were at the precinct but had contradicted his alibi, given eyewitness accounts of the murder, and made identifications. The detectives told Anthony that if he didn't do the same he would be charged with murder.

101)    In 1987, *Kennedy testified that he may have told **all** these young men that they **were** suspects in Casse's murder and believed he **did** say this to Anthony*.

102)    Delgrosso's account of how willing the young men were to "cooperate" altered substantially from 1987 through 2023.

- In 1987, he testified that Bess was "evasive" during the display of photos, but not when he viewed lineups later that day, and that he was the only "evasive" witness on the 8th.

- In 2019, he testified that Anthony initially denied witnessing Casse's robbery or murder but he didn't believe him.

- In 2023, he admitted that **all** the young men initially denied witnessing Casse's robbery or murder. He said "[i]t was very typical for kids to come in and change their stories" but *"[w]hen they're confronted with the fact that someone else told the cops they were there, they talk…they're trying to make an excuse or **keep themselves out of the homicide.**"* [**Exhibit F**: Notes of Delgrosso PCJU Interview (emphasis added)].

103)    *There is no credible evidence that **anyone** told the police that the Houston brothers or Bess were present for Casse's robbery or murder before detectives confronted them with this "fact."*

104)    After the police threatened them with murder charges, Anthony and the Houston brothers signed false statements written by Kennedy and made false photo identifications. In 1987: Kennedy testified that ***he believed** he told Anthony he **was a suspect** in Casse's murder*; Andre Houston testified that Kennedy told him he ***was** a suspect** in the murder; and Alfonso Houston testified that Delgrosso told him that *he* could be charged with the murder ***if he didn't select a photo*** and Kennedy told him he *and* his brother could be charged ***if he didn't select a photo***. *None* of this testimony was controverted. **False witnesses against Smokes and Warren were *created* through evidence feeding, coercion, incentivization *and* the suppression of evidence demonstrating the extent of that misconduct.** Andre Houston was learning disabled and could not read the statement Kennedy attributed to him. Anthony

falsely identified Smokes and Warren, and both Houston brothers falsely identified Smokes and Robert Moore.

105)    There is no credible evidence that Bess identified any photo. Furthermore, he refused to sign the statement attributed to him by Kennedy and invoked counsel. At the pretrial hearing, Kennedy produced *one* statement for each of the young men interrogated on the 8th. The statement Kennedy attributed to Bess was headed 8:10 AM and signed by Kennedy but *not* Bess. This statement referenced "Smokey" and being on "the block where the old man got hit." At trial, Delgrosso testified that Bess gave a (single) statement. In 2019, the DANY disclosed a statement *written **and** signed by Bess at 7 AM on the 8th*. That statement contradicted the one Kennedy wrote for Bess over an hour later and demonstrated, in contrast with the 1987 police testimony, that Bess did *not* say he was a witness to Casse's robbery or murder. The disparity between the signed and unsigned statements made apparent that the January 8th statements disclosed by the People were crafted by police. Anthony's unadulterated statements, disclosed in 2023, made this further apparent. [Exhibit E].

106)    All the information in the January 8th statements written by Kennedy and disclosed by the People in 1987 was known or believed to be true by police before they were written.

107)    Just after 7 AM, Delgrosso and Cruthers went to bring Smokes, Warren, and Robert Moore to the precinct for lineups. Smokes was picked up at home around 8:30 AM and brought to Automotive High School, where he was made to watch as the detectives picked up Warren at or about 9:30 AM.[7] On the way to the precinct, the detectives told Smokes and Warren to take a good look at their neighborhood because they wouldn't see it again for a long time. Warren was told that Smokes was already giving information and he should do the

---

[7] Smokes had $6.00 when he was picked up and Warren had $5.60 and a friendship ring Smokes had given him that was taken by the detectives.

same. Smokes was told the same of Warren. At the precinct, video equipment was set up so

that ADAs Michael Goldstein and David Drucker could take statements, but *neither Smokes*

*nor Warren wavered in their innocence*. [**Exhibit G**: Smokes Video Cover Sheet].

108)    Goldstein and Drucker were present for lineups. They questioned the viewing witnesses

and Moore. Kennedy and Eloise Yellen testified that Goldstein was at the precinct on the 8th.

In 2019, despite testifying that "some people" identified Moore from photos but "said

otherwise" at lineups, as well as what witnesses said, "by the time of lineups," Goldstein

denied being present for lineups. In 2022 he admitted he "maybe saw some lineups."

109)    Moore was picked up that afternoon. He had been arrested in Manhattan on the 1st for

what police and prosecutors called a "wolfpack robbery." When Moore was interrogated, he

denied going above 49th Street on New Year's. However, Goldstein's notes reflect that

Darnell Jones, who was arrested with Moore, contradicted this claim. Neither the fact that

Moore was contradicted by Jones, nor his statements to Goldstein and Drucker, were

disclosed until 2019.

110)    Lineups were held just hours after the display of photos. None of the viewing witnesses

left police custody in the interim and none of the subjects were allowed counsel. Detectives

were in the viewing room with each youth coercing them during the lineups.

111)    Warren's lineup reportedly began at 1:20 PM. The filler next to Warren was at least an

inch taller and seventy-five pounds heavier than him. Although Robert Anthony was the *only*

person who identified Warren from the twenty-five photos shown earlier that day,

*investigators made the Houston brothers and Bess view Warren's lineup*. All four young men

reportedly took three minutes or less to view the lineup. Anthony *and the Houston brothers*

falsely identified Warren.

112)    Moore's lineup reportedly began at 2:15 PM and was viewed by all four young men within fifteen minutes. The Houston brothers identified Moore. Delgrosso reported that Bess identified Moore.

113)    Smokes' lineup reportedly began at 5 PM and was the only lineup viewed by anyone other than Anthony, Bess, and the Houston brothers. Although Eloise Yellen told Detectives Delgrosso and Chartrand that she could not make an identification, investigators had her view the Smokes lineup. *She did not recognize anyone*. The fillers in the lineup were, on average, seventy-one pounds lighter than Smokes. Anthony and the Houston brothers falsely identified Smokes. Delgrosso reported that Bess identified Smokes.

114)    There is no credible evidence that Bess identified anyone as a perpetrator, nor any documentation regarding the substance of his reported lineup identifications. Bess never testified in support of the statement or identifications attributed to him by police and prosecutors. He died in 1993. In 2022, his mother told the PCJU that: after Bess and the Houston brothers were picked up, she called to find out what was going on and was told that they were not suspects, just witnesses; the police told Bess that *if he identified someone*, they would have his open cases dropped and "kept offering him deals"; Bess told police that he did *not* see Smokes on New Year's; and, Bess had an attorney named Lee Jacobsen.

115)    Anthony, Bess, and the Houston brothers were released after lineups, served with Grand Jury subpoenas, and told they would be arrested if they didn't appear. Anthony was held at the precinct for *over eighteen hours*. Bess and the Houston brothers were held for *over twelve hours*. Delgrosso told them that they could discuss their identifications, and Anthony and the Houston brothers later acknowledged having done so.

116)     Smokes, Warren, and Moore were formally arrested after lineups. Newspapers published

their names and home addresses after their arrests. Smokes and Warren were imprisoned on

Riker's Island through their trial.

117)     On January 11th, Lee Jacobson directed prosecutors not to speak with Bess.

118)     The evidence against Smokes, Warren, and Moore was presented to a Grand Jury by

ADA Goldstein with the assistance of ADA Drucker beginning on January 12th.

119)     Robert Anthony testified that *after midnight* he and his companions "[w]alked *up towards*

*47th Street*."[8] (emphasis added). After Goldstein directed him to 52nd Street and specifically

asked what he saw happen to an elderly man there, Anthony said, "I seen an old man falling

down, hit his head *on the concrete wall*…and I seen another guy, *number one*, he was

walking away." (emphasis added). Smokes was number one in his lineup. Anthony testified

that the person he identified in the first lineup he viewed (Warren) went through Jean Casse's

"raincoat" and took his "wallet." Although he had purportedly referred to Smokes as "Eric"

in a statement four days earlier, Anthony *never* referred to Smokes *or* Warren by name

throughout his 1987 testimony. Casse *did not* hit his head on a concrete wall. However, on

January 2nd, *The Daily News* reported that Casse struck his head on "the concrete" and, at

trial, Anthony acknowledged reading about the murder in the paper *on the 2nd*. The People

concealed that Anthony's mother found news clippings about the murder in his bedroom.

120)     Andre Houston testified that he was "[i]n Times Square" at midnight and then walked

uptown before the following exchange:

**Goldstein:** "When you got to 52nd Street between 6th and 7th Avenues did you see
something happen?"

**Andre:** "Yes."

---

[8] The Grand Jury transcript is incorporated herein by reference.

**Goldstein:** "What did you see?"

**Andre:** "We seen a guy I know by the name 'Catfish,' he swung at a man, an old man."

**Goldstein:** "This guy you know, is he a big guy?"

**Andre:** "Yes."

**Goldstein:** "Do you also know him as 'E'?"

**Andre:** "Yes."

**Goldstein:** "What happened after you saw him take a swing?"

**Andre:** "He left, the old man fell."

121)    Andre claimed that he saw "[a]bout three" people going through Casse's pockets but couldn't tell if they took anything. He said he recognized them in the first two lineups he viewed. Asked where he knew "Catfish" from, Andre replied, "I seen him [at] Albee Square Mall and sometimes in my old schoolyard" but said he did not recognize anyone else at the scene from before that night.[9]

122)    Alfonso Houston did not say where he was at midnight but testified that he walked uptown after the ball dropped. Goldstein then asked him, just as he had asked his brother, "[w]hen you got to 52nd Street between 6th and 7th Avenue, did you see something happen?" Alfonso replied, "we were walking up that block and I seen the old man and the lady who was with him *come out*…and *the guy* walked up and hit him like a closed fist…and he just, he just fell." (emphasis added). Alfonso testified that after Casse fell, he saw three or four guys going through his pockets, and one of them took something but he couldn't tell what. Alfonso didn't use any names for the people he identified in his January 8th statement or the

---

[9] At trial in July, Andre gave no indication that he knew Smokes as "E" *or* from the Albee Square Mall.

Grand Jury, but claimed he recognized them *all* from having *seen* them "a number of times" at the Albee Square Mall. The Casse's were *not* inside Ben Benson's.

123)    James Walker testified on January 13th, ostensibly having waived immunity based *solely* on a promise that he would be paroled *during the pendency* of his prosecution for attempted robbery. The Grand Jury was led to believe that Walker's testimony might be used against him in relation to Casse's murder and other crimes. In truth, Walker was secretly promised that he would be released after his Grand Jury testimony and the People would recommend that he be sentenced to probation in full satisfaction of his pending charges in exchange for his testimony against the defendants *if* he was not arrested again. All three of Walker's accomplices in the January 2nd attempted robbery served years in prison for the crime. Although his written cooperation agreement purported to encompass his Grand Jury testimony, it was not signed until January 16th.[10] The extent of the consideration Walker received from the People, and the fact that he violated his deal without any consequences, were not revealed until 2023.

124)    Although Walker was incarcerated, ADA Goldstein told the Grand Jury that "for reasons [he couldn't] really go into," Walker could not testify the next day. Upon information and belief, Goldstein knew that Walker was experiencing withdrawal.

125)    Walker testified that he knew "Smokey" and "Young" (Warren) from the Albee Square Mall and, specifically, "[f]rom doing robberies" in Midtown Manhattan. Although Detective Delgrosso's DD5 regarding his contact with Walker provided no indication that he claimed to have committed robberies *even with Smokes*, Walker testified that he had committed "a

---

[10] Walker's agreement was signed by Walker, his attorney, and ADAs Goldstein and Drucker.

number" of robberies with *both* defendants during which Smokes would either punch the victim or put them in a headlock and Walker or Warren would then go through their pockets.

126)     Walker testified that he had not seen Smokes or Warren on New Year's, and the next time he saw them after New Year's was on January 2nd at the Albee Square Mall at 11:30 AM or 12 PM. Walker said he had "a short conversation" with Smokes during which Smokes asked if he was going to Manhattan "to get some money." Walker said he was and asked if Smokes was also going, and Smokes said he was not. Walker claimed he asked why and that Smokes responded, "because I think I caught a body," meaning, "[h]e killed somebody." Walker gave *no* indication that anyone other than himself, Smokes, or Warren were present for this conversation.

127)     Detective Delgrosso testified about the lineups and the statements he attributed to Smokes and Warren. He acknowledged that both Smokes and Warren told him they were with the same people in Manhattan on New Year's. However, when the Grand Jury *specifically* inquired about whether Delgrosso had asked Smokes or Warren, *or* whether they had told him, that they were with those same people the entire time they were in Manhattan, Delgrosso replied, "[n]o, I didn't." He referred to this testimony as "a mistake" in 2019.

128)     On January 13th, Kevin Burns was arrested with several guns. Burns was from the same neighborhood as Smokes and Warren. In the summer of 1986 Burns attempted to shoot a man named Kelly Macon and accidentally shot Smokes. This started a feud between Smokes and Burns during which they had several fights before Smokes' arrest. Once in custody, Burns was identified as the perpetrator of a robbery. When the police told him he had been identified, they noted that he was from the same projects as Warren and referenced Casse's murder. Burns knew that Smokes and Warren had been arrested for the crime.

129)    By the 14th, Burns falsely claimed that he was a witness to Casse's murder. In the hope of

obtaining leniency on his own charges in exchange for information, he told Detective Joseph

Salta that he knew Smokes and Warren had been arrested but that "many others were

present." Burns identified Anthony "Guy Tony" Williams and Jerry "Drac" Sanders as

having been on 52nd Street when Casse was attacked and told Salta that Sanders was walking

around hitting people with a plastic bat.

130)    On January 14th, Robert Anthony was arrested in Manhattan for check fraud. While he

was in custody, Detective Kennedy visited him and they discussed the Casse case. No

assistance to Anthony was disclosed in 1987. In 2023, he said that police and/or prosecutors

"helped [him] out because of a check thing."

131)    Detective Salta reported Kevin Burns' claims to Detective Chartrand. Chartrand

inaccurately documented the information in a memo to Detective Delgrosso that Delgrosso

did not review for weeks. Chartrand wrote that Burns told Salta that Sanders hit *Casse* with a

plastic bat. At trial, Burns acknowledged telling Salta that Sanders was hitting people with a

plastic bat but testified that he was "positive" he did *not* say Sanders hit *Casse*. Chartrand

erroneously concluded that Burns was a friend of Smokes providing false information to help

Smokes. He sought to bury what he thought was information favorable to Smokes. He never

spoke to Burns and never called Salta back although he said he would.

132)    In a January 15th Voluntary Disclosure Form ("VDF") ADA Goldstein falsely

represented that *four* witnesses had identified Smokes *and* Warren from lineups and would

identify them at trial. Only three people (Anthony and the Houston brothers) identified

Smokes and Warren from lineups as alleged perpetrators. [**Exhibit H**: VDF]. **Tyrone Bess**

***never* identified Warren**, gave *no indication* that he recognized Smokes *as a perpetrator*, and never testified in support of the identifications attributed to him. Goldstein knew this.

133)    On January 16th, Goldstein appeared as the ADA on James Walker's Manhattan case.

134)    On January 17th, Delgrosso and Chartrand questioned Niles Williams. Williams corroborated the information given by Smokes and Warren on January 3rd-4th and provided contact information for Todd Carson and Michael Berry. Delgrosso told Williams he was investigating a murder and that Smokes and Warren "were identified as being on the street by witnesses." Although the detectives threatened to arrest Williams for murder, he maintained his account and even agreed to go to the DANY and speak with prosecutors.

135)    Also on the 17th, Delgrosso and Chartrand questioned Patrick Denson and Reginald Grant, two of at least seven people named by Anthony, Bess, and/or the Houston brothers as members of the group they were with on New Year's. Unlike Anthony and the Houston brothers, Grant was questioned by phone and Denson was questioned in his home. Both said they did not witness the attack or robbery of Casse. Denson was later questioned at the DANY by prosecutors and repeated this information.

136)    On January 20th, an informant reported that Ian Woodson was involved in Casse's murder. The tip was documented in notes by Delgrosso that were not disclosed until 2018. At trial, Delgrosso testified that he showed photos to Woodson without mentioning that he had also received a tip implicating him in the murder. In 2023, the PCJU disclosed evidence that Stephanie Graham informed police that Woodson, Arthur "Pig" Luckey, and Jerry Sanders were involved in Casse's murder.[11]

---

[11] Upon information and belief, Graham was the mother of Larone "Abgod" Graham, the leader of a gang from Brooklyn's Pink Houses that specialized in robbery. United States v. Graham, 691 F.3d 153 (2d. Cir. 2012)("Graham was the leader of a group of violent robbers associated with the Louis H. Pink Houses...a public

137)     Smokes and Warren were indicted on January 21st. They were arraigned, denied bail, and
remanded to Riker's Island on the 21st or 22nd.

138)     Although the evidence against Robert Moore was equal to that against Warren, ADA
Goldstein did not ask the Grand Jury to vote with respect to Moore. In 2019, Goldstein
testified, "[t]here were discussions between myself and other people in the bureau…and we
concluded that we didn't feel there was sufficient evidence to prove [Moore's] guilt in a
manner that would warrant him going to trial." Goldstein and his second-chair at trial, Susan
Axelrod, attempted to induce Moore to testify against Smokes and Warren even after he told
them he had no relevant information. Smokes and Warren were unaware that the Grand Jury
wasn't asked to indict Moore until the 2019 hearing testimony, during which Goldstein
denied attempting to have Moore cooperate against them but Axelrod acknowledged that
Moore was "maybe" one of the "witnesses" she and Goldstein spoke with together. In 2022,
Goldstein said he "maybe talked to Moore about being a witness."

139)     Documents disclosed in 2019 demonstrate that the People adjourned the case against
Moore until at least March 25th, and that the charges against Moore were dismissed without
prejudice but not sealed at Goldstein's request.

140)     On February 2nd, Niles Williams visited the DANY, spoke with ADAs Goldstein and
Drucker, and corroborated the defendants' innocence.

141)     On February 23rd, James Walker was arrested in Brooklyn for possession and sale of
marijuana in violation of his deal with the DANY.

---

housing project in Brooklyn…The group, which was sometimes known as the "Pink Houses Group," carried out
robberies…[a]fter Graham's henchmen completed the robberies, they would often gather in the parking lot of the
Pink Houses and distribute the loot amongst themselves and to Graham, their leader.").

142)   In a March 24th, response to Warren's omnibus motion, Goldstein falsely represented that he knew of **no** exculpatory evidence. [**Exhibit I**: People's Omnibus Responses].

143)   This representations was *knowingly* false. Goldstein and other DANY prosecutors knew, *inter alia*, that: neither defendant matched the credible eyewitness descriptions of the perpetrators; James Walker was a mentally disabled crack addict who received more consideration than was revealed to the Grand Jury and was *not* at risk of prosecution as Goldstein led the jurors to believe; one of the four alleged identification witnesses refused to testify to the identifications and statement attributed to him despite a subpoena and threats of arrest; the January 8th statements and identifications were generated by misconduct; the witnesses on the 8th were offered deals and threatened with charges *before* making *any* identifications; Andre Houston was learning disabled and schizophrenic; the first identification witness to come to the attention of police was reported by his mother through her detective boyfriend after she found news clippings about Casse's murder in his bedroom; Smokes' nickname was written on the photo displayed by police; Warren's name was told to witnesses; police and/or prosecutors had received information implicating *at least* four alternate perpetrators; and Patrick Denson and Reginald Grant contradicted the statements attributed to the young men on the 8th.

144)   On April 8th, Judge Harold Rothwax directed the People to disclose any evidence of "mis-identifications" and the defense served notice and contact information for alibi witnesses Niles Williams, Todd Carson, Barry Hall, and Michael Berry. Williams, Hall, and Berry corroborated the defendants' innocence to police and/or prosecutors before trial.[12]

---

[12] Carson was away at college but was made available to the People at trial.

145)     On April 10th, James Walker violated his deal again when he was arrested for robbery, assault, and possession of stolen property. On the 13th, a warrant was issued for him in New York County related to a 1986 charge. The People had this warrant vacated.

146)     On May 11th, the DANY subpoenaed all of Niles Williams' school records and "relevant family information."

147)     On May 18th, Detective Kennedy took Michael Berry to the DANY for interrogation. Kennedy and others attempted to coerce Berry into contradicting the defendants' accounts and did not preserve his statements when he instead corroborated their innocence.

148)     On May 19th, Walker was taken to the DANY from Riker's Island to further prepare his account and then released by the People.

**Despite Recognizing "A Lot Of" Problems with the People's Case, ADA Goldstein Suppresses Information and Proceeds with a Malicious Prosecution Based on Fabricated Evidence.**

149)     On May 20th, Goldstein wrote a confidential memo to John Fried, Chief of the Trial Division. He wrote that the People's "main witnesses" were "*three youths* who were at the scene of the incident and identified both defendants in a line-up" but that their "Grand Jury testimony, **particularly with respect to [Warren]**…is *contradicted and impeached by [their] prior statements*…**two of the three witnesses failed to identify Warren (whom they *said they knew*) from photographs shown prior to the lineups**. These witnesses all have criminal records and are extremely uncooperative."[13] Goldstein wrote that Walker had committed "numerous robberies" with the defendants and "[i]n *each* of these robberies *the same method of operation employed in the instant case* was used." [**Exhibit J**: Fried Memo (emphasis added)]. Goldstein's memo demonstrates that, despite his prior written

---

[13] In 2019 testimony, Goldstein claimed that he did not recognize *any* issues with the Grand Jury testimony.

representations, he *knew* of exculpatory evidence *and* that Tyrone Bess was not a witness to Casse's robbery or murder.

150)    In another confidential memo headed "This Case Has a Lot of Problems," Goldstein wrote, *inter alia*, that: the statements attributed to the defendants by Delgrosso were "not going to survive a <u>Huntley</u> hearing without a struggle and…may be viewed with distrust by a jury" since they were picked up late and kept at the precinct for several hours and "there is no question they were prime suspects at the time"; and, "[a]ssuming we can get Walker to testify truthfully…and assuming a judge lets it in…it will show…the inadmissible but unavoidable fact that [the defendants] are bad guys." [**Exhibit K**: "Problems" Memo]. These memoranda by Goldstein were not disclosed until 2018.

151)    On May 21st, Detective Kennedy attempted to coerce Barry Hall into contradicting the defendants' alibi. Hall's adult relatives intervened, and he gave Kennedy a statement corroborating the defendants' innocence that was suppressed until 2018.

152)    Goldstein obtained an order to produce Darryl McDuffy to the DANY based on Detective Delgrosso's claim that he possessed material information relevant to Casse's murder. This claim was based on information from James Walker. Delgrosso produced McDuffy to the DANY on June 2nd but, when he contradicted Walker, his statements were suppressed. Goldstein's notes concerning McDuffy, disclosed in 2019, state, "got us nowhere."

153)    On June 4th, Delgrosso produced Terrell Davis to the DANY based on an order obtained by Goldstein. Davis was interrogated by Delgrosso and Goldstein, told that both defendants had implicated him in Casse's murder, and urged to provide information against them. Davis refused to falsely accuse the defendants and Goldstein and Delgrosso threatened to charge him with Casse's murder.

154) On or about the 4th, Goldstein obtained material witness orders to compel Walker, Anthony, and the Houston brothers to appear at trial, representing that each of them had told him and Delgrosso they did not wish to be involved in the defendants' prosecution and would resist any efforts to be subpoenaed. In 2022, Goldstein told the PCJU that "they wouldn't have come in without the orders." Goldstein didn't even seek an order for Tyrone Bess.

155) On June 3rd, Delgrosso requested the criminal records for Jerry Sanders, Kevin Burns, and Brandon Holmes. Goldstein obtained orders to produce Burns and Holmes claiming that they possessed material information relevant to Casse's murder.

156) On June 11th, Delgrosso produced 15-year-old Holmes from Spofford Juvenile Detention Center to the DANY. Although Holmes had pending cases including a felony, Delgrosso and ADA Axelrod interrogated him without counsel or Miranda warnings. Delgrosso told Holmes that investigators had been informed that Sanders hit Casse and then Holmes robbed him. Delgrosso became so aggressive that Holmes thought he might physically assault him but he told Delgrosso and Axelrod that their information was false. The consideration of Sanders and Holmes as perpetrators, and the fact that both were interrogated about Casse's murder, was suppressed from Smokes and Warren.[14]

**Police and Prosecutors Create Another False Identification Witness.**

157) Delgrosso also produced Kevin Burns to the DANY for interrogation on the 11th. Burns was interrogated by Delgrosso and Axelrod. Delgrosso wrote a statement for Burns claiming, *inter alia*, that: he went to Manhattan on New Year's Eve with his wife Sabrina (Gardner) and her friend Tracy; they saw the defendants, Jerry Sanders, and "Guy Tony" at 48th Street

---

[14] In 2018, ADA Christine Keenan falsely claimed that the People's consideration of Holmes was disclosed in 1987 because the People referred to "Guy Tony." Keenan *knew* that Holmes and "Guy Tony" Williams were different people. Documents *in her possession* reflected distinct criminal records and pedigree information for them.

and Broadway at 11:30 PM; thirty minutes later he saw Guy Tony hit an old man with a plastic horn and Smokes grab at the man's pockets; he couldn't remember what street this was on but claimed he saw other people getting robbed including a woman in a white coat whose chain was pulled off; after he saw Williams hit the man and Smokes grab at his pockets, he saw Williams, Smokes, and Warren run through a passage way to the next block because police were approaching; as Burns, his wife, and Tracy walked away, Michael Berry pretended he was with them so the police wouldn't grab him; and after he returned to Brooklyn, he saw Warren's brother and Niles Williams, and spoke with them about what he saw. Burns told Delgrosso and Axelrod that George Samuels was with him at the scene and gave them Samuels' contact information. Delgrosso then requested Samuels' criminal record. [**Exhibit L**: 6/11/87 Delgrosso Scratch and Samuels Records Request].

158)    The file jacket for James Walker's attempted robbery prosecution reflects that he failed to appear on June 15th but that Judge Carol Berkman stayed a bench warrant because of his "agreement" with the People and told the prosecutor to come to her if Walker stopped cooperating and she would issue a warrant.

159)    On the 16th, Delgrosso took Burns from Riker's Island again.

160)    On the 17th, Delgrosso produced Burns to the DANY again based on an order obtained by ADA Goldstein. He also produced George Samuels "because [Goldstein] wanted to speak with him." Samuels and Burns were interrogated by Goldstein and Delgrosso. Burns now said he was *on 52nd Street* with his wife (Sabrina Gardner), her friend Tracy, and Samuels, among others. He gave the ages of his brother, Thomas Chavis, and cousin, Anthony Fields, both of whom he said were also with him in Manhattan, as well as a phone number for Chavis. [**Exhibit M**: 6/17/87 Delgrosso Scratch]. Samuels told Delgrosso and Goldstein that

Burns was lying to them, and they were *not* present for Casse's robbery or murder. Goldstein and Delgrosso took notes while interrogating Samuels, but their notes were withheld.

**The Pre-Trial Hearing: Police and Prosecutors Secure the Admission of False and Unreliable Evidence Through Misrepresentation, Testi-Lying, and Suppression.**

161)    Pretrial hearings commenced before Judge Clifford Scott on June 25th. The People had only disclosed the autopsy report and the DD5's of the statements Delgrosso attributed to the defendants. Before Detective Zeins testified, *Goldstein claimed that memo book entries were irrelevant to the proceedings.*[15]

162)    On June 29th, Delgrosso produced Samuels to the DANY based on another order obtained by Goldstein. Samuels was interrogated by Goldstein and Delgrosso and *again* told them Burns was lying. The fact that Samuels contradicted Burns was first learned by Smokes and Warren in 2022.

163)    On June 30th, Delgrosso requested the criminal record of Burns' brother Thomas Chavis and produced Burns to the DANY for *at least* the fifth time in twenty days. Burns was interrogated by Delgrosso and ADAs Goldstein and Axelrod. Goldstein discussed Burns' pending charges and both prosecutors threatened him with additional charges if he didn't tell "the truth," by which they meant he would be prosecuted if he didn't accuse the defendants of Casse's robbery and murder. In 2018, Burns testified that he believed he was "in so deep" with the prosecution, that he would receive additional charges if he didn't cooperate. In 2019, Axelrod testified that her warnings to witnesses she didn't feel were truthful could have been perceived as threats. George Samuels told the PCJU that Burns said he testified against the defendants "to get his time cut."

---

[15] In 2019, ADA Keenan claimed that there was "no reason to conclude that [memo books] were not [disclosed]."

164)   Burns signed a statement written by Axelrod claiming, *inter alia*, that: he was in Manhattan on New Year's with "some male friends"; "[a]fter midnight [he] was up in the fifties on a street" and "saw an old man punched to the ground and mugged…by some flower pots"; [t]he guy who punched the old man was someone [he] knew named Eric Smokes…[and] [w]hen the old man was on the ground, several people were over him. One of them was someone [he knew] by the name of Young." All the information in this statement was believed to be true by police and/or prosecutors as of the 30th. Only the June 11th and 30th statements by Burns were disclosed to the defense in 1987.

165)   Burns was produced to the DANY by Delgrosso *at least* three more times before July 8th to prepare his false testimony by, *inter alia*, reviewing crime scene photos and the statements of other witnesses and undergoing mock cross-examinations.

166)   Pretrial proceedings continued on June 30th. Detectives Kennedy and Delgrosso gave false and misleading testimony. Smokes was denied a <u>Wade</u> hearing based on Goldstein's false representations regarding the identification witnesses' familiarity with him and the absence of exculpatory evidence. Goldstein withheld the identities of the People's witnesses. Although his memo to ADA Fried demonstrated that he *knew* there was reason to question whether the identification witnesses truly knew the defendants, Goldstein claimed that their identities were withheld because of their "fear of retaliation and intimidation." **Smokes and Warren *did not know* Anthony *or* the Houston brothers.** John Avanzino, counsel for Smokes, told the Court that he had "no way of knowing" if the witnesses knew Smokes. Pam Jordan, counsel for Warren, learned Tyrone Bess' name after Goldstein was ordered to disclose the identity of a witness who did not identify Warren. *Four statements*, *one* for each young man interrogated on January 8th, were disclosed in redacted form before Kennedy's

testimony. The statements attributed to Anthony and Bess were the ones composed by Kennedy at 3:45 AM and 8:10 AM, respectively. There was no reference to *any* other statement by Anthony *or* Bess during the 1987 proceedings.

167)    Delgrosso kept the stack of photos shown to witnesses in his possession and gave it to Kennedy before his testimony. No chain of custody for the photos was established. Kennedy was first informed that a "prospective witness" (Anthony) was in custody on the 8th by Detective Zeins. When defense counsel asked where this witness came from, Kennedy replied only "from Brooklyn." In addition to the name "Eric," Kennedy falsely testified that Anthony *never* used *either* of these names in 1987 testimony *and did not know Smokes **or** Warren*. Kennedy testified that he may have told all the young men he interrogated on the 8th that they *were* suspects but claimed he couldn't recall telling Bess that if he didn't pick a photo, he could be charged. He did recall Bess wanting to contact his mother. Kennedy also didn't recall telling Bess his photo would be shown or checking into his pending cases. By contrast, Delgrosso believed Bess had a pending case.

168)    Delgrosso testified that he discarded the notes he took when interrogating the defendants. By his own admission, he lied to both defendants while interrogating them. The composition of the stack of photos shown to witnesses began with the photos selected by Walker as "associates" of Smokes. Delgrosso added more photos before giving them to Kennedy. *All* the photos were of people Delgrosso thought were involved in Casse's murder *or* had information about it. Delgrosso claimed that one witness, he couldn't recall which, identified Warren from lineups by his first name or the nickname "Young," *but that he didn't tell the*

*witness the name*. **Evidence that was concealed until 2023 demonstrates that the police told Warren's full name to Robert Anthony**.

169)   After testimony concluded, Ms. Jordan told the Court that she "remain[ed] confused as to exactly what happened during the showing of photographs" because of the People's failure to disclose evidence and the non-committal testimony of Kennedy and Delgrosso. The detectives were non-committal or claimed an inability to recall which young men identified which suspects, if any of them requested counsel, or whether any of them were threatened with charges *or offered deals*. Jordan noted that the detectives' testimony indicated at least three witnesses asked for their mothers and that the detectives knew about Bess' pending charges but claimed to be unable to recall if he was offered deals. She said, "[w]hen I asked…if anyone said to [Bess], you will be charged as a suspect *if* you don't pick someone out, *they were not able to say…that did not happen*." (emphasis added). Knowing that Bess had revealed coercion and incentivization of the young men interrogated on the 8th, ADA Goldstein contended that his not having made an identification was not exculpatory *or* proof of suggestiveness. He then belatedly applied to admit <u>Molineux</u> evidence he had already presented to the Grand Jury (his written application was dated June 1st). Goldstein claimed that an unidentified witness for the People (Walker) would testify to "*about a dozen* crimes *exactly similar* in nature to the one charged here."[16] (emphasis added). There was no apparent basis for this assertion. Walker's Grand Jury testimony indicated only that he had committed "a number" of crimes with the defendants by differing methods.

170)   Judge Scott announced he would reserve decision on the admission of the statements Delgrosso attributed to the defendants and ordered jury selection to begin.

---

[16] In 2019, Goldstein testified that he didn't know what "exactly similar" meant.

171)    Before trial, **Warren declined "extremely favorable" plea bargains** offered by the People.

172)    On July 2nd, ADA Axelrod wrote a memo to the Department of Corrections stating that Burns was scheduled to testify on July 6th.[17] She claimed that Burns was incarcerated with the defendants in C-74 dorm on Riker's Island and had "received both verbal and physical threats from defendant Smokes and his friends." She said that the DANY wanted to ensure Burns was separated from the defendants but asked, ostensibly at Burns's request, that the separation begin on *the bus ride* back to Riker's *after Burns testified on the 6th*. In 2019, Axelrod testified that she "did what [Burns] wanted" and "would have done whatever [he] wanted" because "[a]n incarcerated witness is in the best position to know how he's going to be able to be safe" not just from the defendants, but also "other prisoners within Riker's Island." Axelrod claimed, "that was our standard procedure."[18]

173)    The threats to and assaults of Burns by Smokes (or his friends) were not investigated by the People because they never happened. Axelrod's claim that the DANY would allow Burns to remain in danger after being physically assaulted because it was his preference, or that this was Office procedure, is nonsense. As demonstrated by his July 6th assault of another inmate while in protective custody, Burns was a threat to those housed with *him*.

174)    On July 6th, Burns was produced to the DANY for *at least* the sixth time since June 11th, but *not* by bus, *not* from C-74 dorm, *and not for testimony*. Evidence first disclosed in 2018 demonstrates that he was brought to the DANY on the 6th by Detective Delgrosso from the Riker's Island disease center. Burns testified on **July 8th**.

---

[17] Axelrod's memo was not disclosed until 2018.
[18] The transcript of the CPL 440.10 hearing held from 2018-19 is incorporated herein by reference.

175) Also on the 6th, Judge Berkman once again stayed a warrant in relation to James Walker's pending prosecution and told the People to notify Walker of his next court date.

**Trial by Surprise, Suppression, Misrepresentation, and Fabrication.**

176) At the beginning of trial on July 6th, in accordance with DANY practice, the People disclosed *hundreds* of pages of discovery. Among other things, Avanzino and Jordan learned that <u>Molineux</u> evidence was presented to the Grand Jury and that James Walker had made a cooperation agreement.

177) ADA Goldstein claimed that the timing of the disclosure was due to "fear of these witnesses with respect to *both defendants*" and that threats had been received by "*several witnesses*." (emphasis added). These were *knowingly* false representations. Walker never claimed he was threatened by Smokes *or* Warren. Smokes and Warren did not yet know who Anthony and the Houston brothers were, nor had they been informed that Terrell Davis was a witness for the People (indeed, Davis did not yet know).

178) The **only** witness to ever **testify** that he was threatened by **either** defendant was **Kevin Burns on July 8, 1987**, when Goldstein elicited that *Smokes* had threatened his life on the bus ride from Riker's Island that day (thus, Goldstein could *not* have been referencing *that* alleged threat on the 6th). Burns has repeatedly recanted that testimony. On cross-examination by ADA Keenan in 2018, Burns testified: "***I never seen [Smokes] on the day of my testimony.*** *I was in [Northern Infirmary Command]…I told you* I never seen Eric Smokes at that time."[19] (emphasis added). Moreover, evidence first disclosed after Burns' 2018 testimony establishes that the People had him separated from the defendants *by* July 6th, that Goldstein was informed that Burns would be "housed at Riker's Island Hospital

---

[19] After Burns testified, Keenan disclosed notes taken when she questioned him on October 23, 2018, at the DANY which corroborated that he told her he was *not* housed with Smokes at the time of his trial testimony.

indefinitely," and that Burns was brought to court on July 8th by *Detective Delgrosso*. **Burns could *not* have been threatened by Smokes on the day he testified at trial and Goldstein, Axelrod, and Delgrosso *knew* this**.[20] In 2019 Axelrod testified that she wrote the memo Corrections to ensure "***first of all, that [Burns] was not on the same bus coming to court with the defendants***." (emphasis added).

179)   **There is no evidence that *any* witness *ever* said they were threatened by Warren**.

180)   In support of the <u>Molineux</u> evidence, Goldstein told the Court that there was "no way to prove that [the defendants] were acting in concert…absent that they had done it in the past…[t]hat evidence is crucial to the People's case and direct and probative evidence to the defendants' state of mind, of their intent…so probative that *there is no other way to prove that element of the crime charged*."[21] (emphasis added). Judge Scott ruled that "even though it might be prejudicial" the evidence was relevant and admissible because it was necessary to prove "motive and intent." He found no evidence of suggestive police conduct and, thus, no reason to suppress any identification evidence. Finally, he ruled that the entire statement Delgrosso attributed to Warren was admissible, and that statements Delgrosso attributed to Smokes after his father arrived at the 75th Precinct were admissible.

181)   **The admission of almost *all* the People's evidence was based on false or misleading police testimony, false representations by prosecutors, and the suppression of favorable evidence known to, or in the possession of, police and/or prosecutors**.

---

[20] At trial, Burns testified that he was placed in protective custody in February or March, and that he was in protective custody on July 6th when he "cut up" another inmate.
[21] In 2019, Goldstein testified that he believed the People could have sustained their burden without Walker.

182)    In his opening statement, Goldstein said that after Jean Casse was punched, Warren was among the people who "set upon" him "taking his *wallet*" and the jury would hear from "some *witnesses*" who heard things that Smokes said after the incident. (emphasis added).

183)    In 2022 Goldstein told the PCJU that he "would've prepped all of his witnesses" and "wouldn't put them on cold." Although Goldstein said he "would typically interview witnesses separately," he "maybe spoke to both Houston brothers together."

184)    On the morning of July 6th, Robert Anthony and the Houston brothers were arrested on material witness orders and taken to Goldstein's office by Delgrosso to be prepped. Goldstein took notes as he spoke to them but withheld them from the defendants.

185)    19-year-old Alfonso Houston had an 11th grade education and a warrant for his arrest at the time of trial. He testified that he arrived in Times Square on New Year's Eve at about 8 or 9 PM and was *"near 42nd [Street]" at midnight*. (emphasis added). Alfonso showed that he didn't know how he supposedly got to the crime scene from 42nd Street during the following exchange with Goldstein:

**Goldstein:** "Where did you go when the ball dropped?"

**Alfonso:** "Well, we started—on our way home like walking down the block."

**Goldstein:** "Do you remember was it uptown or downtown?"

**Alfonso:** "Towards downtown."

**Goldstein:** "That is what you think?"

**Alfonso:** "Yes."

**Goldstein:** "Do you know?"

**Alfonso:** "Not really."

186)    Alfonso did not organically place the scene of the crime and didn't know *when* the crime

happened. He testified that it happened "[s]ometime after twelve…[m]aybe a lot after twelve.

I don't really know the time." Goldstein showed him a photo of the scene, which Alfonso had

been shown before, and asked if he recognized it and what he had seen happen there. In

testimony Goldstein *knew* was in contrast with undisputed facts, Alfonso claimed he saw two

couples *exit Ben Benson's* and "somebody" punch "the older man." Alfonso *repeatedly*

testified that the person he saw get punched came out of the restaurant. The first time

Alfonso used a name for the person he claimed to have seen punch Casse was during direct-

examination at trial, when he claimed to have recognized the puncher as Smokey, the name

Detective Delgrosso had written on the Polaroid of Smokes that was shown to him. [Exhibit

D]. Alfonso claimed he recognized "Smokey" from having *seen* him *once* at the Albee

Square Mall two or three years earlier. Goldstein permitted Alfonso to testify that Patrick

Denson was next to him, *and even closer to Casse than he was*, when Casse was punched.

Alfonso claimed to recognize everyone he saw going through Casse's pockets from the

Albee Square Mall but didn't know their names. He identified Warren as one of them before

the following exchange with Goldstein:

**Goldstein:** "Can you tell us specifically what you saw Mr. Warren doing with respect to the elderly man?"

**Alfonso:** "*Just leaning over*."

**Goldstein:** "Leaning over him?"

**Alfonso:** "*Yes*."

**Goldstein:** "*Was Mr. Warren going through his pockets or not?*" (emphasis added).

187)   Court broke for lunch during Alfonso's direct-examination. Over objection, Judge Scott permitted Goldstein to confer with Alfonso during the break and denied the defense counsels additional time to review the discovery disclosed that morning before cross-examination.

188)   Alfonso testified that he didn't want to go to jail because of anything that happened on New Year's, that on January 8th Detectives Kennedy and Delgrosso told him he could be charged if he didn't identify a photo, and that it was possible Kennedy told him he matched the description of Casse's murderer. Alfonso was 6'2".

189)   16-year-old Andre Houston was scheduled to enter 10th grade. Police and prosecutors knew, but concealed, that he was learning disabled and schizophrenic.

190)   Andre testified that he went to Times Square on New Year's Eve with "[his] brother Alfonso and some friends" and arrived at about 11 PM. He couldn't say where he was at midnight other than "like on the street." Like his brother, Andre did not organically offer the location of the crime scene, he was directed to it during the following exchange with Goldstein:

**Goldstein:** "After you saw the ball drop, where did you go?"

**Andre:** "Started walking around."

**Goldstein:** "Did you get to 52nd Street at some point?"

**Andre:** "Yes."

**Goldstein:** "Now, what did you see happen on that street?"

**Andre:** "I seen people getting robbed."

**Goldstein:** "Tell me about some of those robberies you saw."

**Andre:** "There was a lady in front of me, she got robbed, stuff like that."

191) Andre said that on 52nd Street he saw "somebody swing at an older man. Eric Smoke [sic] swing at an older man." He explained his alleged familiarity with Smokes during the following exchange with Goldstein:

> **Goldstein:** "You know Eric Smokes?"
>
> **Andre:** "What?"
>
> **Goldstein:** "You know Eric Smokes?"
>
> **Andre:** "Yes, I seen him somewhere."
>
> **Goldstein:** "Where do you know him from?"
>
> **Andre:** "From like in the school yard."
>
> **Goldstein:** "Excuse me?"
>
> **Andre:** "From the school yard."

192) Andre claimed to know Smokes from having *seen* him "[l]ike two or three times" *in the school yard* when he was in 7th grade. The only name he knew Smokes by was "Catfish," which he claimed to have learned from Robert Anthony. Andre identified Warren as someone he saw going through Casse's pockets but *testified that **he did not know Warren at all*** and Catfish was the *only person* he recognized at the scene from before that night. Like his brother, Andre testified that Patrick Denson was *with him* when he observed the robbery and murder of Casse and that Denson returned to the scene with him after the incident and watched Casse being put in an ambulance.

193) Between direct-examination by Goldstein and cross-examination by counsels for the defendants, Andre gave three distinct accounts of what he did after supposedly observing the crime. On direct-examination, Andre testified that he left the scene after the incident but returned with Denson and Anthony and saw an ambulance there. On cross-examination by

Avanzino, Andre said that after Casse was punched, he stayed at the scene for "[l]ike ten or fifteen minutes." On cross-examination by Jordan, Andre claimed he ran away after the attack but returned alone and saw the ambulance and police. Andre couldn't consistently recount what he did because he didn't truly do it.

194)    On January 8th Detective Kennedy told Andre he *was* a suspect in Casse's murder.

195)    **Andre has repeatedly recanted his 1987 testimony**.

196)    After Andre's testimony, ADA Goldstein applied to have Robert Anthony held in jail on $2,500 bail and produced the next day. He also disclosed that Kevin Burns and Terrell Davis would testify for the People and claimed Burns had been "threatened throughout his stay in jail by [Smokes] directly…[and] jumped by people at the behest of [Smokes]" *and* that Davis had also been threatened. Goldstein claimed that Burns asked *not* to be separated "because he thought he could sort of get by…just by him telling [Smokes] he didn't know anything," and that he honored the request but that Burns "was jumped last week and again yesterday." According to Goldstein, Smokes told Burns *and* Davis they had "better take the Fifth." Goldstein *knew* these representations were false. Burns was placed in protective custody months earlier and had been specifically separated from the defendants. Furthermore, Burns "cut up" another inmate in jail on *this very date* (July 6th) the day *after* Goldstein claimed he was "jumped." Davis *never* claimed he was threatened by *either* defendant.[22]

197)    Detective Delgrosso brought Davis from Riker's Island to testify on July 7th. Davis did not know he would be called until Delgrosso took him to Goldstein's office. Delgrosso and Goldstein had told Davis that the defendants had implicated him in Casse's murder and urged him to accuse them, claim they had made admissions to him or, at minimum, place them at

---

[22] In 2018, Davis testified that the *only* person who threatened him in relation to the defendants' case was *Delgrosso*.

the crime scene in exchange for leniency on his robbery case. When Davis refused, they threatened him with murder charges and accused him of being afraid of Smokes. Davis was called in the hope that he would comply once produced and so Goldstein could falsely insinuate that he had inculpated the defendants before trial. In summation, Goldstein portrayed the defendants as guilty by association with Davis, who was a convicted robber awaiting sentencing.[23]

198)    Goldstein elicited that Davis *may* have seen Warren in Manhattan on New Year's and they *may* have had a conversation where Warren said he got "a little" money. However, Davis was unsure whether he had actually seen Warren because he had been intoxicated and testified, **"I'm *not* saying [Warren] said it because *I ain't sure I saw him*."** (emphasis added).

199)    Robert Anthony spent the night before his testimony at the Bronx House of Detention to ensure that he appeared and testified as the People wanted him to. Goldstein claimed Anthony said he would not return to testify if he was released from custody. In 2018, Anthony testified that in 1987 he told a male prosecutor his account was false but the prosecutor told him it was too late to change it. When Detectives Delgrosso and Kennedy came to arrest Anthony the previous day, they threatened to break down his door. Anthony was 17-years-old, had a 9th grade education, and was on probation for his February fraud charge at the time of trial.

200)    Anthony testified that he went to Times Square on New Year's Eve with "Andre and Alfonso and…Tyrone Bess, Patrick Denson, [and] Reginald Grant," and arrived at "[a]bout

---

[23] In 2019, neither Goldstein nor Delgrosso testified, despite clear prompting by ADA Keenan, that Davis made pretrial statements beyond what he testified to at trial. Goldstein told the PCJU, "[n]ot everything has to be a blank slate when questioning people," and offered the example, "[w]e heard these guys did this. Do you know anything about it?'"

10:00 or so." He was "[o]n Seventh Avenue, somewhere" at midnight. When Goldstein asked where he went after that Anthony replied, "to 52nd Street." There, Anthony claimed he saw "a man, an old man" fall "like he got hit" in front of "Ben Benson [sic]." He claimed the Houston brothers *and Patrick Denson* were *with him* when he saw this. Asked if he recognized anyone at the scene, Anthony replied "them guys," indicating the defendants. Asked if he *knew* the defendants, **Anthony testified that he did not *know* them** but had "seen them" at the Albee Square Mall "[t]wo or three" times. Unlike his cousins, Anthony didn't say when these alleged prior sightings occurred. Anthony testified that he had only seen Smokes walking away after Casse fell but saw "[t]he guy right there" (Warren) bend over Casse, reach into his "jacket," and take his "wallet."

201)    Goldstein knew that Anthony was reported to police by his mother through her detective boyfriend after she found news clippings about Casse's murder in his bedroom, and that Anthony knew this.[24] Nevertheless, Goldstein elicited that Anthony read about Casse's murder in the paper and told his mother he saw what happened but **did not know how police "found out about" him *or* if his mother had called them**. Goldstein was able to elicit this testimony and allow it to go uncorrected because of the suppression of evidence.

202)    When Anthony was picked up for interrogation, the detectives didn't tell him why he was being taken in or mention a murder until after they arrived at the precinct. There, Detective Kennedy brought up Casse's murder and Anthony told him he knew nothing about the crime "[a] lot of times." While in custody "[a]ll day, all morning and all night," Anthony repeatedly told the police that he didn't know anything about the murder and wanted to go home. Before Kennedy wrote anything down, he spent "[a]bout three or four hours" *telling Anthony*

---

[24] In contrast with Detective Stubbs' DD5, Anthony testified that he did not tell his mother he looked down at Casse's body and she did not suggest that he speak with the police.

"[a]bout the mall" and people meeting there to commit robberies, another topic Anthony knew nothing about. Kennedy told Anthony his photo would be shown to witnesses and he could go to jail for the murder. In response, Anthony gave the names of his friends and cousins "to prove who [he] was with" rather than to support any account of the crime.

203)    Anthony was unable to recall his Grand Jury testimony supposedly because it was a "long time ago." However, when he was read an excerpt on cross-examination, he agreed that ***after the ball dropped*, he walked *up towards 47th Street* on Seventh Avenue**. He said it took him 7-10 minutes to get to 52nd Street between Sixth and Seventh Avenues and that he was there for about 30 seconds before he saw Casse fall.[25] On re-direct, ADA Goldstein was permitted to read Anthony's false Grand Jury testimony before the jury.

204)    **Robert has repeatedly recanted his 1987 testimony**.

205)    Dan Melkonian was called by the People. Unlike the civilians called before him, Melkonian volunteered where and when he saw the attack on Casse. He was walking with Eloise Yellen on 52nd Street between "right around midnight, maybe a few minutes past," when he saw a group of "young kids…racing down the street…yelling and screaming." He saw members of this group chase a woman in a white coat and knock her down. Melkonian was directly in line with Casse when he saw a male approach him and punch him in the face, sending him straight backwards on his head with "a ghastly crack." Melkonian was 5'11" and used his own height to determine that the puncher was 6'1"-6'2".

206)    Eloise Yellen was called by the defense but had never met either defense counsel. She met Goldstein at the precinct on January 8th. She described the man who punched Casse as tall, skinny, and standing 6'1"-6'2".

---

[25] Based on this testimony, Anthony would have arrived at the scene *at least* three minutes *after* the crime occurred.

207)    Renee Casse did not see her husband get punched. As they were walking arm in arm, she

felt his arm slip from her own and she fell. She rose quickly and saw Jean on the ground

bleeding while a man "was kneeling on him…holding him around his neck…[and] hitting his

head on the sidewalk." Renee threw herself over this man and pulled at his hair and ears until

"[h]e took *the wallet* from *the pants* of [her] husband." (emphasis added).

208)    After Mrs. Casse's testimony, Ms. Jordan told the Court and Goldstein that Todd Carson

was present and available to speak with Goldstein.

209)    On July 8th, Detective Delgrosso drove Kevin Burns from Riker's Island to testify.

[**Exhibit N**: Burns July 8th Take out]. Burns did not see Smokes on a bus ride before his

testimony. Goldstein had bought Burns $17.41 worth of cigarettes to give him after he

testified. Although Goldstein sought reimbursement for the full amount spent, he took some

of the cigarettes for himself. In 2019, Goldstein testified that he would have given Burns, at

most, one cigarette from his own pack, but would *not* have bought cigarettes for a witness. In

2022, Goldstein admitted that he "obviously" gave Burns cigarettes but "doesn't *think* he

gave him cigarettes *to testify*." (emphasis added).

210)    Burns claimed to have completed the 12th grade at Franklin K. Lane High School.[26] He

said he knew "Smokey" for years but first learned his legal name because "he is in the same

building *where I am at* and I heard him called quite a few times." (emphasis added).

211)    Burns claimed to have gone to 42nd Street on New Year's Eve with his brother Thomas

Chavis, his cousin Anthony Fields, and Edward (George) Samuels. None of these names

appeared in the pretrial statements that were disclosed to the defense, nor did the People

disclose that Samuels had *repeatedly* contradicted Burns. Burns claimed to have seen the

---

[26] In 2023, counsel for Smokes and Warren discovered an email from a NYC schools employee informing ADA Keenan that there was no record of Burns attending Franklin K. Lane. Keenan withheld this information.

defendants on 42nd or 43rd Street. Goldstein asked if he saw them "up in the 50's…later on" and Burns said he had. At this point, the Court directed Goldstein to stop leading Burns.

212)    Burns was shown a photo of the scene by Goldstein before the following exchange:

**Goldstein:** "Do you remember being on that street on New Year's Eve?"

**Burns:** "Yes."

**Goldstein:** "Did you, or didn't you see the defendants on that street?"

**Burns:** "Yes."

**Goldstein:** "Did you or didn't you?"

**Burns:** "I seen them on the street."

**Goldstein:** "And what, if anything, did you see them do on that street?"

**Burns:** "What did I see them doing?"

**Goldstein:** "Yes."

   **The Court:** "Keep your voice up now."

**Burns:** "What do you mean what did I see them doing?"

   **Jordan:** "Let the record reflect that there was approximately a 30 second gap between that question and that answer."

   **The Court:** "There is no answer, there was a question."

**Goldstein:** "Did you see Mr. Smokes, Smokey do anything on that street?"

**Burns:** "Yes."

**Goldstein:** "Tell the jury what you saw him do."

**Burns:** "I seen him go up to a man and punch him in his face."

213)    In contrast with the undisputed eyewitnesses, who uniformly said that Casse fell directly backwards, Burns testified that Casse fell on a slant, first to his knees and then to the ground. He claimed that Warren was one of "quite a few" people he recognized rifling Casse's

pockets after he fell (he didn't name any others and wasn't asked to). However, in a departure from *all* other eyewitness accounts, Burns claimed that Smokes remained in place after throwing the punch, bent down, and came up with Casse's "wallet."[27] Then, the defendants and "Guy Tony" fled together through a passageway onto the next block.

214)    Goldstein permitted Burns to testify that Samuels was with him on 52nd Street when he witnessed the crime. In 2019 Goldstein testified that he *never* thought Burns was lying about his alleged observations of the defendants and if a witness told him they were somewhere and he found them credible, he wouldn't know where to check and "wouldn't just check and see if…that's where they were as a general matter" but "certainly" would have done something if he learned information contradicting Burns' claims about being at the scene. However, Goldstein *did know* where to check because Burns gave the names of the people he said he was with, including Samuels. He and Delgrosso *did* check into Burns' claim that he was at the scene by interrogating Samuels, who repeatedly contradicted Burns. What Goldstein "certainly" did was suppress exculpatory information.

215)    In an attempt to explain the discrepancies between Burns' statements, Goldstein prompted him to claim that he withheld information because police said they would let him speak with someone who would help him with his case and he wanted to see if they did before revealing what he had "really seen." Burns said he "decided to tell the truth" on June 30th, during the meeting with Delgrosso, Goldstein, and Axelrod where his pending charges were discussed and Goldstein told Burns that if he found out he was lying he would be sentenced to additional years in prison. Burns still didn't want to testify but Goldstein told

---

[27] Thus, although Delgrosso claimed that the Koonce tip was discounted because the caller said Casse's wallet was taken rather than a billfold, the trial record reflects that: Casse's wife; the People's first identification witness (Anthony); and the only identification witness independent of the January 8th interrogations (Burns), *all* testified that a "wallet" was taken from Casse, *and* Goldstein referred to it as a wallet in his opening.

him he *had* to, a judge could *force him to* if he refused, he could be held in contempt if he

didn't, and he **would** be prosecuted for perjury if he didn't tell "the truth."

216)    In 2018, Burns testified that anything he said at trial "[he] was totally fabricating because

[he] felt that [he] was in jeopardy with the DA because [he] was in so big with *him* that *he*

*was going to give [him] another case*," that "*[he] was doing what [he] was expected to do by*

*the DA…*[he] *felt they was the one making [him] do more time if [he] didn't do what they*

*asked [him] to do*" and, he said "*what they wanted [him] to say to get a conviction* so they

could take care of it whichever way they planned on taking care of [him]." (emphasis added).

217)    Goldstein completed his direct-examination of Burns by eliciting more knowingly false

testimony over objections by both defense counsels:

> **Goldstein:** "What has [Smokes] said to you?"

> **Burns:** "He said they got him here for something he didn't do."

> **The Court:** "I can't hear you."

> **Burns:** "He said they have him here for something he didn't do."

> **Goldstein:** "What else did he say to you?"

> **Burns:** "Then he found out that I was testifying against him and he said if I testified against him I'm going to get prosecuted."

> **Goldstein:** "What else did he tell you?"

> **Burns:** "Then he says where is my wife and daughter going to live if I testify against him."

> **Goldstein:** "When was the last time you spoke to him?"

> **Burns:** "Today."

> **Goldstein:** "What did he say to you today?"

> **Burns:** "He referred to Rakim says Peace. That means you could die."

218)    Goldstein and Axelrod had arranged for Burns to be separated specifically from the defendants *at least* two days earlier and *knew* that Detective Delgrosso brought him to court that day. Thus, Goldstein, Axelrod, and Delgrosso *all* knew that this testimony was false.

219)    On cross-examination, in testimony that could not have possibly been true if Burns had seen Smokes (or anyone) attack Jean Casse, **Burns *repeatedly* said he was with several people *including Smokes on 43rd-44th Street* from 11:45 PM on New Year's Eve *until 12:10 AM on New Year's Day*.** Burns denied having shot Kelly Macon but admitted having "cut up" an inmate on July 6th, the date Axelrod had him separated—ostensibly to protect *him* from other inmates. On re-direct, Burns claimed to have been threatened by Smokes on numerous occasions. Goldstein elicited that he promised Burns he would do everything he could to ensure his safety and make sure he would be "kept" in protective custody. On re-cross, Burns testified that he was placed in protective custody "[s]ometime in February and March." On re-redirect Goldstein *again* knowingly prompted Burns to falsely testify that he had seen Smokes and spoken with him on the bus ride to court that morning.

220)    **Burns has repeatedly recanted his 1987 testimony**.

221)    Detective Delgrosso testified that Tyrone Bess told him he had witnessed Casse's robbery and murder and that Bess gave a statement (singular) on January 8th. Delgrosso claimed to be unable to recall what, if anything, James Walker told him about his own prior robberies or how many people Walker claimed would be involved in the *modus operandi* the People had proffered as distinctive Molineux evidence. Although Warren was not mentioned to Delgrosso until *after* Walker identified him as Smokes' best friend *on January 3rd*, **Goldstein knowingly elicited false testimony from Delgrosso that Walker told him about the activities of Smokes *and* Warren *together* on *January 2nd*.**

222)   Delgrosso acknowledged having shown photos to Terrell Davis and Ian Woodson and

showing Jerry Sanders' photo to Anthony and the Houston brothers, who he said did not

identify Sanders as having been at the crime scene. In rebuttal, Goldstein prompted

Delgrosso to testify that on June 30th at the DANY, Kevin Burns said that any information he

gave inculpating Sanders in Casse's murder was false. Thus, the jury was given the false

impressions that: (1) Woodson was a mere witness who was shown photos by police; (2) the

consideration of Sanders as a perpetrator was based on information from Burns and was

discounted when Burns said any information he gave about Sanders was false; and, (3)

"legitimate" witnesses viewed Sanders but did not place him at the scene of the murder.

223)   Delgrosso had documented a tip accusing Woodson of Casse's murder in January 1987,

but this information was suppressed from the defendants until 2018. In 2023, the DANY

revealed notes demonstrating that Goldstein had questioned Sanders and acknowledged that

Sanders "was suspected of being involved in" Casse's murder. Notes by an ADA in the

DANY file for Sanders' 1988-89 homicide prosecution state that his "name ha[d] come up as

a poss. suspect in 3 other homicides," with the first of the crimes listed being "Frenchman

homicide." In 2023, the DANY acknowledged that the consideration of Sanders as Casse's

murderer "was given enough weight by police and prosecutors to warrant an application for

enhanced sentencing of [Sanders] on his" homicide case.

224)   The only reference to Arthur "Pig" Luckey in the 1987 transcript came when Niles

Williams testified that Luckey introduced him to James Walker and Terrell Davis. In 2023,

the DANY revealed that Stephanie Graham, the mother of the 17-year-old leader of a

Brookly gang that specialized in robbery, told police that Luckey, Sanders, and Woodson

were responsible for Casse's murder. Accordingly, the jury never learned that Woodson was

named in *at least* two independent tips or that Sanders was genuinely suspected of Casse's murder by the NYPD *and* the DANY. Between the Throop Avenue tip, the Lee Koonce tip, the January Woodson tip, the Brandon Holmes/Jerry Sanders tip, and the Sanders/Woodson/Luckey tip from Graham, the People suppressed information about *at least five alternate perpetrators*. *At least* four of the known tips pointing away from the defendants were suppressed from them altogether for decades.

225)   Pam Jordan called Detective Chartrand to elicit the tip naming Koonce as Casse's murderer, but Judge Scott prohibited the inquiry and said, "I'm not going to let him tell you about every little rumor."

### ADA Goldstein's Examination of James Walker: An Indefensible Display of Prosecutorial Overreaching and Suborning Perjury From an Emotionally Handicapped and Drug Addicted Teenager.

226)   Despite his generous deal, James Walker had to be arrested to appear at trial. Walker had violated his deal [**Exhibit O**: Walker notes re: New arrests] by being arrested *at least* twice since the Grand Jury, including a February arrest in Brooklyn for marijuana and an April arrest in Manhattan for robbery for which the charges were still pending and a warrant had been issued. Walker also had a warrant out of Brooklyn at the time of his testimony. He claimed not to know if the DANY assisted him on his February charge but testified that they said they would have the warrant on his pending Manhattan charges vacated. Walker was scheduled to be sentenced for his January 2nd Manhattan charges after his testimony.

227)    Goldstein elicited that Walker had completed the 11th grade but didn't disclose that he was in special education classes and had recently been placed in "a special class for emotionally disturbed or handicapped students."[28]

228)    Walker claimed to have first met the defendants with Edward Williams, John Williams, and Darryl McDuffy in Manhattan on Easter of 1986 while "doing a crime together."[29] According to Walker, from then on he would see the defendants on Thursdays in Midtown or at the Albee Square Mall. Walker claimed that he and the defendants committed "[a]bout a dozen" robberies together throughout the remainder of 1986. Goldstein asked Walker how these robberies were committed. Despite having privately questioned whether Walker would testify truthfully and knowing he had repeatedly violated his deal, absconded, and failed to voluntarily appear, during the following exchange, Goldstein engaged in persistent leading questioning to elicit testimony that contradicted his own Molineux representations and would have caused a scrupulous and ethical attorney to further question Walker's reliability:

> **Goldstein:** "Let me ask you specifically, did you do any robberies with Mr. Smokes or Mr. Warren?"
>
> **Walker:** "Yes."
>
> **Goldstein:** "About how many would you estimate you did with them?"
>
> **Walker:** "About a dozen."
>
> **Avanzino:** "Objection."
>
> > **The Court:** "Overruled."
>
> > **Avanzino:** "Your Honor, just for the record, I would like a continuing objection to these questions."

---

[28] Thus, along with Andre Houston, Walker was one of two mentally disabled teenagers the People forced and/or induced to testify without disclosing their disabilities to the defense.

[29] Edward and John Williams didn't meet Smokes or Warren until after their arrests for the January 2nd, robbery they attempted with Walker. Goldstein's own notes reflect that questioning McDuffy got the People "nowhere."

**The Court:** "You may."

**Jordan:** "I join in that objection."

**The Court:** "All right [sic], you can have a continuing objection. A dozen robberies with them, is that right?"

**Walker:** "Yes."

**The Court:** "Go ahead."

**Goldstein:** "Was that during the past year of 1986?"

**Walker:** "Yes."

…

**Goldstein:** "Now, on times when you went out with Mr. Smokes and Mr. Warren, explain how you did those robberies."

**Jordan:** "Objection—I ask for clarification as to the time."

**The Court:** "You can do that on cross examination, overruled."

**Walker:** "I go into the pocket while the man is walking."

**Goldstein:** "That is how you do it with Mr. Smokes and Warren and Young [sic]?"

**Walker:** "Yes."

**Goldstein:** "What did Mr. Smokes do?"

**Walker:** "Nothing."

**Goldstein:** "Nothing in terms of what?"

**Jordan:** "Objection, the question was asked and answered."

**The Court:** "Overruled."

**Goldstein:** "Now, in terms of what, Mr. Walker?"

**Walker:** "In terms of robbing the man."

**Goldstein:** "In other words, Mr. Smokes would not go into the man's pockets?"

**Walker:** "No."

    **Jordan:** "Objection, asked and answered."

    **The Court:** "Overruled."

    **Jordan:** "Is the Court declaring this witness as a hostile witness?"

    **The Court:** "No."

    **Jordan:** "Then why are you allowing him to…"

    **The Court:** "Because I made my ruling, I said overruled."

    **Jordan:** "It is okay for him to lead?"

    **The Court:** "Overruled."

    **Jordan:** "Thank you."

    **The Court:** "All right."

**Goldstein:** "Mr. Walker, would you say you have done about a dozen robberies with Mr. Smokes and Young?"

**Walker:** "Yes."

**Goldstein:** "What did Mr. Smokes do when you did those robberies?"

    **Avanzino:** "Objection."

    **Jordan:** "Objection."

    **The Court:** "Overruled."

**Walker:** "Excuse me?"

    **The Court:** "He wants to know what, if anything, did Mr. Smokes do during those robberies you said you committed with him."

**Walker:** "When we was robbing he wasn't doing nothing."

**Goldstein:** "What do you mean when you were robbing?"

    **Jordan:** "Objection."

**The Court:** "Overruled."

**Walker:** "When we went in the pocket he was doing nothing."

**Goldstein:** "Did he do anything before or after that?"

**Walker:** "No, after, if the man chases us or something, he would knock him down or something."

**Goldstein:** "Did he ever do anything before you went into someone's pockets?"

**Walker:** "Sometimes."

**Goldstein:** "What did he do?"

**Walker:** "Punch the man."

**The Court:** "What he are we talking about?"

**Goldstein:** "Mr. Smokes."

**The Court:** "All right, who are we talking about?"

**Walker:** "Smokes."

**The Court:** "All right."

**Goldstein:** "Would you watch him punch somebody?"

**Avanzino:** "Objection."

**The Court:** "Overruled."

**Walker:** "Yes."

**Goldstein:** "What would happen to the person if he punched them?"

**Walker:** "They would fall down."

**Goldstein:** "What did Mr. Smokes do then?"

**Walker:** "Nothing."

**Goldstein:** "Did he stand there?"

**Walker:** "Sometimes."

**Goldstein:** "When you say nothing, you mean he wouldn't go through the man's pockets?"

**Walker:** "No."

**Goldstein:** "What would you and Mr. Warren do then?"

    **Jordan:** "Objection, I ask for clarification of the question."

    **The Court:** "Sustained."

**Goldstein:** "In the case where Mr. Smokes punched somebody and they went down, did you and Mr. Warren do anything?"

    **Jordan:** "Objection to the form."

    **The Court:** "Sustained, he mentioned himself, he didn't say what Mr. Warren had done. You haven't included that yet."

**Goldstein:** "Did either you or Mr. Warren do anything?"

**Walker:** "Yes."

**Goldstein:** "What was that?"

**Walker:** "Go in his pockets."

**Goldstein:** "Well, who would do it?"

**Walker:** "Me and him."

    **The Court:** "When you say 'him' who do you mean?"

**Walker:** "David."

    **The Court:** "David Warren?"

**Walker:** "Yes."

    **The Court:** "All right."

**Goldstein:** "How would that be determined?"

**Walker:** "I don't know, whoever goes to the pocket goes to the pocket."

**Goldstein:** "What did you do with the money you got?"

**Jordan:** "Objection."

**The Court:** "Overruled."

**Walker:** "Split it."

**Goldstein:** "Who would you split it with?"

**Walker:** "With Smokes."

**Goldstein:** "And how many occasions do you remember that you, during your robberies with Mr. Smokes and Mr. Warren have this occur where Mr. Smokes would punch somebody?"

**Avanzino:** "Objection."

**The Court:** "Overruled."

**Walker:** "Excuse me, what did you say?"

**Goldstein:** "You said you committed about a dozen robberies with Mr. Smokes and Mr. Warren, is that right?"

**Walker:** "Yes."

**Goldstein:** "Approximately how many of those was a situation where you just described occur [sic], that is where Mr. Smokes punched somebody and would go down [sic] and either you or Mr. Warren would go through the person's pockets?"

**Walker:** "I don't know."

**Goldstein:** "You don't know?"

**Walker:** "Nope."

**Goldstein:** "Was it…"

**Jordan:** "Objection."

**Goldstein:** "Was it only once? Was it two times?"

**The Court:** "Overruled."

**Jordan:** "The witness already answered the question."

**The Court:** "Overruled. Do you understand the question?"

**Goldstein:** "How many times out of the dozen times?"

**Walker:** "About five."

229)    Walker could not recall any specific times he allegedly committed crimes with the

defendants. Goldstein's willingness to lead Walker to deliver unreliable testimony and,

indeed, perjury, continued when he attempted to elicit the statement Walker falsely attributed

to Smokes during the following exchange:

**Goldstein:** "When was the next time [after January 1st] you saw either Mr. Smokes or Mr. Warren?"

**Walker:** "The second."

**Goldstein:** "Excuse me?"

**Walker:** "The second of January."

**The Court:** "The next day?"

**Walker:** "January 2nd."

**Goldstein:** "Where did you see them?"

**Walker:** "Down at the mall.

**Goldstein:** "That is the Albee Square Mall?"

**Walker:** "Yes."

**Goldstein:** "Did you see them together or separate?"

**Walker:** "Together."

**Goldstein:** "Did you speak with either one of them?"

**Walker:** "Yes."

**Goldstein:** "Who did you speak with?"

**Walker:** "Smokes."

**Goldstein:** "What was the conversation?"

**Avanzino:** "I didn't hear that."

**Walker:** "Smokes."

**The Court:** "He saw Smokes on January 2nd, down at the mall."

**Goldstein:** "What time was that, about, by the way?"

**Walker:** "12:30."

**Goldstein:** "At night or in the afternoon?"

**Walker:** "In the afternoon."

**Goldstein:** "What was the conversation you had with Smokes then?"

**Walker:** "Excuse me?"

**Goldstein:** "What was the conversation you had with Mr. Smokes then?"

**Walker:** "He saw what was up and was I going uptown."

**Goldstein:** "What did you tell him?"

**Walker:** "I told him yeah."

**Goldstein:** "What did you say to him?"

**Walker:** "I asked him was he going uptown?"

**Goldstein:** "What did he say?"

**Walker:** "He said no."

**Goldstein:** "What else did he say?"

**Walker:** "He didn't say nothing else to me."

…

**Goldstein:** "Do you remember him saying anything else to you Mr. Walker?"

**Walker:** "No."

230)  Goldstein impeached Walker with his Grand Jury testimony to prompt him to testify that Smokes said, "he wasn't going because he caught a body." *For the **first** time*, Walker claimed Edward Williams was "next to" Smokes when the statement was made. Williams had never met Smokes or heard him speak at the time of his January 2nd arrest.

231)  Walker claimed he was at home in Brooklyn when the ball dropped and then went to Times Square, arriving at 1:30 or 2 AM. In contrast with his Grand Jury testimony, he claimed to have seen the defendants in Manhattan and to have spoken with them. Walker claimed that Edward Williams, John Williams, and Darryl McDuffy were also there.

232)  Walker's misleading cooperation agreement was admitted into evidence. He didn't know what supervised probation was and Goldstein didn't tell him. Walker admitted he was still committing robberies, claimed that there was no discussion between him and Goldstein about what would happen if he was arrested between the Grand Jury and trial, and said that Goldstein did not tell him that if he was arrested again the deal was off. Notes disclosed in 2023 demonstrate that the DANY's agreement to recommend Walker be sentenced to probation was supposed to be contingent on "no new arrest(s)." [Exhibit O].

233)  When Goldstein asked if Walker had spoken to the defendants since the Grand Jury, he testified that both defendants called him in May (after the People had him released from jail unbeknownst to the defendants). Smokes asked why he was testifying against him and Walker hung up. Warren also asked why he was testifying against him, Walker said he was not, and Walker claimed Warren then said, "if you get blamed for the body he is going to testify against Smokes so we could just take the robbery charge."

234)  **Walker has repeatedly recanted his 1987 testimony**.

235)    Walker's testimony concluded the People's direct case. Goldstein immediately requested disclosure of all prior statements by defense witnesses.

236)    Niles Williams was 20-years-old, had his GED, was gainfully employed, and had no criminal record. He was in Manhattan on New Year's with the defendants, Michael Berry, Todd Carson, and Barry Hall. They were together all night and the defendants did not commit any crimes. Williams spoke with Detectives Delgrosso and Chartrand in January and, although Delgrosso threatened him with murder charges, also went to the DANY in February and spoke with ADAs Goldstein and Drucker. On cross-examination, Goldstein engaged in burden shifting by asking Williams with incredulity why he had not called the police to exculpate the defendants after learning of their arrests.[30] Goldstein also made himself an unsworn witness by questioning Williams about their February encounter during the following exchange:

**Goldstein:** "Do you remember you came down and spoke at the [DANY]?"

**Williams:** "Yes."

**Goldstein:** "Do you remember I asked you to speak with me?"

**Williams:** "Yes."

**Goldstein:** "And there was another Assistant District Attorney there?"

**Williams:** "Yes."

**Goldstein:** "Do you remember his name was Mr. Drucker?"

**Williams:** "Yes."

    **The Court:** "Do you remember the name or are you just saying you knew it was another one?"

**Williams:** "From him telling me I remember."

---

[30] Goldstein also questioned Williams at length about a crime allegedly committed by Michael Berry.

**Jordan:** "Keep your voice up."

**Williams:** "From him telling me I remember."

**The Court:** "He remembers another person there, whether or not it was Drucker or not."

**Goldstein:** "Do you remember then you weren't willing to talk to us or tell us anything about what you did that night?"

**Williams:** "What?"

**Goldstein:** "Do you remember you were not willing to talk to us or tell us anything you did?"

**Williams:** "I talked to you."

**Goldstein:** "Don't you remember you said it was none of our business what you did and where you went?"

**Williams:** "Yes."

**The Court:** "You said you talked with him or told him, which?"

**Williams:** "I did both. I talked with them too."

**The Court:** "But you told them it was none of their business?"

**Williams:** "At first."

**The Court:** "At first, oh."

**Goldstein:** "Then did you start telling us where you were or in plain talk say it was none of our business?"

**Williams:** "Start telling you."

**Goldstein:** "You didn't refuse to answer questions?"

**Williams:** "No."

**Goldstein:** "You told us whatever we asked you?"

**Williams:** "Yes."

**Goldstein:** "That is your memory?"

**Williams:** "Yes."

237)   ADA Goldstein also made himself an unsworn witness when questioning defense witness Richard Farrar, by implying that Farrar contradicted his testimony in a pretrial phone conversation between them.

238)   At the close of evidence, the defense requested missing witness charges for Detective Kennedy, Tyrone Bess, Patrick Denson, and Reginald Grant. Goldstein claimed that there was *no indication* Bess, Denson, or Grant would give testimony favorable to the defense. Goldstein *knew* that Bess, Grant, and Denson would impeach the identification testimony.

239)   In summation, Pam Jordan emphasized Detective Kennedy's absence from trial and argued that Detective Delgrosso developed tunnel vision after encountering James Walker and that Robert Anthony was coerced and fed information on January 8th.

**ADA Goldstein Delivers a Summation Based on Knowingly False Evidence and Made Possible Only by Suppression.**

240)   In summation, ADA Goldstein argued that Walker, Kevin Burns, and Terrell Davis were the witnesses who knew the defendants best, but also the witnesses with the worst criminal records, and this showed what type of people *the defendants* were. Goldstein contended that Delgrosso did not develop tunnel vision after encountering Walker or target the defendants but, rather, "looked around all over" and "just did what the evidence showed."

241)   Goldstein claimed that "[t]here was an agreement with respect to **one** robbery of Mr. Walker's." (emphasis added). He said it would be nonsensical to conclude that Walker fabricated his testimony for a deal for two reasons: he would have been committing perjury and exposing himself to more jail time than he originally might have received; and he would

have made a false account "good" and "real convincing."[31] Knowing that the People's deal with Walker was contingent on his not being arrested again, Goldstein said that *Walker had **not** promised to stop committing crimes*. Goldstein pointed out that it was difficult for him to elicit incriminating testimony from Walker and invited the jury to conclude based on "common sense" that Walker had been scared.[32] Knowing that the alleged threats to Burns were fabricated, and that he had bought gifts for Burns and made threats and promises to coerce his testimony, Goldstein urged the jury to conclude that Burns was afraid to testify because of threats and said, "[Burns] winds up being threatened in jail, having his family threatened. Doesn't sound like he is getting much either."

242)    Despite knowing that each of them had been offered deals and threatened with murder charges, Goldstein claimed that Anthony and the Houston brothers **had no motive to lie** and "[t]hose that didn't see something didn't say they did." He emphasized that Alfonso Houston had referred to Smokes as "Smokey," the name Delgrosso had written on the photo of Smokes displayed on January 8th, and that Anthony, Burns, and Andre Houston had all mentioned the woman in the white coat.[33] Knowing that Patrick Denson and Reginald Grant had contradicted Anthony and the Houston brothers, and that Jerry Sanders was a suspect he had personally interrogated, Goldstein said that the relevance of Denson, Grant, and Sanders was "speculat[ive]" and, shifting the burden again, asked the jury to note that the defense had

---

[31] In 2019, ADA Keenan argued that "[i]f Walker's goal was to fabricate a statement to benefit himself, he would have created a much more specific admission, reporting that Smokes had told him he killed the French tourist."

[32] In 2019, Keenan argued that: "common sense" supported Burns' trial testimony about threats; it "defies common sense" to suggest Delgrosso's inaccurate Grand Jury testimony had any significant effect; "applying common sense" the disparities between Delgrosso's memo book and testimony were irrelevant; Warren's testimony at the CPL 440.10 hearing was not guided by "basic common sense"; "common sense dictates" that Warren made the statements Delgrosso attributed to him; and the "common sense truth" was that "police pressed a naturally reluctant Robert Anthony to tell the truth."

[33] In 2023, the DANY acknowledged that the previously undisclosed evidence supported the argument that facts were fed to witnesses, including the assault of the woman in the white coat.

not called Michael Berry or Todd Carson. The People had declined to seek an indictment against Robert Moore and suppressed *at least* two tips implicating Ian Woodson in Casse's murder. However, Goldstein told the jury that the defendants were "charged separately and you may find [Smokes] guilty of these crimes **and you may conclude he participated with someone else other than [Warren]**. Maybe Robert Moore who you heard about. Maybe Ian Woodson who you heard about. Anyone." (emphasis added). The jury had heard Woodson's name, but *not* that he was implicated in the crimes charged by *at least* two tips made to law enforcement.

243)    The jury asked to have the testimony of Anthony, the Houston brothers, Walker, and Burns read back and then Walker's testimony about phone calls from the defendants. *The jury was not aware that the People were in possession of an **exculpatory recorded call** between Walker and Warren that Walker had not mentioned*.

244)    On July 15th, the jury reached a verdict but said, "[w]e would like the Court to know that we did not come to a decision lightly but with great emotional turmoil." The defendants were found guilty of all charges. As the jury was polled, Smokes repeatedly protested his innocence, shouting "I didn't even do this man…I don't want to go to jail for something I didn't do…They can kill me right now but I ain't do it… This is my life." Judge Scott told Pam Jordan, "you did an excellent job *with what you had*." (emphasis added).

245)    *The New York Post* reported the convictions under the headline "New Year's Evil." The home addresses of Smokes and Warren were published again in reports of the verdict.

### Spiking the Football: ADA Goldstein Argues that Smokes Should Receive a Maximum Sentence Based on Knowingly False Evidence and Speculation.

246)    At sentencing on August 20th, ADA Goldstein argued, "we know [Smokes] was clearly the more culpable [defendant]…**the distinction between [the defendants]**, that

[Smokes]…attempted to undermine the criminal justice system by compromising or attempting to compromise *at least one if not more of the witnesses…by means of threats* and direct, indirect threats of violence to an individual *and* his family." (emphasis added).[34] Pam Jordan said that **Warren maintained his innocence** and, "I still state that **David Warren *did not* commit this crime. And I think that you will have an opportunity at some point to have that information come forward**."[35] (emphasis added). The Court sentenced Warren to concurrent indeterminate prison terms amounting to at least 15 years to life.

247)    The home addresses of Smokes and Warren were published again in reports of their sentences.

## **POST-CONVICTION**

248)    In October 1987, Robert Anthony and the Houston brothers were arrested in Manhattan for the forcible robbery of a couple. Alfonso struck the male complainant on the head. Notes by the assigned ADA that were disclosed in 2023 demonstrate that ADA Goldstein told her that Anthony and the Houston brothers "testified in a homicide for him [and] he will make that known to [the] court." A February 1988 letter from Alfonso's attorney demonstrates that he was in communication with Goldstein, who told him that "Eric Smokes in particular has a reputation for violent behavior." Alfonso pled guilty but received a stay of sentencing so he could get married.

249)    On June 15, 1988, Jean Gelin was attacked on Sixth Avenue between 46th and 47th Streets and knocked to the ground, fracturing his skull. As he lay wounded, one assailant went through his pockets and took money. Gelin died and Midtown North Detective Harry Bridgwood was assigned to investigate. His investigation resulted in the prosecution of Jerry

---

[34] Thus, Goldstein demonstrated that *he knew* there were no threats made by Warren.
[35] The sentencing transcript is incorporated herein by reference.

Sanders, who was accused of committing Gelin's robbery and murder with two un-apprehended accomplices, prosecuted before Judge Scott, and convicted on May 8, 1989.

250)     During the investigation of Gelin's murder and the prosecution of Sanders, Detectives Bridgwood and/or Delgrosso concealed evidence that was exculpatory to Smokes and Warren, including undisclosed materials concerning Casse's murder. This evidence remained secreted until 2023, when it was located in the DANY file for Sanders' prosecution.

251)     In 2023, the DANY baselessly claimed these materials were "misplaced" in the Sanders file. The chapter of Robert Jackall's "Street Stories," which purports to be an account of the investigation into Casse's murder and the prosecution of Smokes and Warren concludes with a defense of Delgrosso's investigation. Addressing the argument that Delgrosso developed tunnel vision, Jackall wrote that "[i]nstead of an exercise in tunnel vision, Delgrosso's investigative work on the Casse homicide was so thorough that it aided in the robbery and murder of John [sic] Gelin a year later." Jackall wrote that Bridgwood "pounded the streets…for any news of young robbers who had recently made a big score in the city, he heard the street name 'Drak'…Delgrosso told Bridgwood to go through the Casse file because he remembered that the name Drak had surfaced in his investigation. Bridgwood not only found Drak's name but Delgrosso's note about Drak's predilection for ducking underground when in flight." No note about Sanders' "predilection(s)" has ever been disclosed to Smokes or Warren. The materials from their case that were found in Sanders' file were of no use to Bridgwood's investigation or Sanders' prosecution. They were placed there by Bridgwood and/or Delgrosso to conceal them from Smokes and Warren. For years, Delgrosso was in charge of cold and closed case files at the Midtown North Precinct. After

retiring from the NYPD, Bridgwood worked as a Detective Investigator for the DANY. The PCJU never disclosed the notes of their interview with Jackall.

252)     In August 1989, Robert Moore signed an affidavit stating that ADA Axelrod offered to dismiss his charges if he testified that he knew Smokes and Warren and saw them rob and murder Casse.

253)     On April 6, 1992, Warren moved to vacate his conviction on the grounds that the Molineux evidence should not have been presented to the Grand Jury without proper limiting instructions and should have been excluded at trial as overly prejudicial. Judge Scott denied the motion without a hearing.

254)     In 1993, the First Department reversed the defendant's conviction in People v. Dunn, 185 A.D.2d 54 (1st Dept. 1993). The underlying crimes occurred in 1986 and were investigated by Detective Delgrosso. Delgrosso admitted discarding 40-70 pages of handwritten notes after "probably" transferring the information therein into formal reports. He admitted that his notes "might have" contained descriptions from eyewitnesses and the DANY conceded that "many" of the notes were Rosario material, and it was possible the eyewitness testimony differed from the information in the notes. The Court found that the defendant's ability to cross-examine Delgrosso and the eyewitnesses was impeded by the destruction of the notes.

255)     Warren was paroled on December 19, 2007, after spending almost twenty-one years in prison for a crime he did not commit.

### The Conviction Re-Justification Unit.

*"The worst form of injustice is pretended justice."*
*-Plato*

256)     In 2010, District Attorney Cyrus Vance established the CIU at the DANY, ostensibly "to re-examine closed cases where claims of innocence have been made." Bonnie Sard was

named Chief of the CIU. Upon information and belief, the Unit was established to defend problematic convictions or, at minimum, avoid or delay exposure of misconduct, by gathering information to oppose defendants' claims under the guise of reinvestigation.

257) For years the DANY refused to disclose whether the CIU had agreed to vacate any convictions. In or around 2018, Vance provided journalist Tom Robbins a list of seven defendants he claimed the CIU had exonerated. Robbins discovered that one of the defendants was convicted after a retrial and another was released only after pleading guilty to lesser charges. Thus, in eight years of existence, the CIU had actually exonerated only five defendants. By contrast, the Brooklyn District Attorney's Office established a Conviction Review Unit ("CRU") in 2014. Within eight years, the Brooklyn CRU had consented to vacate the convictions of at least thirty-three defendants.

258) Attorneys said the DANY was "much more interested in preserving convictions than in taking a fresh, objective look at all the evidence," and "***[t]heir method is to collect evidence to attack your witnesses and your argument***." (emphasis added).

259) In 2017, when Jennifer Gonnerman contacted the DANY about the CIU while covering the hearing on Plaintiff's motion, a representative gave her a list of ten defendants whose convictions and/or charges the Unit had supposedly consented to vacate.

260) Johnny Hincapie was among the defendants the DANY told Gonnerman the CIU had exonerated. When Hincapie had applied for review, the Office assigned his trial prosecutor, Thomas Schiels, to reinvestigate. Schiels found the conviction to be sound.[36] When Hincapie filed a motion to vacate his conviction, the DANY convinced Justice Eduardo Padro to put

---

[36] Although George Delgrosso didn't require counsel for his interactions with ADA Keenan during CPL 440.10 proceedings from 2017-2020 (during which he directed her to the NYPD file, revealed his departmental discipline for the first time, and provided her "follow up information" for the Court after he testified), or, indeed, his testimony at the hearing, he only agreed to speak with the PCJU in 2023 in the presence of his counsel, Thomas Schiels.

off a hearing to allow the CIU to investigate. Defense counsel recognized the investigation as "a ploy to avoid a hearing." After delaying the hearing for months, CIU Chief William Darrow told the Court, "[w]hen we looked at the facts, the facts took us in a different direction." In a memo signed by DA Vance, the DANY called Hincapie's claims "demonstrably false." Justice Padro vacated Hincapie's conviction after the hearing. Vance's spokesperson said the DANY "remain[ed] committed to retrying the case, if necessary." After unsuccessfully appealing Justice Padro's decision, the DANY announced that it would not retry Hincapie. Even as a senior ADA recommended Hincapie's charges be dismissed, the DANY emphasized that the recommendation did *not* mean that he was innocent. It was absurd for the DANY to claim it had seriously consented to any relief for Hincapie.

261)    There is no apparent record of the CIU consenting to relief for "Darrell Blue," another defendant named to Gonnerman. Thus, in ten years of existence, the Unit had apparently agreed to relief for eight defendants at most, far less than other such units established after the DANY's. At the beginning of its tenth year of existence, the Brooklyn Conviction Review Unit ("CRU") had agreed to vacate the convictions of at least thirty-seven defendants and regularly publicly released the reports detailing its investigations. The CIU never released such reports and the DANY maintains that PCJU reports should not be released.[37] The DANY has made false public claims about the work of both the CIU and the PCJU.

262)    By 2010, Smokes had been unable to secure counsel. He learned of the CIU and sent a letter professing his innocence along with James Walker's recantations, Robert Moore's

---

[37] The Bronx District Attorney's Office established a CIU in 2016 and the Queens District Attorney's Office established a CIU in 2020. As of 2024, the Bronx CIU has exonerated at least eight defendants and the Queens CIU has exonerate at least twelve defendants.

affidavit, and a redacted copy of DD5 #17 regarding the anonymous call naming Jean Casse's murderer.[38]

263)    On August 11, 2010, ADA Sard wrote to Smokes that his claims would "undergo a preliminary review" and he could expect to receive "a response or a request for additional information within the next couple of months." Smokes received no further contact.

264)    The DANY knew that Walker had recanted for *at least* fourteen years before Smokes and Warren were exonerated and either did nothing to investigate his recantation or suppressed the results of any investigation.

265)    In or around 2016, Smokes and Warren secured *pro bono* representation. Their counsel submitted a FOIL request to the DANY seeking an unredacted copy of DD5 #17. The request referenced that Smokes and Warren were innocent. The DANY responded by informing counsel that the claim of innocence would be forwarded to CIU Chief Darrow without disclosing the DD5.

266)    Defense counsel had several meetings and conversations with ADAs Darrow and Charles King of the CIU. They consistently displayed an aversion to disclosing evidence or insulating the trial prosecutors from any reinvestigation. By contrast, they persistently demanded evidence and information from the defense, conditioning a reinvestigation on unilateral open file discovery. Counsel provided the CIU with a proposed cooperation agreement to facilitate a collaborative reinvestigation. On January 17, 2017, King replied that the DANY would not consent to the terms proposed including insulating the trial prosecutors from any reinvestigation.

---

[38] Beginning in or around 2005, Walker wrote to Smokes in prison and admitted falsely accusing Smokes and Warren.

267)     Unbeknownst to the defense, Darrow and King began consulting Susan Axelrod and

Michael Goldstein immediately after their first contact with defense counsel. In December

2016, King contacted Axelrod and Goldstein to arrange for them to look through the DANY

file. On January 3, 2017, the CIU met with Axelrod and Goldstein together. In 2019, Axelrod

testified that *Darrow came to her "to let [her] know that there were issues being raised*."

(emphasis added). The CIU sent her a copy of the defendants' motion "as a courtesy"

because she was "one of the trial prosecutors," and King and ADA Consuela Fernandez of

the CIU "kept her apprised" *during the hearing on the motion but **before** her testimony*.

268)     By contrast, Goldstein testified that he had no contact with the CIU in relation to the

defendants' case or any other. After he testified, ADA Keenan "corrected the record" by

emailing counsel and the Court that Goldstein had in-person and telephone contacts with the

CIU about the defendants' case. Keenan emphasized that Goldstein did not contact her to

correct his testimony, the correction "came from [her] office." This was not the only instance

of Keenan improperly supplementing the record. Between George Delgrosso's two days of

testimony, Keenan emailed the Court and defense "follow up information for Court" that

included additional details about subjects Delgrosso testified about on his first day on the

stand and which the Court reviewed.[39]

269)     Shortly before counsel for Smokes and Warren first met with the CIU in 2016, Robert

Anthony verbally recanted and revealed that his mother erroneously told police he was an

eyewitness to Jean Casse's murder. The 1987 record was silent as to how Anthony first came

---

[39] In response to the defendants' objection to placing this information before the Court, ADA Keenan wrote that the "[d]efendants suggest that [Delgrosso] acted improperly when providing the People with notes of his thoughts *during his testimony*. They further suggest that the People acted improperly when they disclosed these notes to the defendants in the same manner as they had disclosed all other documents. Neither was improper *in any respect*. What the defendants are effectively saying is that such disclosures should be withheld from this Court because it is incapable of disregarding, when appropriate, *matters not in evidence*." (emphasis added).

to be considered a witness, and Goldstein elicited testimony from Anthony that he did not know how police "found out about" him. This information was, however, conveyed to Robert Jackall and appeared in his 2005 book "Street Stories: The World of Police Detectives." Accordingly, in 2016-17, the defense was investigating Anthony's revelations and repeatedly asked Darrow and King to disclose how Anthony first came to be considered a witness. Each time, they declined. When the evidence was finally disclosed, it amounted to a one-page DD5 that contradicted testimony Goldstein elicited from Anthony at trial. [Exhibit C]. Darrow's bio page on the "Prosecutors' Center for Excellence" website states that he "chaired the [DANY's] <u>Brady</u>/<u>Giglio</u> committee."

270)     During a 2023 review of the DANY file, counsel discovered an email from Axelrod to King on January 3, 2017, before the CIU met with Axelrod and Goldstein, showing that *the CIU asked the trial prosecutors whether to disclose evidence to the defense*.

271)     King appended an unredacted copy of DD5 #17 to his January 17, 2017, letter to defense counsel.[40] However, he took the position that no additional material would be disclosed to the defense, nor would any reinvestigation commence, until the defendants disclosed all their evidence. King wrote, "[b]efore deciding whether or not to commence a reinvestigation…we need to know the specific factual basis for defendants' claim of innocence." Without acknowledging that the CIU had refused to provide evidence to the defense to that point, King wrote, "[y]ou have been reluctant to provide us with copies of the affidavits you have obtained and to share information constituting the specific factual basis of that claim." This was not true, counsel had explained that the defendants' claim of innocence was based on evidence that they were not present for Jean Casse's murder and, indeed, many of the

---

[40] This was when Smokes and Warren first learned who the individual named in DD5 #17 was (Lee Koonce).

People's purported eyewitnesses were not present either. Counsel had also shared a detailed case synopsis, transcripts, DD5's, and a copy of chapter three of "Street Stories."

272) King suggested that if the defendants were unwilling to provide their evidence, they should file a motion or, "[a]lternatively, perhaps you will consider providing…a draft copy of the motion with supporting affidavits. We will read it and give you a reasonably expeditious decision on whether [the CIU] will commence a reinvestigation…[w]e can also discuss at that time whether it would be mutually advantageous for us to collaborate…[i]n our view, a collaborative reinvestigation should be undertaken if both sides believe it would facilitate a search for the truth."

273) This was the same type of conduct the CIU engaged in during John Hincapie's post-conviction efforts. King wanted advance notice of the specifics of the defendants' claims so the DANY could more effectively prepare to defend against them.

274) On February 1, 2017, Michael Goldstein called King, said that he was "curious as to what is going on" with the case, and asked that King call him back. Less than two years later, Goldstein testified that he could not recall *ever* having contact with the CIU.

275) In a final effort to facilitate a collaborative reinvestigation under fair conditions, defense counsel met with the CIU on February 15, 2017. The meeting was held in the office of General Counsel Cary Dunne and attended by ADAs Darrow, King, and Catherine Christian. Counsel provided the prosecutors with several affidavits, including the recantations of James Walker and Kevin Burns, and offered to provide the entire defense file in exchange for the evidence demonstrating how Robert Anthony first came to be considered a witness. *Again*, the DANY *refused* to disclose this information.

276)   ADAs King and Fernandez of the CIU regularly attended the CPL 440.10 hearing and "kept [ADA Axelrod] apprised." During a 2023 review of the DANY file, the undersigned discovered that King took notes *and consulted ADA Keenan concerning strategy for opposing the defendants' claims*. Axelrod met with Keenan "at least five" times, including at least once while Goldstein was present.

277)   Thus, the DANY was *again* notified that Walker had recanted, and that his recantation was supported by Edward Williams, John Williams, and James Moody (each of his January 2, 1987, accomplices) for just under seven years before Smokes and Warren were exonerated and either did nothing to investigate the recantation or suppressed the results of any efforts. Although Kevin Burns was incarcerated in February 2017 and for months thereafter, no one from the DANY spoke with him until about three weeks before he testified at the hearing on the defendants' motion in November 2018.

278)   On July 17, 2017, the defendants moved to vacate their convictions and charges on grounds of newly discovered evidence and actual innocence. The motion was supported by:

- DD5 #17, which demonstrated that before investigators spoke with Smokes or Warren, Lee Koonce was named to the police as Jean Casse's murderer and Koonce's accomplice told police where Koonce could be found with Casse's wallet.

- Recantations by James Walker stating, *inter alia*, that: when he made claims about Smokes and Warren in 1987, he was addicted to crack; he lied and said what he thought investigators wanted to hear so he could avoid prison and continue to use crack; and the statement he attributed to Smokes and "any testimony [he] gave about [the defendants] having committed any crimes" was false.

- The affidavit of Edward Williams, stating that he first met Smokes after his own January 1987, arrest for attempted robbery and that Walker's testimony about the statement he attributed to Smokes was false.

- The affidavit of Tyrone Bess' mother, Elizabeth Bradford, stating that Bess did not see Casse's robbery or murder but police pressured him to make false identifications by offering help on his open charges and threatening to bring new charges against him.

- The affidavit of Barry Hall, who corroborated the defendants' alibi and stated that Detective Kennedy threatened him with charges.

- The affidavit of Brandon Holmes, who was interrogated and accused of committing Casse's robbery and murder with Jerry Sanders.

- The recantation of Robert Anthony stating, *inter alia*, that: he and his companions did not see the robbery or murder of Casse and only happened upon the scene when Casse was already lying injured; his mother overheard he and his cousin Andre discussing what they saw and erroneously reported that he was a witness to the crime; when he was interrogated on January 8, 1987, the detectives threatened to charge him with murder; and he didn't know what the defendants looked like before that date.

- The affidavit of Patrick Denson, stating that he did not Casse's robbery or murder, he told investigators this, and the Houston brothers told him they didn't see the crime either.

- The affidavit of Terrell Davis, stating that he was interrogated in 1987 by ADA Goldstein and George Delgrosso who told him he was implicated in Casse's murder by the defendants and urged him to cooperate against them. When Davis refused, Goldstein and Delgrosso threatened to charge him with the murder and subjected him to "bullpen therapy." When Davis was produced at trial, Goldstein and Delgrosso again pressured him to falsely implicate the defendants and, when he wouldn't, accused him of being afraid of Smokes. Davis has never been threatened by either defendant.

- The affidavit of Robert Moore, stating that ADA Axelrod pressured him to falsely implicate the defendants in exchange for dismissal of the charges against him.

- The recantation of Kevin Burns, stating, *inter alia*, that: he and Smokes had a "beef" that began when he shot at someone and hit Smokes; when he was first questioned about Casse's murder, he saw an opportunity to harm Smokes and help himself, so he provided false information; when he was brought to the DANY months later, he was threatened with charges if he refused to cooperate and fed information about the murder; and he was given cigarettes after his testimony.

279)    Thus, the defendants presented: the recantation of Walker, the **sole** source of the People's Molineux evidence *and* the inculpatory statement attributed to Smokes, and evidence corroborating his recantation; the recantations of **half** of the People's identification witnesses, and other evidence calling the testimony of the remaining identifications witnesses into question; and, substantial evidence of police and prosecutorial misconduct during the investigation of Casse's murder and the defendants' prosecution.

280)    ADA Christine Keenan represented the People on the motion and repeatedly claimed that portions of the DANY file were missing and that she was unable to locate the NYPD file.[41] However, the motion was supplemented to include claims of prosecutorial misconduct and constitutional violations after Keenan made a series of mid-hearing disclosures.

281)    Before the first appearance on the motion in October 2017, Keenan informed defense counsel that she intended to ask the Court to compel disclosure of the contact information for the defendants' witnesses. At the appearance, she represented that she was missing portions of the DANY file but conspicuously refused to certify a lost file. Keenan asked for the contact information for all defense witnesses purportedly because she wanted to investigate the defendants' claims *to determine whether the People would oppose them*. Judge Stephen Antignani was informed that the defense had learned that James Walker had recently died. He said that he didn't see how the People could avoid a hearing on the defendants' motion, but that he would give the People as much time as Keenan requested and the defense could avoid delay by disclosing the requested information.[42]

282)    On October 25, 2017, the defense gave Keenan information for all witnesses who provided statements in support of the defendants' motion as well as some who had not, including Andre Houston. For the next eight months, under the illusory guise of reinvestigation, the DANY delayed the resolution of the motion while Keenan and other

---

[41] Keenan located the NYPD file during the hearing after George Delgrosso reportedly "insisted" it was at the Midtown North Precinct. She disclosed portions of the missing DANY file throughout the hearing and, in 2019, additional materials from the file were located *by Jennifer Gonnerman* at the Manhattan Municipal Archives, *blocks from the DANY*. Additional materials from the file were located in 2023 by the PCJU in the DANY file for Jerry Sanders' case, at the Brooklyn location of the Archives. During the hearing, Keenan claimed that the CIU file opened in 2010 was missing, and disputed Smokes' testimony about what he sent the DANY. Keenan said she couldn't say whether Smokes sent Walker's recantations, then that she didn't believe they were sent. In 2023, the PCJU found the CIU file, which showed that Smokes sent what he claimed in his testimony.

[42] Despite receiving notice of Walker's death at the same time as the Court and having purportedly conducted a "thorough reinvestigation," over a year later Keenan contended that there was *no proof Walker was deceased*.

agents of the Office sought to generate evidence to oppose it, coerce witnesses, prepare witnesses to testify in defense of the convictions, conceal information and evidence that was favorable to the defendants and, indeed, investigate their legal team.

283)   In May 2018, after Keenan attempted to speak with him, Robert Anthony responded with a voicemail in which he invoked counsel and accused the DANY of being unethical. When questioning Anthony in November 2018, Keenan implied that he simply refused to speak with her. She was able to do this because she withheld the voicemail, which the DANY still has not disclosed.

284)   In June 2018, ADA Keenan and Detective Investigators Jeff Salta and Peter Salerno went to California to ensure Andre Houston would preserve the defendants' convictions. At some point between June 1st and 5th, Keenan contacted Andre using the phone number provided by the defense. Andre admitted falsely accusing the defendants because of police coercion but "adamantly stated that he did not want anything to do with the case and refused to meet." Keenan reportedly responded that she "just wanted the truth, and that it was very important that [they] meet in person to have a full conversation." Keenan sent Salta and Salerno to meet with Andre in private, outside of her presence, and with a copy of his testimony. Salta and Salerno held themselves out as FBI agents to Andre and members of his family. During their first unrecorded meeting with Andre, who is schizophrenic, Salta and Salerno coerced him to repudiate his recantation.

285)   On or about June 15, 2018, Keenan obtained a subpoena for the subscriber records for the cell phone of the undersigned. She had no legitimate basis for this subpoena and obtained it in bad faith.

286)    On June 28th, the DANY consented to a hearing on the defendants' motion without

submitting written opposition and Keenan applied *ex-parte* for a protective order to withhold

Andre's statements from the defendants ostensibly "due to the substantial risk of physical

harm or intimidation to the witnesses" (plural). Keenan's application was not supported by

any legitimate evidence and consisted almost entirely of her own representations, largely

concerning *events **she** was **not** present for.*[43] The application was submitted to gain a

strategic advantage, not merely by fooling the Court into allowing the People to withhold

Brady material from the defense on false grounds, but to bias the Court against recantation

evidence before a hearing at which it would be required to assess several recantations.

Keenan also used her application to report false allegations of threats to witnesses to

prejudice the Court against the defendants.

287)    *Keenan* wrote that Andre repudiated his recantation *at the meeting with Salta and

Salerno*, said he was afraid for himself and his family, and asked for protection. She told the

Court that there were "great safety concerns for the witness and a witness tampering risk,"

and "already evidence of witness tampering." Upon information and belief, Andre was not

given protection and no investigation into "witness tampering" or threats was done.

288)    According to Keenan, Andre's fear was because of a single anonymous call he "believed"

to have come from Smokes. Although she wasn't present for the meeting, her application was

not supported by a statement or testimony from Salta, Salerno, *or* Andre. Indeed, *nothing* was

endorsed by Andre and *there was no evidence presented that the detectives had actually met

with him*, let alone that he said the things Keenan reported. Nevertheless, Judge Antignani

granted the application, in which Keenan represented that Andre's statements would be

---

[43] Judge Antignani's one-page order granting the application stated that he was "satisfied based upon the affirmation of [ADA] Keenan."

provided in "ample time to make use for cross-examination," but if "for some reason" the People were "unable" to call him, they would turn over the information to the defendants and "permit them" to reopen their portion of the hearing and the Court could then deem appropriate what to consider in Andre's "absence."

289)    Keenan knew that the proposed remedy to avoid prejudice to the defendants if the People didn't call Andre was illusory. The plain language of her application demonstrates that she *knew* the defense would be unable to compel Andre to appear and, thus, he would testify for the People or not at all.

290)    Judge Antignani's one-page order stated, "the People are not required to turn over the protected information, as stated in the protective order, until one week prior to the individual testifying." Unbeknownst to the defense and, upon information and belief, Judge Antignani, DANY agents met with Andre at least twice between June 28, 2018, and May 22, 2019.

291)    On September 14, 2018, the defendants served a demand for discovery including a specific request for any statements made by witnesses whose contact information was provided to the People at the advice of Judge Antignani—including Andre Houston. The People made no disclosures in response. In September and October 2018, Andre told members of the defense that he was not in California and would not come to New York to testify. Accordingly, when the hearing began, the defense applied to have Andre deemed unavailable to elicit testimony about statements he had made to Robert Anthony and Patrick Denson under the declaration against penal interest exception to the prohibition on hearsay. Without revealing that Andre had personally told her he would not appear, ADA Keenan responded that she didn't know if it would be legally accurate for the Court to designate him unavailable. The Court denied the defense application. As a result, the defendants were

prejudiced in that they were prohibited from eliciting significant testimony because of suppression and misrepresentations. This prejudice was compounded months later when Keenan announced that the People would not be calling Andre to testify as indicated in her *ex-parte* application.

292)    The hearing commenced on November 14, 2018. Among the evidence the defense presented was the testimony of Edward Williams, Robert Anthony, Kevin Burns,[44] Terrell Davis, Robert Moore, Brandon Holmes, Patrick Denson, Michael Goldstein, George Delgrosso, and the defendants; Delgrosso's previously undisclosed memo book, which contradicted the 1987 police testimony and revealed the previously undisclosed Throop Avenue tip; and the recantations of James Walker and proof that, along with Moore's affidavit, Smokes submitted them to the DANY in 2010.[45] Judge Antignani refused to consider an Affirmation by Pam Jordan.

293)    Delgrosso admitted testifying inaccurately about the defendants' alibi in the Grand Jury. His testimony also revealed that: Robert Anthony was indeed reported by his mother through Detective Stubbs, her boyfriend; Anthony denied being a witness to Casse's robbery or murder; and, in 1978 Delgrosso was disciplined by the NYPD after knocking another officer unconscious while drinking in a bar, lying to responding police and Internal Affairs investigators and falsely blaming his conduct on "kids," and maintaining his lie for *well over a year* before independent witnesses revealed the truth.

---

[44] The defense first learned that Keenan and Salta met with Burns on October 23, 2018, during Keenan's cross-examination of Burns on November 14th. Keenan withheld the notes she took during the meeting until after Burns left the stand. They reflect that he told her, *inter alia*, that: *he wasn't housed with Smokes at the time of his trial testimony*; he heard "Drac" hit Jean Casse; and *the trial prosecutors knew he was lying and caught him in lies*.
[45] Because ADA Sard responded to Smokes in 2010, Judge Antignani agreed to consider the recantations by Walker that Smokes sent to the DANY. He refused to consider a 2016 affidavit that Walker gave to defense counsel.

294)   Kevin Burns testified in November 2018, before ADA Axelrod or Michael Goldstein, and

said that in 1987 a female ADA "blatantly said" she could make his impending prison term

harder. Burns also testified that he was given cigarettes by a male after his trial testimony.

When Goldstein testified in January 2019, he denied that he would have given any witness

more than one cigarette from his own pack. After testimony concluded, ADA Keenan

derided Burns' testimony as "bad fiction" and claimed that none of the law enforcement

witnesses who testified would have "**risk[ed] their careers** by giving an inmate

[cigarettes]." (emphasis added). After Keenan submitted this argument, Jennifer Gonnerman

of *The New Yorker* discovered portions of the "missing" DANY file, including documents

prepared *by Goldstein* seeking reimbursement for $17.41 *for cigarettes for Burns*

accompanied by a receipt dated the day he testified.[46]

**Déjà vu All Over Again: The DANY Invents Evidence Related to Kevin Burns.**

295)   On direct-examination by the defense, Burns was asked what he did for work and

responded, "New York City Sanitation." ADA Keenan did not ask Burns *any* questions about

his employment, despite asking him about several alleged inconsistencies between his

hearing testimony and statements he had supposedly made at the DANY on October 23,

2018. Over two months after he left the stand, Keenan suddenly argued of Burns, "[h]ere is a

man that showed up late to my office, and when asked why, he said he worked an overnight

shift. When asked where, he pointed to his shirt, which read DSNY. He came dressed to my

office in what appeared to be a makeshift…New York Department of Sanitation uniform."

She claimed that Burns testified falsely about his employment and that she didn't need to

---

[46] After Gonnerman discovered the materials, the defense obtained a subpoena from Judge Antignani for them. Keenan usurped this subpoena and took custody of the documents, claiming *it was her understanding that they were the property of the DANY.*

confront him before introducing collateral evidence of what she referred to as his "bad act" of allegedly misleading her. Of the *three* witnesses the People called at the hearing, *two* were called to show that Burns was not a "real" sanitation worker, was not "authorized to wear" a DSNY t-shirt and, thus, had supposedly lied about his employment. Keenan's notes from the October 23rd meeting contained *no* information about Burns' employment.

296)    ADA Keenan attempted to find legitimate evidence to impeach Burns' recanting testimony but, when she found none, she invented evidence. An email found in the DANY file in 2022 demonstrates that she learned information that contradicted *trial testimony ADA Goldstein elicited from Burns* but concealed it.

297)    On November 16, 2018, Keenan said that the DANY "turned over *more than we're ever required to turn over*…[w]e have given them **everything**. This case has *been thoroughly reinvestigated…we* just came to the conclusion that *they are not actually innocent*." (emphasis added). **Keenan's representations about prior disclosures were baseless and false**. On January 25, 2019, Michael Goldstein testified that Keenan first contacted him 2-3 months earlier (at the time of or just after her representations) and that he could not recall what was disclosed in 1987. In 2022 Goldstein told the PCJU that there were no <u>Brady</u> or <u>Rosario</u> lists documenting disclosures in 1987. A deluge of undisclosed evidence that was available to Keenan in November 2018 was disclosed from 2019-23. However, the Court was clearly influenced by Keenan's representations. On the day Goldstein testified, Judge Antignani said of witness statements, "It was all turned over. It was not hidden. It wasn't disguised. It was given." Capitalizing on the effect of her misrepresentations, in a subsequent filing, Keenan argued that "ADA Goldstein turned over the <u>Rosario</u> material in accordance with the law, at the time statutorily prescribed, and the defendants had sufficient opportunity

to review the materials. In addition, many of the witness statements had already been provided to the defense."

298)   On January 31, 2024, Judge Antignani admitted that his 2020 decision was "wrong" because he did not have the initial statements of Robert Anthony, which were in files Keenan explicitly argued were in the People's possession.

299)   ADA Keenan repeatedly claimed that the DANY had conducted a "thorough reinvestigation." However, she didn't locate the NYPD file until November 2018, when she also disclosed portions of the "missing" DANY file and first spoke with Goldstein. She disclosed additional portions of the DANY file in December 2018, when she also said there was no proof that James Walker was dead (he died over a year earlier). She disclosed more of the DANY file in January 2019, did not find the DANY file materials in the Manhattan location of the Municipal Archives (found by a civilian in 2019), and never produced the CIU file opened in response to Smokes' 2010 letter (found in the DANY in 2023) or the DANY file materials in the Brooklyn location of the Archives, notwithstanding her representation that they were in her Office's control.

300)   On April 5, 2019, after the defendants had called all their witnesses, Keenan made a record disclosing statements she attributed to Andre Houston in June 2018, September 2018, and March 2019. No credible evidence that Andre made the statements was presented, and Keenan said that a signed statement from him would be "meaningless." In contrast with her *ex-parte* application, Keenan stated that, "*[b]ased on all the circumstances*, [the People would] *not* be calling [Andre], as indicated in the protective order." (emphasis added). Keenan did not explain what these "circumstances" were, nor did she call Detective

Investigators Salta or Salerno to testify about their work regarding Andre.[47] Only Salta and Salerno were present during the June 2018 and March 2019 in-person interactions with Andre. **Keenan indicated that during the June and September 2018 meetings, *Andre made no reference to Warren* when recounting his alleged recollection of the robbery and murder of Jean Casse** and only "believed" the person he claimed to have seen hit Casse was Smokes. **According to Keenan, in March 2019, *at a meeting she was not present for*, Andre became "certain" that he had seen Warren going through Casse's pockets**.

301)    After withholding Andre's statements for eleven months and throughout the defense case, only to decline to call him as she claimed she would in her application, Keenan contended that *the defense* was "trying to jump over" calling him. She said that if the defendants wanted to call Andre as *their* witness, she would see if she could assist in producing him. Thus, "all the circumstances" underlying the People's decision not to call Andre evidently did *not* include an inability to produce him. When counsel argued that requiring the defendants to call Andre as their witness after months of clandestine contact with DANY agents would be unfair, Keenan claimed this contention was "frankly not genuine."

302)    Keenan didn't reveal what "all the circumstances" underlying the People's choice not to call Andre were because that information would have demonstrated the misleading and disingenuous nature of her *ex-parte* application and on-the-record representations. Andre's nebulous concern for his family takes on a different light given that members of his family were approached by DANY agents holding themselves out as FBI agents even before they spoke with Andre, who is schizophrenic. The fact that Andre reads at a fifth-grade level calls into question Keenan's representation that, while meeting with Salta and Salerno, he "stat[ed]

---

[47] Although Keenan called Salta to testify, his testimony concerned Burns' supposed statements on October 23rd.

in substance 'you want the truth, that is the truth' while pointing to the trial transcript." Even in June 2018, Keenan acknowledged that Andre's alleged recollection differed from his trial testimony but said that "[h]e was not confronted with the difference…because the investigators were not aware of his specific trial testimony." She did not explain why, if the investigators were not aware of Andre's testimony, they brought a copy of it when they met with him *after* he recanted it to her.

303)    The defendants submitted a supplement requesting a remedy for the suppression of Andre's statements and the prejudice to their case. Judge Antignani denied any remedy and, relying on Keenan's unsupported representations, referenced that Andre believed he was threatened by Smokes, which he erroneously opined was "not atypical" in this case. Thus, Keenan biased the Court against evidence proffered by the defendants by submitting an unsupported *ex-parte* application on the same day she consented to a hearing on their claims. Furthermore, claims of threats **were** atypical. *Kevin Burns was the **only** witness to **ever** testify that he was threatened by **either** defendant*, in trial testimony he had *repeatedly recanted*. The entire basis for Andre Houston's alleged fear was an undated call he "believed" to have come from by Smokes. Keenan had subpoenaed Smokes' phone records along with a number of other witnesses. *If this call was made by Smokes, Keenan could have demonstrated that*. However, *she never even attempted to* and there is *no* indication that the alleged threats to Andre were investigated or the protection he supposedly sought was provided despite the purported "substantial risk of physical harm or intimidation."

304)    On January 14, 2020, Judge Antignani issued a one hundred and twenty-three page decision denying the defendants' motion and found, *inter alia*, that:

- Notwithstanding George Delgrosso's testimony that he first revealed his departmental discipline to a prosecutor when he told ADA Keenan in 2018, and that Michael Goldstein said he never learned of it, the defense could have learned of it before trial.[48]

- The contention that coercion and threats by law enforcement caused witnesses to testify falsely was "belied" by the hearing evidence because no witness testified that police used any *physical* threats or force and "the explanation of coercion as a motivating factor for the allegedly false testimony of various witnesses is simply not believable and, more importantly, could have been raised on appeal."

- Robert Anthony offered "no specific details of any actual threat used against him."

- Anthony could not have testified about the assault of the woman in the white coat unless he was present during the attack on Casse.

    - In 2023, the DANY admitted that previously undisclosed evidence *reinforced* Anthony's 2018 account of "an *interrogation* process that treated him *both as a perpetrator and a witness*," (emphasis added) and corroborated that the police introduced facts to him, including about the woman in the white coat.

- Kevin Burns gave no "compelling reason" for why he testified falsely against the defendants. The Court didn't believe the explanations he gave would have prompted him to lie "especially at a murder trial against individuals who lived in his neighborhood and where he did not testify under a cooperation agreement." There was no "rational basis" for his recantation, "other than the possibility that [he] was influenced by friends of [Smokes]." He didn't "claim the prosecutor engaged in any threats," and, the Court couldn't accept his account "based solely on his word, where he deliberately misled the court on something so innocuous as his employment status and…his trial testimony was consistent with that of other witnesses."

    - Like Anthony, Burns gave detailed testimony about threats by law enforcement. The "possibility" that he was influenced by friends of Smokes and the proposition that he lied about his employment were unsupported by *any* evidence.

    - Burns' testimony was *not* consistent with other witnesses. He was the *only* witness to testify that: Casse fell on a slant and first to his knees; the person who punched him also took his wallet; and the assailants fled through a "passageway."

- Michael Goldstein testified credibly in denying that he engaged in *any* misconduct and his purported inability to recall contacts with the CIU didn't negatively impact his credibility.

---

[48] Although Delgrosso testified that he revealed his assault, fabrication, and discipline to Keenan in November 2018, she withheld it until January 23, 2019, after she claimed she might not call him and the defendants said they would.

- Documentary evidence demonstrated that Goldstein committed what ADA Keenan explicitly argued was "career risking" misconduct by giving cigarettes to Burns, an act that Goldstein denied in hearing testimony. [**Exhibit P**: Notes of Goldstein PCJU Interview].

- The money Goldstein spent on cigarettes for Burns was "an insignificant amount."

- That Edward Williams didn't see the defendants at the Albee Square Mall on January 2, 1987, wasn't "persuasive evidence that Walker's testimony about his encounter with Smokes was false."

- Before trial, Terrell Davis made statements to law enforcement claiming to have seen Warren in Manhattan on New Year's Day, when Warren made an admission to him, and his hearing testimony was a "supposed recantation."

  - Davis did *not* recant his trial testimony. He *did* deny making statements to law enforcement before trial beyond what he testified to at trial in uncontradicted hearing testimony.

- The defendants failed to show that Delgrosso's false Grand Jury testimony "was a deliberate lie calculated to mislead the Grand Jury, rather than a mistake" and "whether defendants were with the same friends the entire night was not so important a factor as to have affected the Grand Jury's decision to return an indictment."

305)    The defendants sought leave to appeal, explicitly asking the First Department to set aside Judge Antignani's credibility determinations. On June 25, 2020, the First Department granted leave to appeal on the law and the facts.

306)    In 2022, the PCJU began a review of the defendants' convictions. The defendants agreed to hold their appeal in abeyance pending the outcome of the review, provided the Unit with a draft of their appellate brief, waived certain privileges, and sat for interviews. Among the evidence the defense provided to the PCJU was:

- The affidavit of George Samuels, who corroborated Kevin Burns' recantation and said that he told George Delgrosso and Michael Goldstein that Burns' information was false.

- The affidavit of Thomas Chavis, who corroborated Burns' recantation and said that he was not asked about Jean Casse's murder until 2021.

- The affidavit of Sabrina Gardner, who corroborated Burns' recantation.

- The affidavit of Edith Beaujon and her correspondence with Smokes.

- The affidavit of Alvena Jennette, who knew James Walker his entire life, corroborated that he was addicted to crack, and said that he reached the "point of no return" in 1987.

- A pre-hearing report by a defense investigator assigned to locate and speak with Andre Houston. During an October 2018, phone conversation, Andre wouldn't tell this investigator where he resided and claimed he was not in California.

- The Affirmation of Professor Alan Hirsch, Esq., a nationally renowned expert on false confessions and flawed interrogation techniques who concluded that Robert Anthony's accusations against the defendants were produced through the Reid Technique, an interrogation method known to produce false statements, and found "substantial reason to doubt the reliability of [Anthony's] recanted accusation."

307)    In addition to the defendants, the defense arranged for multiple witnesses to be

interviewed by the PCJU including Robert Anthony; Kevin Burns; Sabrina Gardner; Thomas

Chavis; Pam Jordan; Alvena Jennette; George Samuels; Niles Williams; Barry Hall; and

Elizabeth Bradford.

308)    In the Fall of 2022, the PCJU and defense jointly engaged private investigator Heidi

Werntz to locate and interview Andre Houston. On October 7, 2022, Andre recanted during

an interview with Werntz, defense counsels, ADA Rosenblatt, and other members of the

PCJU, stating, *inter alia*, that:

- On January 8, 1987, the detectives told him they knew who murdered Jean Casse, his cousin Robert Anthony had already given a statement, and if Andre didn't tell them who did it, they were going to say he did;

- The detectives "screamed at him." He was "scared out of his mind" and "crying a lot";

- **He did *not* know the defendants**;

- He is learning disabled, reads at a 5th grade level, and cannot read the statement written for him by Detective Kennedy;

- He cannot recall the name "Catfish" and does not know anyone by that name;

- He did *not* see the defendants do anything on New Year's of 1986-87 but, rather, was "given a script" and "asked to be an excellent actor";

- The police "took some scared kids" and **"*made* a case"**; and

- Once the January 8th statements were made "the pressure was on, and **there was no turning around from there**."

309)    Werntz said that Andre's interactions with DANY agents from 2018-19 were apparently "not a pleasant experience for him."

310)    After Andre's recantation, ADA Rosenblatt said the DANY could not stand behind the defendants' convictions or the conduct of the police and prosecutors who worked on their case. Rosenblatt said she expected to complete the PCJU reinvestigation by November 7th and to have her report submitted to DA Bragg by the end of November 2022. It was *more than another year* before Smokes and Warren were exonerated.

311)    In December 2022, Robert Anthony was interviewed by the PCJU and defense. Anthony remained consistent with his 2018 testimony. He reiterated that: neither he nor his cousins saw what happened to Jean Casse; the police *told him they knew he knew what happened*, "coerced" him and **told him** what **he** saw; and he did not know what the defendants looked like before viewing their photos, but the detectives "pushed them in our face."

312)    Thus, **Alfonso Houston is the *only* civilian witness who *might* stand by his testimony against Smokes and Warren**, but his testimony has been contradicted by his cousin, his brother, Reginald Grant, and Patrick Denson, all of whom he claimed to have been with when he supposedly saw the defendants commit Casse's robbery and murder.

313)    During a May 2022 review of the DANY file, the undersigned discovered a June 2018 subpoena by ADA Keenan seeking the subscriber information for five phone numbers, those of James Moody, Patrick Denson, Terrell Davis, Alfonso Houston—and the undersigned. Keenan had subpoenaed the subscriber information for the cell phone of the undersigned for

the period of January 2015 through June 2018.[49] The materials apparently obtained through the subpoena were in a file labeled "Henning phone records" in Keenan's handwriting and included references to the phone numbers and home addresses of the defendants' prior counsels and investigators, and the parents of the undersigned. [**Exhibit Q**: Henning Phone Records File]. Keenan's investigation into the defendants' legal team was an improper fishing expedition conducted in bad faith to erroneously imply that the defendants had manipulated or incentivized witnesses (as the DANY did in the Fernando Bermudez and Jon-Adrian Velasquez cases discussed herein) and intrude upon the attorney-client privilege.

314)    When this subpoena was brought to the attention of the PCJU, no action was taken. When defense counsel raised the issue again, ADA Rosenblatt responded with a threat. On November 7, 2023, General Counsel Leslie Dubeck used familiar language in responding to concerns about Keenan's conduct and stated, "[t]he Office has conducted a *thorough* review and determined that there were no unlawfully issued subpoenas." (emphasis added). Dubeck claimed that Keenan didn't recognize the phone number of the undersigned when she sought the subpoena in June 2018. Keenan knew that this number belonged to the undersigned *at least by* the first appearance on the defendants' motion in October 2017 *and* the records were kept in a file labeled *in Keenan's handwriting* with the last name of the undersigned. The DANY reportedly told members of the media that "remedial action" was taken in response to Keenan's conduct. There is no indication that this was true nor has any material been disclosed indicating that Keenan was questioned about this subject or, indeed, at all.

315)    Also during the May 2022 file review, defense counsel discovered the 2018 voicemail left for Keenan by Robert Anthony. ADA Rosenblatt was initially averse to interviewing

---

[49] The undersigned did not take the bar exam until July 2015 and was not admitted to practice law until March 2016.

Anthony because of this voicemail. Indeed, on December 6, 2022, Rosenblatt referred to Anthony's message as a "very clear" statement communicating to Keenan, "I think your office is unethical, and I have a lawyer."

316)    The defense was given unfettered access to the DANY file for the defendants' case twice and the DANY file for Jerry Sanders' case once during the PCJU reinvestigation.

317)    While the defense made witnesses available for joint interviews by the PCJU, the Unit interviewed law enforcement witnesses (and Robert Jackall) unilaterally. To date, the identities of certain police and/or prosecutorial witnesses interviewed are unknown to Smokes and Warren. Although Michael Goldstein was interviewed in November 2022 and George Delgrosso was interviewed in January 2023, the notes documenting their statements had not been disclosed to the defense by May 2023. After repeated inquiries by the defense, on June 7th, ADA Rosenblatt said that she had withheld the notes **because their disclosure might "humiliate" Goldstein and Delgrosso**. The notes made it apparent that Goldstein and Delgrosso perjured themselves at the CPL 440.10 hearing. [Exhibit F; Exhibit P].

318)    In April or May 2023, the materials sent to the DANY by Smokes in 2010, which ADA Keenan claimed were lost, were found *at the DANY* by the PCJU.

319)    On May 2, 2023, ADA Rosenblatt informed the defense that the PCJU had located materials from the defendants' case in the DANY file for People v. Jerry Sanders, including:

- Photos of the defendants, Robert Moore, Robert Anthony, Andre Houston, Alfonso Houston, Tyrone Bess, Edward Williams, Darryl McDuffy, and Kevin Burns.

- Requests by Detective Delgrosso during the investigation into Jean Casse's murder for the criminal records of various people including Jerry Sanders, Michael Berry, George Samuels, Anthony Warren (Plaintiff's brother), Alfonso Houston, Andre Houston, Robert Anthony, Tyrone Bess, and Thomas Chavis.

- Documents pertaining to Kevin Burns' January 1987 Kings County robbery case.

- Various original notes made by Delgrosso during the Casse investigation.

- Previously undisclosed notes reflecting Stephanie Graham's information that Sanders, Arthur Luckey, and Ian Woodson were responsible for Casse's robbery and murder.

- Undisclosed notes by Detective Kennedy reflecting Robert Anthony's unadulterated January 8, 1987, statements that corroborated Anthony's 2018 testimony that he wasn't on 52nd Street when Casse was attacked or robbed and that he gave the names of his cousins and friends as an alibi, rather than to support any eyewitness account.

320) None of the materials from the defendants' file would have been of *any* conceivable use to the investigation of the murder Sanders was convicted for.[50] Although the DANY claimed that they were "misplaced," there was no apparent basis for such an assertion.

321) Before the notes were disclosed, even the defense considered it possible that Anthony had been on 52nd Street when the woman in the white coat was assaulted. The disclosure of the notes made clear that this information was fed to him, and that the same information was fed to Kevin Burns on June 11, 1987, by Detective Delgrosso and ADA Axelrod.

322) On May 9, 2023, ADA Rosenblatt informed the defense that she had completed ninety pages of the PCJU report and requested a copy of Judge Antignani's 2015 deposition in the matter of Kareem Bellamy v. The City of New York. As of Rosenblatt's last update, the PCJU report was over one-hundred and fifty pages long. The DANY has not disclosed it.

323) On May 11th, Rosenblatt acknowledged at least one Rosario violation during the defendants' prosecution. On July 31, 2023, Rosenblatt sent the defense a "timeline of disclosures" [**Exhibit R**: Timeline of Disclosures] listing **all** the following material and information as having been revealed or disclosed **since trial**:

---

[50] The murder Sanders was convicted for occurred on June 15, 1988. By that time, at minimum, Smokes, Warren, Alfonso Houston, Robert Anthony, Kevin Burns, and Edward Williams were *all* serving State prison sentences. Hence, their photos would be of no *legitimate* use in the investigation of the crime Sanders was convicted for. Obviously, Anthony's statements about his whereabouts on New Year's Eve and Day of 1986-87 would have no relevance to a June 1988 murder prosecuted in 1989. Likewise, Burns' statements about Casse's murder, or documents concerning his 1987 Brooklyn robbery, would have no relevance.

- The signed statement of Tyrone Bess.

- The production and take-out orders for Brandon Holmes, George Samuels, Kevin Burns, and Terrell Davis.

- The Throop Avenue tip.

- Detective Delgrosso's notes documenting the January 1987 tip implicating Ian Woodson.

- Michael Goldstein's notes *of his conversations with trial witnesses* and his memoranda detailing problems with the case and the inconsistencies of the identification witnesses.

- Delgrosso's assault of another officer, fabrication, and resulting departmental discipline.

- Notes by Delgrosso of *statements by Burns*.

- Sheila Moody's relationship with Detective Stubbs.

- The fact that Moody found news clippings in Robert Anthony's bedroom.

- The notes of *Anthony's initial statements* on January 8, 1987.

- Anthony's 2018 voicemail to ADA Keenan.

- The fact that James Walker received consideration from the DANY beyond what the jury and defense heard.

- Stephanie Graham's tip accusing Sanders, Woodson, and Luckey of Casse's murder.

- Notes that police believed Sanders was at the scene of Casse's murder and a prosecutor's notes requesting enhanced sentencing for Sanders on his 1989 conviction *"because of his purported involvement in the Casse murder."* (emphasis added).

324)    At this point, the DANY had all of the evidence they acknowledged as support for vacating the defendants' convictions almost five months later.

325)    On May 16, 2023, ADA Rosenblatt explicitly acknowledged that the defendants' constitutional rights were violated, including their right to <u>Brady</u> material. She said that she had two more meetings with DA Bragg scheduled, with the second being on June 8th. Upon

information and belief, Rosenblatt advised Bragg of her conclusions concerning <u>Brady</u> and <u>Rosario</u> violations.

326)    In 2023 Luana Dunn, a deliberating juror from the defendants' trial, provided an affidavit stating that the initial votes during deliberations leaned in favor of acquittal and only changed after the testimony of Walker, Anthony, the Houston brothers, and Burns was read back. The jury was particularly persuaded to convict *because the witnesses who inculpated the defendants were portrayed as their friends*, and the jurors could not comprehend why the defendants' "friends" would falsely accuse them. Dunn also recalled that one juror held out "because she did not believe the police testimony at all," and only voted to convict after the other jurors "started to kind of bully her to avoid a hung jury." [**Exhibit S**: Luana Dunn Affidavit]. Thus, **the verdict against the defendants was based on evidence that is now *known* to have been false.**

327)    With seven months having passed since Andre Houston recanted, during which David Warren's wife Kim passed away and significant exculpatory evidence was revealed, the defense became concerned that the PCJU review continued to inexplicably drag on without a resolution. At the suggestion of ADA Rosenblatt, the defense submitted a letter to DA Bragg on July 24, 2023, apprising him of evidentiary developments and urging him to agree to vacate the defendants' convictions. The letter detailed, *inter alia*, the following:

- Andre Houston's recantation and the information concerning Andre that was not disclosed by ADA Keenan or Detective Investigators Salta and Salerno.

- Evidence that Detectives Delgrosso and Kennedy testified falsely in 1987.

- Delgrosso's admission that Sheila Moody found news clippings in Robert Anthony's bedroom, and the fact that this information was never disclosed but *was* referenced in Robert Jackall's book.

- Evidence establishing that, as Kevin Burns testified in 2018, he did not see Smokes on the day he testified at trial and, thus, could not have been threatened by Smokes as he claimed in testimony elicited by Michael Goldstein.

- Evidence that Keenan concealed evidence and acted improperly before and during the CPL 440.10 hearing.

- The statements of George Samuels.

- The tip accusing Ian Woodson of Casse's murder, and Delgrosso's statements to the PCJU on the subject.

- Delgrosso's admission that detectives offered to "take care of" robberies for the young men interrogated on January 8, 1987.

328)    On August 28, 2023, ADA Rosenblatt invited defense counsel to review the People's file again and flag materials for disclosure. Counsel meticulously reviewed approximately eight file boxes and marked materials for disclosure. However, the PCJU did not disclose them.

329)    In late August 2023, Rosenblatt informed the defense that the DANY did not intend to oppose the defendants' appeal and would join a motion to vacate their convictions. The convictions remained in place for five more months.

330)    On September 15th, Rosenblatt told defense counsel that she would need to think of how she could justify disclosing materials to her "bosses" when "we're not litigating." Thus, the DANY withheld evidence on the basis that there was no litigation as of September 15, 2023.

331)    On September 26th, Rosenblatt informed defense counsel that **she had been "directed" by the DA to rely only on newly discovered evidence in any motion to vacate the defendants' convictions**.

332)    On September 29th, Rosenblatt informed the undersigned that the People's pre-motion letter to Judge Antignani had been sent to general counsel for review. On October 4th, Rosenblatt stated that general counsel would have to "sign off" on the letter before it could be shown to the defense. Although the PCJU publicly holds itself out as an *independent* unit

that reports *directly* to the District Attorney, throughout the PCJU reinvestigation Rosenblatt repeatedly referenced the need to have general counsel, "senior" people, and other higher-ups at the DANY approve PCJU decisions, disclosures, and filings.

333)    On October 6th, Rosenblatt sent a twelve-page pre-motion letter to Judge Antignani stating that, "the People believe[d] that the only legally correct and just outcome" was to move to vacate the defendants' convictions on grounds of newly discovered evidence.[51] Rosenblatt wrote that the People's motion would be based on "new evidence" that was "not available" at trial or during the prior CPL 440.10 proceedings and "consist[ed] of witness statements and documents that were not known to the parties or [the] Court at the time of the CPL 440.10 hearing." She said the motion would be supported, *inter alia*, by the following:

- The People credited George Samuels and found that his account was corroborated by testimony and documentary evidence.

- The People credited Robert Anthony and wrote that he adhered to his CPL 440.10 testimony and "stated that he was made to feel like a suspect during his interrogations, and his accusations [against the defendants] were, in part, to avoid getting arrested himself." Delgrosso's statements to the PCJU "provided more information that corroborated Anthony's account." Delgrosso said that Anthony's mother "found news clippings…in her son's room, which was what prompted her to call Det. Stubbs, whom she was dating." The People claimed that the fact that news clippings were in Anthony's room "was not known at the time of trial or the prior CPL 440.10 hearing." Delgrosso also told Anthony that if he committed "any other robberies, he should tell the police during his interrogation so that they can 'take care of it.'"

- The notes reflecting Anthony's unadulterated statements to Detective Kennedy "first list the people [he stated] he was with on the night of the crime and a notation that **they were south of 52nd Street at the time of the crime**" which corroborated "Anthony's account that he provided the police those names as people who could corroborate that [he] was not himself a perpetrator, as opposed to offering them up as people who also witnessed the crime." (emphasis added). The People acknowledged

---

[51] Also on October 6th, ADA Rosenblatt contacted a pair of attorneys, colleagues of the undersigned, in an attempt to have them pressure the defense to refrain from discontinuing cooperation with the PCJU or contacting the media about the DANY's disingenuous and dilatory conduct. One of these attorneys served as independent counsel to Smokes during his PCJU interview. The other is a co-counsel to the office of the undersigned in an unrelated murder case. Neither is, or has *ever* been, employed by the DANY.

that the notes also undermined Kennedy's recollection and testimony and corroborated that the police introduced facts to Anthony, *including about the woman in the white coat*. In addition, Warren being specifically named in the notes corroborated Anthony's "account that he was told Warren's name and shown his individual photograph before making an identification [and] contradicts his written statement and trial testimony."

- The People credited Andre Houston and were able to corroborate "certain aspects" of his account.

- The police file for the defendants' case, and the DANY file for Sanders' prosecution (which the People called a "related case") "contained notes showing that law enforcement received specific information that two individuals other than [the defendants] were suspected of the crime." From Delgrosso, "the People learned that [one lead] was taken seriously enough to warrant police investigation." The People averred that the results of the investigation are "largely unknown…due to the passage of time" and revealed that "[a]nother one of the leads was given enough weight by police and prosecutors to warrant an application for enhanced sentencing of that alternate suspect in his own, subsequent, criminal case," but that there was "no evidence in the People's file that this information was known to the parties at the time of trial."

- The People relied on the recorded call between Walker and Warren but claimed that "[a]t the time of trial, the parties were aware that…Walker placed a controlled call to [Warren] in which [he] obtained [Smokes's] phone number. This information was recounted in a DD5." The People represented that the recording was in the police file and there was "no indication it was provided to the trial prosecutor."

- The People acknowledged "new" impeachment material concerning Burns and Walker that "include[d]" information from Burns' Kings County case file that he "did not testify truthfully at trial about his criminal history" and information from Walker's DANY case file that he "received additional consideration beyond what the jury heard."

334)   After reviewing the DANY's submission, the defense advised ADA Rosenblatt that it was replete with mischaracterizations and ignored substantial evidence that would support vacating the defendants' convictions. For instance:

- The People claimed that the fact that news clippings were found in Anthony's room was not previously known. However, it was revealed by George Delgrosso, who testified at *every* proceeding in the case where testimony was taken. Moreover, Delgrosso was acknowledged for contributing to Robert Jackall's 2005 book, in which the information about the news clippings in Anthony's room also appeared. This

information was known *at least* to Delgrosso at *all* relevant times but concealed from the defendants.

- Delgrosso's admission about offering to "take care of" robberies on January 8, 1987, was not merely "new information," it was known to Delgrosso since 1987 but concealed. *Delgrosso's non-committal testimony about whether deals were offered was the basis for Pam Jordan being "confused" at the pretrial hearing.*

- The People acknowledged that previously undisclosed evidence generated on January 8, 1987, corroborated Anthony's account that he gave the names of his alibi witnesses to prove he was not a perpetrator, not that he had witnessed the crime. In 2019, ADA Keenan asked Delgrosso, "[w]ould it be fair to say when [Anthony] was giving those names, he was *not* providing them *as alibi people*, but *actually as other people that were potential witnesses to the crime*?" Delgrosso responded, "[h]e was supporting his statement," and Keenan asked, "[i]s that the statement of *what he observed happened to the elderly gentleman*?" Delgrosso responded, "[c]orrect." (emphasis added).

- The People provided no basis for the assertion that the materials found in the Sanders file were "misplaced." By contrast, in 2005 Jackall wrote that Delgrosso directed Detective Bridgwood to go into the Casse file and, during his PCJU interview, Delgrosso referred to the crime Sanders was convicted of and stated that the "detective on the case asked [him] for photographs collected in this case." The defense did not learn that Jackall was interviewed by the PCJU until the People's pre-motion letter.

- Although the People wrote that Sanders "was suspected of being involved in" Casse's murder, this was not disclosed in 1987. The only instance of Sanders being accused of Casse's murder during the defendants' prosecution that was disclosed in 1987 was the accusation Detective Chartrand attributed to Kevin Burns when Chartrand believed Burns was giving false information. At trial, Burns testified that any incriminating information he gave about Sanders had been lies.

- The People cited Patrick Denson as "new" corroboration for Andre Houston's recantation. However, Denson told police *and* prosecutors he didn't see the assault or robbery of Casse in 1987 and repeated this in 2018 testimony.

- There was no basis for the assertion that the results of the investigation into the Throop Avenue tip were "unknown…due to the passage of time." The available evidence demonstrates that the results are unknown because of the suppression of evidence.

- The assertion that "the parties were aware that" police arranged for a recorded call between Warren and Walker is unsupported. While it was documented in a DD5, the People withheld Walker's name. Likewise, the People's statement that there "is no indication it was provided to [Goldstein]" was perplexing considering that the PCJU interviewed Goldstein. Goldstein's own statements and testimony that the police file, including DD5's, was available to him, and that he would review police reports before

eliciting testimony on the subject concerned, undermine the proposition that he didn't know about or possess the recording at trial.

- The People credited George Samuels. But Samuels said that his interrogators took notes when he contradicted Burns, and no such notes were ever disclosed.

335)   The defense had also repeatedly detailed for ADA Rosenblatt how documentary evidence and sworn testimony established that Burns could *not* have seen Smokes on the day of his trial testimony and thus that the only testimony *alleging that either defendant threatened a witness at any time was **false***. Furthermore, the defense explained that the evidence demonstrating this fact consisted of the same form of evidence the People relied on in crediting Samuels, as well as additional evidence composed by the trial prosecutors and Detective Delgrosso. Rosenblatt responded by speculating that ADA Goldstein *might* not have known how Burns got to court on the day he testified.

336)   The People credited evidence they characterized as newly discovered without acknowledging that the same evidence also established constitutional violations and official misconduct. For instance, they credited George Samuels. Goldstein and Delgrosso repeatedly interrogated Samuels before trial, and he told them that Kevin Burns' information was false. They suppressed this impeachment evidence and Goldstein permitted Burns to falsely testify that Samuels was with him when he witnessed Casse's murder. In 2019, Goldstein testified that he "never" elicited testimony that he knew *or* should have known was false.

337)   The People said that the "new" notes reflecting Robert Anthony's initial statements to Detective Kennedy undermined the reliability of Kennedy's 1987 testimony. ***The notes were not new***, they were made in 1987 and suppressed in the face of a specific pretrial request by the defense. Furthermore, Kennedy's testimony was integral to the admission of three of the four identifications presented at trial and was credited because evidence in the People's

possession that undermined it was withheld. James Walker having received consideration beyond what was disclosed indisputably constituted a violation of the defendants' right to due process.[52] *See,* People v. Colon, 13 N.Y.3d 343, 350 (2009)("…benefits conferred on a witness by a prosecutor provide a basis for the jury to question the veracity of a witness on the theory that the witness may be biased in favor of the People.").

338)    ADA Rosenblatt was co-counsel to the defendant(s) in Colon, whose convictions were obtained by the DANY in 1993 before Judge Scott and vacated in 2009 by the Court of Appeals *because the prosecutor failed to disclose benefits to a prosecution witness and compounded the effect of that suppression in summation by repeating and emphasizing misinformation*. Thus, Rosenblatt was acutely aware of the legal implications of Walker having received additional consideration beyond what the jury heard.

339)    The People's submission made it apparent that the DANY intended to erroneously characterize evidence as "newly discovered" to conceal violations of the defendants' constitutional rights and police and prosecutorial misconduct. Defense counsels had experience with other prosecutorial offices erroneously citing "new" evidence in wrongful conviction cases to avoid exposing constitutional violations and misconduct, and the defendants were unwilling to ratify such whitewashing. Counsel advised ADA Rosenblatt that the defense would file separately based on known evidence the People had not acknowledged.

340)    A conference was held with Judge Antignani on October 20, 2023. Judge Antignani asked defense counsels whether the defendants contended that the newly discovered evidence

---

[52] In 2019, ADA Keenan argued that "the jury had ample evidence concerning Walker's credibility. Walker was cross-examined by the defense and his criminal past, cooperation agreement, and motive to testify was thoroughly explored."

the People cited also established that <u>Brady</u> violations occurred, and counsels affirmed that this was the defendants' position and they would be filing separately to outline their own view of the evidence.

341)    On November 2, 2023, ADA Rosenblatt emailed the undersigned, copying General Counsel Leslie Dubeck, and stated that, "the People's letter…reflects the relief that the People have found to be supported by the evidence and to which the People are prepared to consent…the People are likely to oppose *any* grounds for relief that is beyond the scope of the position set forth in the [letter]…it is my opinion that a joint submission that adheres to the content and spirit of the [letter] is the best path forward to relief, and that the alternative path you proposed…as you explained to me on Tuesday, will draw on issues that the People ***cannot consent to***, may not be accepted by the judge, and could lead to the Court losing faith in this case…we ***cannot negotiate*** the People's position, which is based on a careful review of the law and the evidence…In all events, the People's position…will be based only on the facts and the law." (emphasis added). This was an attempt to pressure the defense into accepting the DANY's whitewashed characterization of the evidence and validating a motion that would suppress and disregard substantial evidence of constitutional violations and official misconduct. Indeed, Rosenblatt neglected to acknowledge that the conversation in which defense counsel proposed an "alternative path" was prompted by her own efforts to have non-DANY attorneys exert pressure on the defense to endorse the DANY's position.

342)    On November 15th, the defendants submitted a motion to vacate their convictions on grounds of newly discovered evidence, police and prosecutorial misconduct, and constitutional violations supported by:

- The call Walker placed to Warren on January 3, 1987.

- Evidence that George Delgrosso produced George Samuels to the DANY at least twice in June 1987 based on orders obtained by Michael Goldstein and that, each time, Samuels contradicted Kevin Burns.

- Evidence that Delgrosso also received Thomas Chavis' name and contact information before trial but that Chavis was not questioned despite being available.

- Evidence that Burns was separated from the defendants before trial and brought to court by Delgrosso on the day he testified.

- The 2018 email to ADA Keenan stating that there was no record of Burns having attended Franklin K. Lane High School as he testified at trial.

- An affidavit and report by Heidi Werntz documenting her work in relation to Andre Houston, including her contact with the mother of Andre's child, who told her that investigators claiming to be FBI agents visited her looking for Andre in 2018 because they wanted him to testify. Werntz also stated that ADA Rosenblatt reached out to her, unbeknownst to the defense, to offer assistance to Andre.

    - Notes composed by Keenan and discovered in the DANY file in 2023 include the name and contact information for the mother of Andre's child.

- Documents pertaining to the October 1987 prosecution of Anthony and the Houston brothers for robbery, including proof that Goldstein made their cooperation with the defendants' prosecution known to the Court that presided over their case.

- The statements Delgrosso and Goldstein made to the PCJU.

- Stephanie Graham's tip accusing Sanders, Luckey, and Woodson of Casse's murder.

- The affidavit of Luana Dunn.

343)    In contrast with her November 2nd communication, on the 17th, ADA Rosenblatt responded to the defendants' motion by email to the Court and defense stating, "[w]hile the People do not agree with everything in the defendants' motion, the People nevertheless maintain that relief in the form of vacatur and dismissal is warranted…In the interest of resolving this matter expeditiously and without further litigation, the People are prepared to rely on their…October 6, 2023, letter. If, upon review of the defendants' arguments, the Court would like briefing on any issue or issues, the People will of course provide a further

response." Rosenblatt did not explain what the People disagreed with, and the Court did not request further briefing. **The People did not respond to the defendants' motion as Rosenblatt claimed they were "likely to" because they could not argue "on the facts and the law" without acknowledging constitutional violations and official misconduct**.

344)    The parties were directed to appear on January 31, 2024. Before announcing his decision, Judge Antignani told the defendants he wanted "to comment on one particular issue" that had "no bearing on [them]." He then chastised the undersigned for allegedly accusing ADA Keenan of suborning perjury. He stated that the alleged accusation was "unfair" because Keenan "can't say anything" and said:

> "I didn't appreciate it when I was called, really out of the blue to say, oh, your case or for some reason you were on TV, it was about two months ago. And so, *I was getting all of these calls and these texts*. So I went and I watched it. And I think it was Ms. Wallace's report I believe…it didn't sit well with me because it's not how we should be as officers of the court."[53] (emphasis added).

345)    Keenan certainly could have responded to any *false* statements made about her *if* any were made. Furthermore, the report Judge Antignani referred to, in which defense counsels were interviewed by Sarah Wallace of NBC News, concerned Keenan's conduct in subpoenaing the phone records of the undersigned, rather than any allegation that she suborned perjury. The undersigned made no public comment to that effect. Upon information and belief, Keenan and/or other agents of the DANY contacted Judge Antignani and prompted his defense of her.

346)    Judge Antignani then said that he made his 2020 decision "based on the information that was in front of [him] at the time" but "[had] to make a decision as to the information that

---

[53] After announcing his decision, Judge Antignani said, "I deliberately didn't hand [the decision] out…because I just wanted to say what I had to say and put it on the record."

[was] in front of [him] at this time." He admitted that he considered recusing himself from

the case and said:

> "I can easily just say, look, I think *I should be conflicted off*, but I didn't think that was
> fair. Because there was *always* a part of me that said, both of you, this was 1987…so
> what are we, 30 something years later, that you are still fighting for your right for a Court
> to say to you that *those convictions were **not** warranted…**today I am going to grant that
> desire***. I find that, based on the new information, because one of the things I will note in
> my original decision, there were witnesses who I just didn't find credible, **but I was
> wrong *because* notes came up that were not with us at the last hearing that
> suggested that what the witness testified to at the hearing was actually true** and what
> he testified to at trial may not have been. And so…the convictions and sentences…are
> vacated today and a new trial is ordered." (emphasis added).

347)    ADA Rosenblatt then applied to dismiss the indictment, and the Court granted the

application. Judge Antignani told Smokes and Warren, "you are now innocent of these

charges and the case has been dismissed" but, "it will never give you back the years you

lost." **David Warren emphasized the truth for the Court during the following exchange**:

> **The Court:** "…now you can all leave with the confidence that you are not criminals.
> You are not."

> **Warren:** "*We never were*."

> **The Court:** "Exactly…***You are innocent*** and you are free to go as innocent men."
> (emphasis added)

348)    Although his decision denying Smokes and Warren relief four years earlier was one

hundred and twenty-three pages long, Judge Antignani's decision vacating their convictions

was only nine pages long and stated, *inter alia*, that:

- "To the extent that the defense argues that the failure of the People to turn over the
  interview…of Mr. Samuels resulted in a <u>Brady</u> violation, in addition to other claims, the
  Court takes no position in its current decision as the constitutional implications of a
  <u>Brady</u> violation need not be reached. The Court's current decision renders a
  determination regarding any <u>Brady</u> violation moot."

- The People "interviewed [Robert] Anthony…[and] uncovered additional documents and
  witness statements that *the Court did not have access to when it determined that Mr.
  Anthony was lying at the hearing*. New information, *including more details provided by*

*Det. Delgrosso*…supported Mr. Anthony's description of an interrogation that treated him as both a perpetrator and a witness. *Misplaced* scratch notes…corroborate Mr. Anthony's contention that he provided police with the names of people who could confirm that he was not a perpetrator." (emphasis added).

349) On the DANY website, DA Bragg stated, "Eric Smokes and David Warren lost decades of their life to **an unjust conviction**. I am inspired by the unyielding advocacy of Mr. Smokes and Mr. Warren." (emphasis added). The site reported that the PCJU reinvestigation included "review of all underlying prosecution and police files" and uncovered "new evidence…including new interviews with the teenagers who testified at trial, which established that many of them were treated as suspects."

## CAUSES OF ACTION

350) With respect to each cause of action, Plaintiff incorporates by reference each paragraph of this Complaint.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious Prosecution in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants Delgrosso, Kennedy, Cruthers, Chartrand, Zeins, Paccione, Bane, Bavolar, Stubbs, Goldstein, Drucker, Axelrod, and Does #1-10.**

351) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

352) Plaintiff's prosecution commenced when Defendant Delgrosso, assisted by others, arrested him based on fabricated probable cause.

353) Defendants Delgrosso, Kennedy, Cruthers, Chartrand, Zeins, Paccione, Bane, Bavolar, Stubbs, Goldstein, Drucker, Axelrod, and Does #1-10, individually, collectively (referred to as the "Individual Defendants"), acting in concert and aiding and abetting one another, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of, false statements by James Walker and false statements and identifications by Anthony, the

116

Houston brothers, and Burns which they improperly compelled or induced those individuals to adopt, accusing Plaintiff of the robbery and murder of Jean Casse and/or uncharged crimes, and causing the DANY to commence or continue criminal charges against him.[54]

354)    The Individual Defendants knew that the statements, identifications, and allegations would be relied upon by the DANY and the court as a basis to formally initiate a prosecution against Plaintiff and continue his prosecution, and that the statements and identifications would be introduced into evidence at criminal proceedings including Plaintiff's trial. These statements and identifications were forwarded to the DANY, which did in fact introduce them during Plaintiff's trial and at other proceedings before and after trial.

355)    Defendants, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or continue criminal proceedings against Plaintiff without legitimate probable cause to believe he was guilty of any crime or could be successfully prosecuted lawfully, and to deprive him of his liberty, in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

356)    The proceedings terminated in Plaintiff's favor when his conviction was vacated pursuant to CPL 440.10(1)(g), in a manner affirmatively indicating his innocence and the charges against him were dismissed, ending the criminal case against him.

357)    The Individual Defendants are liable for their violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 Evidence Fabrication in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Defendants Delgrosso, Kennedy, Zeins, Paccione, Chartrand,**

---

[54] A "plaintiff is allowed to plead in the alternative." Breton v. City of New York, 404 F. Supp.3d 799, 814 (S.D.N.Y. 2019)(Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

**Bavolar, Bane, Stubbs, Cruthers, Cowan, Bridgwood, Goldstein, Drucker, Axelrod, Sard, King, Darrow, Keenan, Salta, Salerno, Rosenblatt, and Does #1-10.**

358)     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

359)     Defendants Delgrosso, Kennedy, Zeins, Paccione, Chartrand, Bavolar, Bane, Stubbs, Cruthers, Cowan, Goldstein, Drucker, Axelrod, Keenan, Salta, Salerno, Rosenblatt, and Does #1-10, acting individually and in concert, fabricated evidence and concealed material exculpatory and impeachment evidence thereby depriving Plaintiff of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

360)     Without limitation, the Individual Defendants fabricated or caused the fabrication of: statements and allegations of prior crimes attributed to James Walker; statements attributed to Plaintiff and his co-defendant; statements attributed to Niles Williams; statements and information attributed to Sheila Moody; statements, information, and/or identifications attributed to Anthony, the Houston brothers, Tyrone Bess, Kevin Burns, and Terrell Davis; the 1987 testimony of Walker, Anthony, the Houston brothers, and Burns; threats to and assaults of witnesses; claims regarding the availability, existence, and/or nature of evidence; and along with other unnamed co-conspirators, created a host of false police reports, documents, and allegations.

361)     The Individual Defendants, including Delgrosso, Kennedy, Zeins, Paccione, Chartrand, Bavolar, Bane, Stubbs, Cruthers, Cowan, Goldstein, Drucker, Axelrod, Keenan, Salta, Salerno, Rosenblatt, and Does #1-10, did not intervene when each other created false evidence.

362)     The Individual Defendants falsely represented to prosecutors, their superiors, and courts in the course of charging and indicting Plaintiff, and at trial and afterward, that all of the

fabricated evidence was accurate, and all of the fabricated evidence factored into the DANY's decision to charge Plaintiff, continue his prosecution, defend his conviction, and delay his exoneration.

363) The fabricated statements, information, and false allegations of prior crimes attributed to Walker; the fabricated statements, information, and/or identifications attributed to Anthony, the Houston brothers, Bess, Burns, and Davis; the fabricated threats and assaults; and false documentation were introduced against Plaintiff in the Grand Jury, at pretrial hearings, at trial, at sentencing, and/or in post-conviction proceedings, and were a substantial basis for his indictment, the admission of the evidence against him, the jury's verdict, his sentence, the unjust defense of his conviction and the adverse judicial decisions thereafter, and the unnecessary delay of his exoneration.

364) The Individual Defendants deliberately and/or recklessly fabricated and created the above evidence or caused it to be fabricated or created. The fabricated evidence was provided to the DANY, was likely to and, in fact, did influence the trial jury [Exhibit S], the Trial and Sentencing Court, appellate courts, and the courts that presided over Plaintiff's CPL 440.10 proceedings.

365) For instance, in 2019 ADA Keenan usurped a defense subpoena for records and claimed her conduct was permissible because DANY files in the Municipal Archives were property of the DANY. In 2020, Judge Antignani denied Plaintiff's 2017 motion because he declined to credit Robert Anthony. In 2023, notes supporting Anthony's 2018 testimony before Judge Antignani, that were housed in a DANY file in the Municipal Archives, were disclosed by the PCJU. In 2024, Judge Antignani credited Anthony and said his prior decision *was wrong*

*because* the notes, which impeached testimony by Delgrosso that he had credited, were not presented to him.

366)   As a result of the Individual Defendants' forwarding of evidence they had fabricated to prosecutors and courts, the DANY initiated a prosecution of Plaintiff, convicted him, vehemently defended his conviction, and delayed his exoneration, and his liberty was infringed or curtailed.

367)   The Individual Defendants' misconduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

368)   The Individual Defendants, including Delgrosso, Kennedy, Zeins, Paccione, Stubbs, Chartrand, Bavolar, Bane, Cruthers, Cowan, Goldstein, Drucker, Axelrod, Bridgwood, Sard, Darrow, King, Keenan, Salta, Salerno, Rosenblatt, and Does #1-10, violated Plaintiff's Fourteenth Amendment right to due process and his right to prove his innocence with new evidence [Newton v. City of New York, 779 F.3d 140 (2d. Cir. 2015)], where it was reasonable for Plaintiff to rely on the representations of his prosecutors, including those made post-conviction. Banks v. Dretke, 540 U.S. 668 (2004).

369)   Without the fabricated evidence which the Individual Defendants manufactured and/or knew had been manufactured, there would have been no basis to arrest, indict, or convict Plaintiff, to defend his wrongful conviction, or to delay his exoneration.

370)    Alternatively, Defendants Paccione, Bavolar, Bane, Cruthers, Cowan, Drucker, Sard, and Rosenblatt had an affirmative duty to Plaintiff to protect his above-mentioned constitutional rights from infringement by other government officials.

371)    As supervisor of the Midtown North Detective Squad, Zeins was responsible for directing and supervising the work of Delgrosso, Kennedy, Chartrand, Cruthers, Paccione, Bavolar, and Bridgwood and was obligated to ensure they complied with the law but failed to do so and permitted and/or joined in their misconduct. For instance, Zeins permitted Delgrosso to take a photo of Smokes to use for identification and drafted or directed the drafting of false reports permitting police to pick Smokes and Warren up for interrogation.

372)    As commanding officer of the Midtown North Detective Unit, Cowan was responsible for directing and supervising the work of Zeins and all the officers under his supervision and was obligated to ensure their conduct complied with the law but failed to do so and permitted and/or joined in their misconduct. For instance, Cowan directed the surreptitious calls to Warren and to Smokes' residence and endorsed the demand to the telephone company.

373)    Paccione knew that Plaintiff's constitutional rights would be violated if he was implicated solely because of his friendship with Smokes, if Walker's false and incentivized information was forwarded to prosecutors and courts while his crack addiction and emotional disability were concealed and used as basis to focus the police investigation on Plaintiff, to justify his arrest, or as evidence at trial or other criminal proceedings.

374)    Bavolar knew that Plaintiff's constitutional rights would be violated if he was implicated solely because of his friendship with Smokes, if Walker's false and incentivized information was forwarded to prosecutors and courts while his crack addiction and emotional disability

were concealed and used as a basis to focus the police investigation on Plaintiff, to justify his arrest, or as evidence at trial or other criminal proceedings.

375)   Bane knew that Plaintiff's constitutional rights would be violated if he was brought to the 75th Precinct based on the baseless report he composed, subjected to un-counseled interrogation without <u>Miranda</u> warnings, and the unreliable, unrecorded, and unendorsed statements attributed to him were used as a basis to justify his arrest or as evidence at trial or other criminal proceedings.

376)   Cruthers knew that the Houston brothers were alibi witnesses, *not* witnesses to the robbery or murder of Jean Casse, and that Plaintiff's constitutional rights would be violated if they were made to act as false witnesses, if their coerced and fabricated statements and photo identifications were used as grounds to make Plaintiff stand in a lineup without legitimate probable cause or counsel, and if the resulting fabricated evidence was used as a basis to justify Plaintiff's arrest, or as evidence at trial or other criminal proceedings.

377)   Drucker knew that the January 8th statements and identifications were produced through coercion and incentivization and were unreliable, that Walker's Grand Jury testimony was false, that Walker was addicted to crack, emotionally disabled, and given more than his cooperation agreement indicated, and that Delgrosso's Grand Jury testimony was inaccurate and, thus, that Plaintiff's constitutional rights would be violated if the January 8th statements or identifications, Walker's false claims and misleading cooperation agreement, or Delgrosso's inaccurate testimony were used as basis to justify Plaintiff's arrest, as basis for his indictment, or as evidence at trial or other criminal proceedings.

378)    Sard knew of evidence that Plaintiff was innocent as early as 2010 and claimed it would be investigated. She knew that Plaintiff's constitutional rights would be violated if she concealed or failed to safeguard and/or investigate evidence of his innocence.

379)    Rosenblatt knew of an increasing body of evidence of Plaintiff's innocence from 2022-2024 and that Plaintiff's constitutional rights would be violated if his conviction was needlessly kept in place because she withheld evidence and/or acted on the unjust directives of her superiors.

380)    Each of them had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

381)    Nevertheless, each of them deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

382)    As a result of their failure to intervene, the Individual Defendants caused false evidence to be manufactured and forwarded to prosecutors and courts, the DANY to initiate and continue a prosecution of Plaintiff, and Plaintiff's liberty to be infringed or curtailed.

383)    In failing to intervene, the Individual Defendants proximately caused the violation of Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and his rights of access to courts and to prove his innocence with new evidence [Newton, *supra*], and his resulting injuries.

384)    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

385)   By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under 42

U.S.C. § 1983.

## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 Denial of Due Process, Suppression of Favorable Evidence in Violation of the Fifth, Sixth and Fourteenth Amendments. Against All Defendants.**

386)   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if

fully set forth herein.

387)   At all relevant times, Plaintiff had a clearly established right, pursuant to the Fifth, Sixth,

and Fourteenth Amendments to the United States Constitution [Brady v. Maryland, 363 U.S.

83 (1963); Giglio v. United States, 405 U.S. 150 (1972)], to timely disclosure of all

information that was favorable to the defense, including impeachment evidence.

388)   Without limitation, the Individual Defendants knowingly and deliberately chose not to

document and/or disclose to the defense: that George Delgrosso was disciplined by the

NYPD for criminal conduct evincing a violent and corrupt character; that James Walker was

an emotionally disturbed crack addict who was induced to give false information; recordings

of calls from Walker to Warren, and by an unidentified officer to Smokes' home, that were

favorable to Plaintiff; that Walker's cooperation agreement was misleading and the DANY

vacated warrants for him and gave him more consideration than was disclosed; that Robert

Anthony was reported to police by his mother through the detective she was dating after she

found news clippings in his bedroom; that police and prosecutors coerced, incentivized, and

fed information to witnesses throughout the investigation and prosecution that led to

Plaintiff's conviction; that people the prosecution witnesses said were with them when they

supposedly saw Casse's murder contradicted their statements; that Tyrone Bess refused to

sign the statement written for him by Kennedy, invoked counsel, and refused to cooperate

124

with Plaintiff's prosecution; that Bess wrote and signed a disparate statement; that the January 8th witnesses did not know Plaintiff or his co-defendant; that Anthony was assisted on his fraud case by police and/or prosecutors; that Andre Houston was learning disabled and schizophrenic; that the DANY conferred post-trial assistance on Anthony, the Houston brothers, and Kevin Burns; that Anthony and the Houston brothers committed a robbery similar to the attack on Jean Casse in October 1987; that Jerry Sanders committed a robbery and murder similar to the robbery and murder of Casse in June 1988; that Andre and Anthony recanted to police and prosecutors and Anthony disparaged the DANY; that Robert Moore's statements to police and prosecutors were contradicted by the person he was arrested with; that the People did not ask the Grand Jury to indict Moore and attempted to have him testify falsely against Plaintiff; that evidence of alternate perpetrators was known to police and prosecutors; that Burns was threatened and promised an easier prison term depending on his cooperation by police and prosecutors, and given cigarettes by ADA Goldstein; evidence that Burns' trial testimony was false; that all of the People's inculpatory civilian witnesses materially contradicted themselves to police and prosecutors before trial; that the DANY requested an enhanced sentence for Sanders based on his involvement in Casse's murder; evidence contradicting the pretrial, trial, and post-conviction police testimony; evidence contradicting the post-conviction prosecutorial testimony; that ADA Keenan conducted a bad faith investigation into Plaintiff's legal team; that Keenan, Salta, and Salerno threatened and/or coerced Andre Houston and attributed false post-conviction statements to him; evidence contradicting the representations in the People's pre-motion letter; and, information and evidence concerning misconduct learned by the PCJU.

389)   The information the Individual Defendants failed to document and/or withheld from the

defense was favorable in that it would have contradicted essentially all the People's evidence

at trial and post-conviction and would have shown, *inter alia*, that:

  a.   James Walker was utterly unreliable and had been incentivized to an extraordinary
       degree and beyond what was disclosed. In essence, the DANY gave Walker a license to
       commit crime without repercussions in exchange for his testimony against Plaintiff;

  b.   The identification witnesses had contradicted themselves, were contradicted by the
       people they supposedly offered as corroboration for their claims, and had clear motives
       to fabricate;

  c.   No witness identified Plaintiff or his co-defendant until after being fed information,
       coerced, and/or incentivized;

  d.   The police officers responsible for obtaining or generating the evidence presented
       against Plaintiff were unreliable and had fabricated and/or concealed evidence and/or
       perjured themselves;

  e.   There was significant basis, known to police and prosecutors, to consider that
       individuals other than Plaintiff and his co-defendant perpetrated the crimes charged;

  f.   Police and prosecutors committed misconduct including the suppression of evidence
       and perjury during Plaintiff's CPL 440.10 proceedings; and

  g.   Evidence known to police and prosecutors but suppressed from 1987 through 2023-24
       (and to date) demonstrated that Plaintiff and his co-defendant were innocent and that
       the *only* legally correct and just outcome in their case was to vacate their convictions.

390)   This information was material to the outcome of the 1987 prosecution and post-

conviction proceedings because the case against Plaintiff was based entirely on testimony by

civilian witnesses who supposedly were not fed information, coerced, or incentivized by

police or prosecutors, and the supposedly credible testimony of police witnesses. Had the

evidence demonstrating the unreliability of the police witnesses, standing alone, been

disclosed to Plaintiff in 1987, his prosecution likely would not have survived the suppression

hearing. Had the evidence bearing on the credibility of the civilian and police witnesses been

disclosed, Plaintiff likely would have been acquitted at trial. This proposition is supported by

a sworn statement from one of the jurors that convicted Plaintiff based on what is now known to have been false and misleading evidence. Had the previously undisclosed evidence of official misconduct been disclosed from 2017-20, Plaintiff might have been exonerated years before he was. Had the DANY acknowledged and/or disclosed the true state of the evidence during the PCJU process, Plaintiff would have been exonerated *at least* a year earlier.

391)     The Individual Defendants had a constitutional obligation to disclose such information to Plaintiff at trial and afterward. Banks, 540 U.S. at 676 ("When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."); People v. Hunter, 11 N.Y.3d 1, 5 (2008)(defendant's due process right to obtain favorable evidence could not be nullified by post-trial events); People v. Olmo, 153 A.D.2d 544 (1st Dept. 1989)(the prosecutor's duty to the court and the criminal justice system does not end upon the defendant's sentencing).

392)     In withholding the aforementioned information from Plaintiff, the Individual Defendants acted deliberately, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional rights to a fair trial, procedural and substantive due process including his rights of access to courts and to prove his innocence with new evidence [Newton, *supra*], to be free from the cruel and unusual punishment of being convicted of a heinous crime despite his innocence, or to the effect of such misconduct on Plaintiff's constitutional rights.

393)     But for the Individual Defendants' actions in withholding favorable information, there is a reasonable likelihood that the charges against Plaintiff would have been dismissed, the evidence against him suppressed, or he would have been acquitted at trial or exonerated years before he was.

394)    The Individual Defendants' actions in withholding favorable information were a foreseeable, substantial, and proximate cause of Plaintiff's conviction and subsequent deprivation of liberty and other damages.

395)    The Individual Defendants are liable for their violations of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 and <u>Monell</u>. Municipal Liability for Conduct of Employees of the DANY. Defendant City of New York.**

396)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

397)    The misconduct of the DANY in Plaintiff's case was the result of office-wide policies, customs, and/or practices that ignored, tolerated, and/or encouraged violations of the constitutional rights of criminal suspects and defendants as a means of securing and defending convictions and concealing misconduct.

398)    The New York County District Attorney, as the manager and chief administrator of the DANY, a New York City Agency, failed to properly train, supervise, and/or discipline his employees regarding functions germane to the investigation and prosecution of criminal matters, despite an obvious need to do so to prevent misconduct and constitutional injuries to criminal suspects and defendants.

399)    Before, at the time of, and after Plaintiff's conviction, including when the DANY was opposing his efforts to prove his innocence and overturn his unconstitutional conviction and causing the continuation of his constitutional injuries, the New York County District Attorney maintained a policy, custom, and/or practice of deliberate indifference to violations

128

by his employees of the rights guaranteed to all criminal suspects and defendants under the Constitution and laws of the United States and the State of New York.

400)    Such violations included the knowing, reckless, or negligent use of false or misleading evidence and argument before the Grand Jury, and at pretrial hearings, trial, sentencing, and post-conviction proceedings, and the failure to correct such false or misleading evidence and argument; the deliberate, reckless, or negligent withholding of statements of witnesses or potential witnesses and exculpatory and/or impeaching evidence required to be disclosed under Brady, *supra*, Giglio, *supra*, and their progeny, the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and/or New York's Rosario rule; and the deliberate, reckless, or negligent mismanagement and/or suppression of new and/or previously undisclosed evidence after conviction which, in effect, violated the rights of convicted defendants to due process and access to courts and their right to demonstrate their innocence with new evidence. Newton, *supra*; Hunter, *supra*.

401)    Unlawful policies, customs, and/or practices of the DANY routinely deprived criminal suspects and defendants of their constitutional rights and significantly contributed to Plaintiff's conviction and the continuation of his constitutional injuries.

402)    From January 1, 1975, to December 31, 2009, Robert Morgenthau was the District Attorney for New York County.

403)    Plaintiff was convicted under Morgenthau's administration, and his unconstitutional conviction was kept in place throughout Morgenthau's tenure in Office.

404)    Under Morgenthau, the DANY emphasized the importance of obtaining and defending convictions but failed to address persistent misconduct and obvious deficiencies in training, supervision, and/or discipline pertaining to basic and significant prosecutorial duties.

405) **Exhibit T**, which is incorporated herein by reference, **lists *over* one hundred and sixty (160) judicial findings of misconduct by DANY prosecutors during Morgenthau's tenure**, demonstrating that misconduct was rampant throughout his administration before, at the time of, and after Plaintiff's conviction.

406) These decisions were so numerous, persistent, and strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining and defending convictions no matter the cost to constitutional rights. Nevertheless, through his deliberate indifference, Morgenthau permitted this culture to continue at the DANY throughout his entire tenure.

407) He did so by failing to conduct internal disciplinary investigations or to discipline prosecutors who committed such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committee, failing to ensure that they were properly trained and/or supervised and, indeed, concealing, defending, and/or diminishing their conduct.

408) Morgenthau was placed on notice of the rampant misconduct in his Office and the obvious need to further train, supervise, and/or discipline DANY prosecutors *before* Plaintiff's conviction by *at least* seventy (70) decisions listed in **Exhibit T** finding misconduct by DANY prosecutors. **Exhibit T** demonstrates that from when Morgenthau took office through Plaintiff's conviction, courts *repeatedly* found misconduct by DANY prosecutors including the use of false, misleading, or improper evidence and/or argument and the suppression of or failure to timely disclose information or evidence to the defense. *At least* fifty-six (56) decisions issued under Morgenthau *before* Plaintiff's conviction reversed or vacated convictions, including in *at least* fifteen (15) homicide cases.

409)   In virtually all instances where misconduct by prosecutors was identified, some of which are listed in **Exhibit T**, others which are described herein, and others which are known only to the DANY and may be ascertained in discovery, the Office concealed the extent of, defended, diminished and/or declined to acknowledge the prosecutors' conduct when it was exposed, thereby revealing that it was consistent with and caused by Office policies.[55]

410)   In a deposition of a former ADA who began working at the DANY in 1987, the year Plaintiff was convicted for a homicide he did not commit, the former ADA testified, "*I don't believe that there was **any** formal training that accompanied being appointed to serve on the homicide chart*, which is the point at which you **begin** *doing that work*." (emphasis added). Although this former ADA testified that, "[t]here was a definite risk, a definite awareness when I was in the [DANY], a risk of false confessions. I think people knew about that," he could not recall *any* formal training at the Office on avoiding false confessions.

411)   DANY prosecutors and detective investigators (and NYPD officers working with them) were permitted, and in fact instructed, to refrain from making or preserving any record of false or inconsistent out of court statements by prospective prosecution witnesses, or information bearing upon their potential motives to lie, in order to avoid creating Rosario material that would have to be disclosed to the defense under State law, even though this policy predictably resulted in prosecutors not disclosing the same as Brady material.

412)   The DANY further allowed prosecutors, in violation of their Brady obligations, to refrain from disclosing statements of uncalled witnesses which favored the defense.

413)   Under DA Morgenthau and through the current day, the DANY has failed to ensure that prosecutors are properly trained on their prosecutorial obligations including those concerning

---

[55] **Exhibit T** is a non-exhaustive list compiled in relation to the instant Complaint.

<u>Brady</u>, <u>Giglio</u>, and/or <u>Rosario</u> disclosure. **Exhibit T** and the instant Complaint detail dozens of cases from 1975-2024 in which DANY prosecutors violated such obligations.

414)    Before and after Plaintiff's conviction, there were additional unpublished findings of <u>Brady</u> and related discovery violations, as well as credible allegations of such violations, known to the DANY, which did not result in relief on that specific basis.

415)    In many instances courts granted relief for what amounted to <u>Brady</u> violations, but only addressed whether material should have been disclosed under State law as <u>Rosario</u> material.

416)    In 2014, Joshua Steinglass, a current ADA who began working at the DANY in 1998, testified that he received *no training* at the Office about whether or not to take notes when questioning witnesses. In 2019, ADA Axelrod testified that she couldn't recall taking *any* notes during Plaintiff's prosecution, which was her first homicide assignment. At the time of his 2014 deposition, Steinglass was a Senior Trial Counsel, a title signifying that an ADA has "a lot of trial experience and [is]…qualified to handle significant homicides and other significant cases," and which Michael Goldstein held at the time of Plaintiff's trial. Asked about investigating a wrongful conviction at the direction of then-CIU Chief Sard, Steinglass said he "wasn't trying to determine whether or not a <u>Brady</u> violation had been committed…that wasn't his mission" as explained by Sard.[56]

417)    During the 1989-1991 "Central Park Jogger" prosecution, the DANY "explored the possibility of using [teenager] Lamont McCall as a cooperating witness" and requested that ADAs *and* attorneys in the Office of Corporation Counsel "avoid creating <u>Rosario</u> issues" with McCall. Six teenagers who were convicted in the case have since had their convictions

---

[56] Plaintiff requested depositions of other DANY prosecutors through FOIL on April 2, 2024, and the City Law Department responded that two hundred and forty (240) business days are required for a determination or "an estimate of the time required to reach such a determination."

vacated. As in Plaintiff's case, the primary evidence against them consisted of inconsistent, coerced, and/or incentivized statements by young men of color to police and prosecutors.

418)   Elizabeth Lederer, lead prosecutor in the case, was deposed in 2013. Except for a brief period from 1985-86, Lederer had been a DANY prosecutor since 1979. By 2013, it was well settled law that an individual prosecutor was obligated to learn of favorable evidence known to others acting on the prosecution's behalf. It was also well-settled that the prosecution was obligated to disclose all recorded statements by prosecution witnesses concerning the subject matter of their testimony. Nevertheless, Lederer testified that she was *not* obligated to obtain all statements by a prosecution witness. She was unable to recall *any* training at the Office regarding questioning juveniles or people with intellectual disabilities, nor any formal training regarding what an ADA should do if a suspect alleged police misconduct.

419)   In 2013, Tim Clements, who worked at the DANY from 1984-1991 and prosecuted the Central Park Five case with Lederer, testified that he remembered a meeting during the prosecution where Lederer became "frustrated with Jermaine Robinson [a teenaged cooperating witness] because of inconsistencies in his statements." In 2002, during the DANY reinvestigation of the case, Robinson informed the Office, *inter alia*, that: he was taken to the DANY in 1989 and Lederer **told him** specifics about **his** account; he was later taken to Central Park to walk through his account and Lederer "*kept insisting* that the events [he described] took place in other locations, not where *he* was placing them" and "*corrected*" **his** *account* "as *she kept going over* the sequence of events"; after the park Robinson was returned to the DANY where he "*was able to read reports about the evidence*"; and, when he revisited the DANY for trial preparation Lederer *again* attempted to

manipulate his account. (emphasis added). Such manipulation of young inconsistent witnesses was DANY custom and practice at and around the time of Plaintiff's trial.

420)    Although Robinson's statements were conveyed to Nancy Ryan, Chief of the DANY's Trial Division, Ryan's 2002 Affirmation in response to the motion to vacate the first five defendants' convictions relied solely on newly discovered evidence with no acknowledgement of official misconduct. Ryan even represented that the prosecution "credibly, honestly, and persuasively" argued that discrepancies in the teenagers' statements were not unusual. The omission of any acknowledgement of misconduct was repeated in the People's submission in support of vacating the conviction of a sixth defendant, Steven Lopez, in 2022. In 2010, Linda Fairstein, who supervised the Central Park Jogger prosecution, wrote to DA Morgenthau and recounted a 1999 conversation in which Morgenthau reportedly said that Ryan "should be fired," and that he "knew even then that she had stopped holding bureau chief meetings within the division—causing administrative chaos…her leadership skills were non-existent, and that she was a tyrant and a bully to the young lawyers under her control."

421)    Clements could not remember creating Rosario or Brady logs in *any* case he prosecuted. **Nor could he recall *any* formal Brady or Rosario training during his time at the DANY**. Courts granted relief on grounds of Brady and/or Rosario violations in *at least* seventeen decisions in his seven years with the Office. Michael Goldstein, who was employed by the DANY from 1980-89, said that there "were no Brady or Rosario lists" at the time of Plaintiff's trial. Courts granted relief in *at least* seventeen decisions involving Brady and/or Rosario violations by DANY prosecutors in his nine years with the Office. **Exhibit T**.

422)    Months after DA Morgenthau took office, Justice Peter McQuillan, a former DANY prosecutor, placed him on notice of misconduct and deficiencies in training, supervision, and/or discipline at the DANY.

423)    In People v. Lee Earl Johnson, Ind. No.: 657/74, a defendant was charged with homicide after a truck he was assumed to be driving struck a limo, killing two. Two witnesses told a prosecutor that someone other than the defendant exited the truck and fled the scene. The prosecution withheld this evidence for **over a year** *while attempting to induce the defendant to accept a plea to 18-20 years in prison*. In May 1975, Justice McQuillan acquitted the defendant, "castigated the [DANY] for having *concealed evidence that might have exonerated a man who spent 14 months in jail awaiting trial* in a double homicide," and said the prosecution engaged in **misconduct that "shocks the conscience."** (emphasis added). He found that there was deception by the prosecution at *every* stage of the court process. The prosecution never even hinted at the "readily available exculpatory evidence." **Justice McQuillan explicitly reminded Morgenthau *and* his Bureau Chiefs of their "obligation to carefully train and closely supervise the work of the younger and less experienced staff members,"** and stated, **"[i]f this case reflects the kind of training and supervision done, then corrective measures are *obviously promptly required*."** (emphasis added).

424)    In response to Justice McQuillan's excoriation of the DANY and recommendation for prompt corrective measures to the Office's training *and* supervision of prosecutors, Morgenthau denied misconduct, and said the DANY's review of the facts showed that the "mistakes" were unintentional. *He did not take **any** action against the prosecutors involved **or** change their assignment from the homicide bureau*. Instead, *he criticized Justice*

*McQuillan* for not holding a hearing before reaching his conclusions. Justice McQuillan said the DANY excuse that there had been a mere "oversight" was "sheer hogwash."

425)   From the beginning of his tenure, Morgenthau and other DANY policymakers were deliberately indifferent to misconduct by employees of the Office. Morgenthau sent a message to DANY prosecutors that they would suffer no consequences and indeed, be defended, even if they committed serious misconduct. There were 200 or less prosecutors in the Office at the time of Justice McQuillan's decision. Morgenthau permitted prosecutors that a court found to have committed shocking misconduct to remain in the homicide bureau to influence other prosecutors who handled such cases and further poison the Office culture.

426)   Upon information and belief, from the beginning of Morgenthau's tenure through the present, the DANY maintained a policy, custom, and/or practice of not seriously investigating or disciplining prosecutors for misconduct, including but not limited to discovery violations, and/or the failure to correct false, inaccurate, or misleading testimony and to refrain from the use of false or improper evidence and argument, and no prosecutor was disciplined or sanctioned by the DANY for actions which a court found to be improper or to constitute misconduct, no prosecutor was disciplined for misconduct or violating the constitutional rights of a criminal suspect or defendant, and no effort was made to address the deficiencies in training and supervision before Plaintiff's trial, although serious misconduct had occurred and the need for corrective measures were "obviously promptly required."

427)   Upon information and belief, the DANY, during all relevant times, had no employee handbook, manual, or other document setting forth disciplinary process for misconduct, or potential sanctions for it, nor was any such process made known to employees in some other manner as a deterrent to misconduct. The knowledge that there would be no personal

consequence for violations of the constitutional rights of criminal suspects or defendants permitted a culture of misconduct to fester at the DANY and encouraged prosecutors, including Plaintiff's prosecutors, to commit such violations.

428)    Upon information and belief, unless otherwise specified, none of the prosecutors responsible for the misconduct discussed herein or in the matters listed in **Exhibit T** were disciplined by the DANY or referred for discipline by any outside body.

429)    Morgenthau's indifference to misconduct and the deficiencies in training, supervision, and discipline at the DANY caused further misconduct to occur, including in Plaintiff's case.

430)    As evinced by *over* one hundred and seventy (170) decisions listed in **Exhibit T**, throughout the tenures of DA Morgenthau and his successor, Cyrus Vance, courts repeatedly assailed the DANY for misconduct, yet there were no genuine adverse consequences to the prosecutors who were responsible, nor any change in Office policy, practice, or procedure to forestall further misconduct.

431)    The message to prosecutors was that the DANY only cared about how aggressive and successful they were in obtaining and defending convictions, not whether, in doing so, they violated the constitution or committed misconduct. They were incentivized to violate the rights of those they prosecuted since they knew they were likely to be rewarded for winning but would suffer no genuine negative personal consequences in the unlikely event their misconduct was exposed.

432)    Linda Fairstein began her employment with the DANY in 1972 and was promoted to Chief of the Sex Crimes Bureau by 1976. By the mid-1980's, she was one of three Deputy Chiefs of the Trial Division. *At least* eight defendants prosecuted by Fairstein or under her supervision have had their convictions reversed or vacated. In 1990, Fairstein boasted that of

her 34 or 35 trials as a prosecutor, only 2 resulted in acquittals. In 1995, Fairstein was in the

courtroom supervising ADA Bridget Fleming during the trial of Patrick Griffin when

Fleming violated an "explicit" pretrial ruling, which the Appellate Division found was

"intentional misconduct" when it reversed Griffin's conviction. Fleming was not disciplined.

The year Griffin's conviction was reversed, ADA Gail Heatherly prosecuted Oliver

Jovanovic under Fairstein's supervision. Jovanovic was precluded from introducing emails

from the complainant demonstrating her consent to sadomasochistic sex, which the Appellate

Division found "particularly egregious, in view of the People's approach to presenting the

case" when it reversed Jovanovic's conviction. Despite knowing of the complainant's emails,

Heatherly repeatedly questioned why she would lie and argued that if she wanted to engage

in sadomasochism, *she could have said so in her emails*.

433)    While Fairstein was supervising the Central Park Jogger case, during interrogations at the

police precinct, she and police officers prevented the mother, aunt, and "Big Brother," of one

of the teenaged suspects from speaking with him or halting his interrogation. A Justice of the

Court of Appeals stated that, "other than an undisguised intention to exploit this defendant's

youthful vulnerability, there was no justification for the authorities' actions." The suspect in

question is one of six teenagers convicted in the case whose convictions have been vacated.

In 2013 Fairstein was asked if she felt the need to defend herself in relation to the case and

testified, "I didn't feel as though I had done anything that needed to be defended." Elizabeth

Lederer testified that she was not concerned she would be blamed for *anything*. Upon

information and belief, no one was disciplined or referred for discipline by the DANY in

relation to the Central Park Jogger case.

434)    In 1979, the Appellate Division reversed *at least* eight convictions obtained by DANY prosecutors for misconduct such as the suppression of evidence and the use of improper evidence, questioning and/or argument including in summation. **Exhibit T**.

435)    Michael Goldstein began his employment with the DANY in 1980. That year, appellate courts reversed *at least* three convictions for misconduct by DANY prosecutors. In People v. Rivera, 75 A.D.2d 544 (1st Dept. 1980), the First Department unanimously reversed the defendants' convictions for murder despite "conclusive" evidence of guilt because the prosecutor's summation was "used as a tool to inflame the passions of the jurors to the end that a conviction would be assured." From 1980-89, while Goldstein was with the Office, *at least* forty-three convictions were reversed for misconduct by DANY prosecutors.

436)    David Drucker began his employment with the DANY in 1981. That year, *at least* five judicial decisions found misconduct by DANY prosecutors, including in *at least* three homicide cases. **Exhibit T**. In People v. Yarusevich, 81 A.D.2d 528 (1st Dept. 1981), the Appellate Division unanimously reversed a murder conviction because the prosecutor introduced inadmissible evidence and delayed in disclosing that a witness was "mentally slow." In People v. Bolden, 82 A.D.2d 757 (1st Dept. 1981), the Appellate Division reversed another homicide conviction for "several instances of prosecutorial misconduct [that] deprived [defendant] of a fair trial" including an improper summation.

437)    In 1982, appellate courts reversed *at least* six convictions for misconduct by DANY prosecutors, including at least three reversals involving summation misconduct. **Exhibit T**. In People v. Kitt, 86 A.D.2d 465 (1st Dept. 1982), the prosecution *suppressed evidence the defendant requested at least a year before trial* because of an erroneous conclusion that it

was not <u>Brady</u> material, demonstrating that there was *still* an obvious issue at the Office concerning discovery compliance.

438) In 1983, *at least* six judicial decisions noted summation misconduct by DANY prosecutors [**Exhibit T**], including one that also involved a "clear <u>Brady</u> violation." <u>People v. Wallert</u>, 98 A.D.2d 47 (1st Dept. 1983)(reversing conviction where prosecutor knew before trial, but didn't disclose, that complainant planned to file a civil suit after trial, and argued in summation that complainant had no motive to lie). *Again*, the need to train and/or supervise DANY prosecutors regarding appropriate argument and disclosure obligations was obvious.

439) <u>Wallert</u> was prosecuted by Stephen Saracco, who was prosecuting homicides by the time the Appellate Division reversed the defendant's conviction for his misconduct [*See*, <u>People v. Sweeper</u>, 122 Misc.2d 386 (Sup. Ct. New York Co., 1984)(where Saracco exposed information that the Court found led to the murder of a witness)], promoted to Deputy Chief of the Sex Crimes Bureau under Fairstein by 1989 and, in 1992, prosecuted and convicted David Lemus and Olmedo Hidalgo for a murder they did not commit. In a 2006 decision dismissing the indictment against Thomas Morales, the true perpetrator of the murder, Justice Bonnie Wittner found that the DANY "steadfastly ignored the mounting evidence" that either the wrong men were convicted and Morales was the perpetrator or, at minimum, Morales was involved in the murder. In line with DANY policy, custom, and/or practice, Saracco participated in the Office's defense and "reinvestigation" of Lemus and Hidalgo's convictions along with Daniel Bibb, who was a DANY prosecutor from 1982-2006.[57] From 1996 to 2000 "the People spent considerable effort" defending the convictions. In 2003, the People began another investigation. However, the main thrust of the DANY investigation

---

[57] Linda Fairstein testified that Saracco was one of numerous DANY employees who kept her apprised of the Office's reinvestigation of the Central Park Jogger case although she had left the Office.

was *not* to pursue leads or witnesses that implicated Morales, "*but rather **to defend the most recent motion by Lemus and Hidalgo to set aside their convictions***." (emphasis added). Bibb said that he believed Lemus and Hidalgo were innocent *even as he argued to sustain their convictions which **"his bosses ordered" him to do***. In 2019, ADA Axelrod testified that she may have watched Bibb present cases to the Grand Jury before Plaintiff's trial "to get experience."

440)    In 2005, as the Lemus and Hidalgo case became a subject of controversy amid the race for DA, Robert Morgenthau boasted that the DANY's felony conviction rate was the highest in the City. Six weeks after Morgenthau's opponent publicly criticized him for inaction in the case, his Office finally indicted Morales. Contemporaneously, the DANY *continued to defend* the convictions of Lemus and Hidalgo. At Morales' arraignment Bibb told the Court that the evidence of his guilt began to develop with information *known* to the NYPD *and DANY days after the murder*.

441)    In 2006, Morales moved to dismiss the case against him, arguing that his rights were violated by the delay in charging him. The DANY argued that the delay was excusable because of the case's "complexities, uncertainties, and overall high degree of challenge." Justice Wittner found that a review of the facts "belie[d] this claim" and the evidence against Morales was straightforward and had "always been readily available to the People." She held that the prosecution of Lemus and Hidalgo could not excuse the DANY's failure to pursue Morales and the inexcusable delay compelled her to grant his motion.

442)    Two innocent men spent years in prison and a murderer evaded justice because of the misconduct and inaction of the DANY and the Office's policy, custom, and/or practice of concealing, denying, and/or diminishing misconduct and/or failing to disclose or

acknowledge favorable evidence, including evidence of such misconduct, to enhance the likelihood of successfully defending convictions or, at minimum, inhibit the efforts of defendants to expose misconduct and overturn their wrongful convictions. In line with this DANY policy, custom, and/or practice, the Office permitted prosecutors who had obtained questionable convictions to participate in or lead reviews of the convicted defendants' claims, often under the illusory guise of reinvestigation, as Saracco was permitted to do in the Lemus and Hidalgo case. The predictable result was that the prosecutors would determine the convictions they obtained were proper and deny any misconduct. This practice was known to others in the Office and apparent in the cases of Johnny Hincapie and Jon-Adrian Velasquez, as well as Plaintiff's case. In 2013, Elizabeth Lederer was asked about DANY policy regarding involving the trial prosecutor when a conviction was challenged. She testified that she was not aware of "any special protocol that was followed" but *knew* that in the Lemus and Hidalgo case the "reinvestigation" was done by the ADAs who prosecuted the case. Lederer was an "active participant" in the reinvestigation of the Central Park Jogger case until she was "eased out," after which DA Morgenthau continued to ask her to gather information in the case.

443)    In 1984, *at least* four judicial decisions found misconduct by DANY prosecutors. **Exhibit T**. In <u>People v. Hunter</u>, 126 Misc.2d 13 (Sup. Ct. New York Co., 1984), a New York County court dismissed an indictment because of a prosecutor's **failure to disclose evidence that demonstrated the defendant's absolute innocence**.

444)    Before, during, and after Plaintiff's conviction, prosecutors at the DANY were permitted and/or tacitly encouraged to refrain from investigating, learning of, and/or documenting misconduct and/or credibility issues concerning officers who acted as their agents, generated

or obtained evidence they presented, and testified as their witnesses to permit them to maintain the "deniability" of evidence they would be required to disclose by deliberately avoiding acquiring direct or actual knowledge of it, and then to present false or misleading evidence and/or argument that would be contradicted by the undisclosed information. Despite decades in the Office, Linda Fairstein erroneously testified that detectives did not isolate juvenile witnesses for questioning, which they did in Plaintiff's case. In 2019, Michael Goldstein testified that in his nine years at the DANY, he *never* looked into the disciplinary history of an officer before calling them to testify.

445)    In 1984, Thomas Dargan, a Lieutenant with the Internal Affairs Division of the Transit Police, sent a report ("the Dargan Report") to the DANY that showed four transit officers had made "scores of false or improper arrests," and "[swore] falsely as to the circumstances of the arrests." Many complainants didn't know they were purported victims until informed by the officers, didn't know they had pressed charges until court papers arrived by mail or, indeed, were never shown to actually exist. The DANY didn't file charges against the officers and refused to review convictions *or* drop charges against defendants in cases they generated *or* to disclose the Report to defendants under Brady.

446)    In People v. Marzed, 161 Misc.2d 309 (Crim. Ct. New York Co., 1993), the court overturned a weapons conviction because the People failed to disclose that their sole substantive witness, a police officer, was indicted for perjury in another gun case. While the court made no finding that the prosecutor had actually known this information, if he had not, it would have been because of the DANY's indifference to its obligation to ensure that such information was disseminated to prosecutors handling cases in which the officer was a witness.

447)    In another decision demonstrating that this was DANY policy, People v. Curry, 164 Misc.2d 969 (Sup. Ct. New York Co., 1995), a court overturned a conviction although the defendant had pled guilty, because the Office deliberately kept the prosecutor handling the case in the dark about a corruption investigation of the arresting officer for stealing money, exactly what the defendant claimed the officer had done in his case. The People misrepresented that they had no Brady material, then induced the defendant to plead guilty, and even after the suppression of the corruption was revealed, **defended the conviction**.

448)    Notwithstanding the Marzed and Curry decisions, and numerous cases involving the failure to disclose the Dargan Report (discussed further *infra*), the DANY's suppression of impeachment material concerning law enforcement witnesses continued. In People v. Williams, 7 N.Y.3d 15 (2006), a Brady violation occurred at a suppression hearing when the assigned prosecutor was kept in the dark by others in the office about a perjury investigation of the only witness, a police officer, in a contemporaneous, similar, but unrelated case. When the prosecutor learned the information, he *still* wrongfully withheld it. Disclosure was made only when the defense subpoenaed the witness.[58] The Court of Appeals upheld the hearing judge's decision to allow the People to reopen the suppression hearing and rely on a different witness but condemned the prosecution's behavior and found "no excuse" for the failure to make the hearing judge aware of the perjury investigation at the same time the People were asking the judge to rely on the officer's testimony to deny suppression.

449)    In 2011, Carlton Wigfall was convicted after a trial that "hinged" on the testimony of the arresting officer. Justice Charles Solomon vacated his conviction in 2015 because the DANY suppressed evidence that the arresting officer had been accused of making false arrests and

---

[58] All available evidence indicates that ADA Keenan would have withheld George Delgrosso's revelation of his prior misconduct from the defendants if the defense had not called him at the CPL 440.10 hearing.

there was "no question" the suppressed evidence could have been useful for impeachment. In 2014, Jeremiah Spruill was convicted based on the testimony of an undercover officer after a trial where, in summation, the prosecutor told the jury "we know" the officer was "not going to just say he saw a subject for the sake of apprehending someone to complete his narrative." In 2017, Spruill moved to vacate his conviction based on evidence that the officer had a history of improper arrests involving the identification of innocent persons and false testimony to justify those arrests and Justice Gilbert Hong vacated his conviction. In 2014, Jawaun Fraser was convicted of robbing an undercover officer. In 2019, his conviction was vacated because the DANY violated <u>Brady</u> by failing to disclose that members of the NYPD unit responsible for his arrest had been sued for falsifying evidence at least thirty-five times.

450)    Susan Axelrod began her employment with the DANY in 1985. In 2019, Axelrod testified that DANY prosecutors were "required" to draft a confidential memo outlining the strengths and weaknesses of each case to their Bureau Chief for three reasons: (1) as "training to learn how to think critically about your cases"; (2) to communicate with the Bureau Chief as to the strengths and weaknesses of the case; and (3) to reassess if there was an offer, the purpose of the offer, and what it should be. Such a memo was composed in Plaintiff's case [Exhibit K], but the weaknesses identified therein, including <u>Brady</u> information, were concealed from Plaintiff. Thus, required DANY "training" that apparently *was* memorable included identifying the weaknesses in each case to supervisors but *not* disclosing them to the defense while taking advantage of the disparity in knowledge in plea negotiations. Michael Goldstein testified that "the idea was to point out issues and problems potentially with a case in terms of *moving forward* with the case." (emphasis added).

451)    A 1985 article in *The New York Times* before DA Morgenthau's campaign for a fourth

term demonstrates that his focus was on obtaining convictions and incarcerations, even as his

ADAs were *again* being accused of misconduct and incompetence. Morgenthau boasted that,

on the average day, the DANY sent 13 people to state prison and 40 to local jail, and that

3,400 Manhattan defendants were sent to state prison in 1984, representing 28% of all new

state incarcerations that year. The article highlighted the DANY's 83% overall conviction

rate and 73% felony trial conviction rate, the latter of which Morgenthau was "fond of

saying" was "better" than when Thomas Dewey was New York County DA from 1938-1941.

However, the article also demonstrated the persistent obvious problem of misconduct and

deficient training, supervision, and/or discipline at the DANY, reporting that "judges who

know the [DANY] assistants best say they run the gamut from highly competent *to*

*incompetent*. In one murder case, *a judge excoriated an assistant for delaying delivery to the*

*defense of witnesses' prior statements to the police*. In another murder case, an assistant was

reprimanded for 'running off' to a second judge for an order to produce a witness that had

already been denied by the first judge." (emphasis added).

452)    *At least* three convictions obtained by DANY prosecutors were reversed by appellate

courts in 1986 for misconduct including the use of improper evidence and/or argument and

the suppression of evidence. **Exhibit T**. In 1986, Frederic Slack was arrested for robbery by

Edward Lacey, one of the officers who was a focus of the Dargan Report. The DANY did not

disclose the Report to Slack. The alleged complainant did not appear at trial, Lacey testified

as the sole witness, and Slack was convicted.

453)    By 1987, Lt. Dargan issued a report implicating five more officers in the false arrest

scandal. The Legal Aid Society asked the DANY to dismiss the charges against Slack or

consent to a retrial based on the failure to disclose the Dargan Report. A DANY spokesman stated, "[w]hether the report is a <u>Brady</u> matter in this specific case likely will be an issue to be resolved in court." Slack moved for a new trial based on the suppression of the Report and Justice Alfred Kleiman granted the motion. The DANY initially said it would retry Slack, then admitted that the complainant, whose existence was never confirmed independent of Officer Lacey's report, could not be located. Justice Kleiman dismissed all charges against Slack, who had already spent nearly two years in prison and been released on parole. A spokesman said the DANY would *consider* retrials in "two or three" convictions based on the work of officers named in the Report, but *not* cases where defendants had pled guilty. A class action lawsuit was brought by victims of the false arrest scandal, including claims against DA Morgenthau and his Deputy Chief, arguing that "their continued prosecution of plaintiffs in the face of evidence of the false arrest pattern, and their handling of that and other exculpatory evidence in the course of the prosecutions, made them members of the conspiracy to deprive plaintiffs of their rights."

454)    Between 1986 and Plaintiff's conviction, *at least* twelve judicial decisions found misconduct by DANY prosecutors including the improper use of propensity evidence, disregarding court directives, the failure to disclose evidence, and the use of improper argument such as burden shifting and/or summation misconduct, **all** of which occurred in Plaintiff's prosecution. In *at least* nine decisions during this period, appellate courts reversed convictions for misconduct, including *at least* three homicide convictions. **Exhibit T**.

455)    DANY prosecutors and their agents were permitted to make informal promises, and/or to provide informal inducements to witnesses without recording and/or disclosing them.

456)    The DANY permitted prosecutors to present false or misleading testimony and argument denying their witnesses' motives to lie, to fail to correct such false or misleading testimony and argument, and improperly vouch for the credibility of such witnesses through the prosecutors' own arguments and unsworn "testimony" in summation.

457)    The DANY permitted prosecutors to maintain the "deniability" of impeachment information they were required to disclose by deliberately avoiding acquiring direct or actual knowledge of it or failing to document it, and then presenting false or misleading testimony and argument that was contradicted by the undisclosed information. In the unlikely event that the defense was able to uncover the information, the DANY would then argue that its prosecutors were not guilty of misconduct because they lacked actual knowledge of the information and/or there was no record of it, and the Office would not discipline the prosecutors involved.

458)    The DANY would also deny or defend the types of misconduct discussed herein to defeat or inhibit the efforts of defendants to expose it and overturn their wrongful convictions. Policymaking officials at the Office would almost always defend such behavior when it was challenged, thereby teaching employees of the Office that such conduct would be tolerated or even approved of by the DA and causing additional violations to occur and constitutional injuries to continue.

459)    For instance, four months after Plaintiff's conviction, in People v. Novoa, 70 N.Y.2d 490 (1987), the Court of Appeals unanimously reversed the denial of a defendant's motion to vacate his murder conviction because the prosecutor breached a duty to disclose promises, to correct a witness's testimony that she was promised nothing, and to refrain from misstatements in summation. The prosecutor had elicited the witness's denial that "anyone

had promised anything with respect to your pending case," and then argued that she was a "forthright woman" who had no reason to lie because "she wasn't promised anything." In fact, the witness's Special Narcotics prosecutor had promised to consider the totality of her cooperation, including in the homicide case.

460)     The Novoa Court emphatically rejected the DANY's position that the prosecutor did not mislead the jury because any promise of consideration was made by a different prosecutor in the Office of Special Narcotics and was **"contingent and insignificant."** (emphasis added). The "separateness of offices" could not excuse the prosecutor's apparent "disinclination" to find out the truth. The prosecutor was responsible for her "failure to reveal the promise in the first instance, her failure to correct [the witness's] misstatement…and her own affirmative mischaracterization in the summation [which] constituted both a denial of defendants' rights and a breach of her own obligations."

461)     Pursuant to the aforementioned policies, customs, and/or practices of the DANY, misconduct of the sort persistently committed by prosecutors at the Office under DA Morgenthau, recognized as far back as Justice McQuillan's decision in Johnson, *supra*, and continuing through the decision in Novoa (and for decades thereafter [**Exhibit T**]), occurred in Plaintiff's prosecution in 1987 and caused him to be unconstitutionally convicted for a crime he did not commit. The familiar misconduct that DANY prosecutors and their agents perpetrated against Plaintiff included but was not limited to: misleading the Grand Jury; suppressing Brady, Rosario, and Giglio material including informal promises a to witnesses; and the use of false, misleading and improper evidence and argument including prior uncharged crimes, burden shifting, vouching and bolstering, collateral evidence, violating the unsworn witness rule, and summation misconduct.

462)    For instance, DANY prosecutors made informal promises and provided undisclosed consideration to Kevin Burns and James Walker and knew or had reason to know of informal promises and/or consideration to Anthony and the Houston brothers but failed to disclose that information. Although the DANY has conceded that Walker received "consideration beyond what the jury heard," including that he was permitted to violate his agreement not to be arrested again and that the Office vacated warrants for him, ADA Goldstein argued that Walker's deal involved one crime, it was nonsensical to conclude he was testifying falsely for a benefit, and he did not promise to stop committing crimes. In 2019, ADA Keenan wrote "[t]he defendants also note that Walker's agreement was silent as to any consequence for Walker committing new crimes…any claims regarding this ***non-issue***…***obviously [don't] constitute any*** *misconduct on the part of ADA Goldstein*." (emphasis added).

463)    Other decisions further demonstrate that this was DANY policy concerning undisclosed benefits and/or promises to witnesses and their potential motives to lie. In People v. Conlan, 146 A.D.2d 319 (1st Dept. 1989), the Appellate Division unanimously reversed **a 1985 murder conviction** because of the prosecutor's "particularly disingenuous" denials that *she* had made any promise to a crucial witness, when the witness expected assistance based on the assurances of *another* ADA. In People v. Grice, 188 A.D.2d 397 (1st Dept. 1992), the trial court vacated **a 1980 murder conviction** because the prosecutor did not "ascertain and disclose the full details of a cooperation agreement" with a material witness. The People, *denying fault and somehow blaming the defense*, appealed, but the Appellate Division affirmed. In 2009, the Court of Appeals reversed the **1993 murder convictions** of Danny Colon and Anthony Ortiz because ADA Margaret Finerty withheld favorable evidence including benefits to a key witness, elicited and failed to correct false testimony from the

witness, and emphasized this perjury in summation. <u>Colon</u>, *supra*. Finerty was never disciplined. There were obvious problems with the conduct of DANY prosecutors handling homicides in and around the time of Plaintiff's trial.

464)    In <u>People v. Sinha</u>, 84 A.D.3d 35 (1ˢᵗ Dept. 2011), *aff'd on other grounds*, the Appellate Division reversed a 2007 conviction "because the prosecution failed to fulfill basic disclosure obligations…essential to a fair trial," including promises of consideration if a witness cooperated, benefits he had already received, and other information bearing upon his motive to lie. In <u>Sinha</u>, one of the ADAs who withheld evidence was a Bureau Chief.

465)    In Plaintiff's case, DANY prosecutors failed to document and/or disclose numerous statements by non-testifying witnesses that should have been disclosed under <u>Brady</u>, including statements by Tyrone Bess, Robert Moore, George Samuels, Brandon Holmes, Darrell McDuffy, Stephanie Graham, and Patrick Denson. In line with DANY policy, custom, and/or practice, in 2019, ADA Keenan contended that "the fact that the non-exculpatory interview [of Holmes] was not disclosed is irrelevant and…[t]he interview did not need to be disclosed." Thus, Keenan acknowledged that an interrogation of a suspected alternate perpetrator who was alleged to have acted with someone (Sanders) the DANY has since revealed ***was a suspect*** (which was also concealed), during which the assigned detective and a trial prosecutor violated a juvenile's right to counsel and failed to give <u>Miranda</u> warnings, was not disclosed. However, she argued that information was *not* exculpatory *or* discoverable and, thus, the nondisclosure was permissible.

466)    DANY prosecutors also failed to document and/or disclose statements by witnesses who *did* testify, including Robert Anthony, Terrell Davis, and Kevin Burns, and statements by trial witnesses *documented by ADA Goldstein*. As the DANY conceded in 2023, an

undisclosed statement by Anthony *that has been in the Office's control **since 1987*** corroborated Anthony's 2018 testimony that *the police introduced facts to him*, **including his since-recanted claim about seeing the woman in the white coat**. In summation, Goldstein emphasized this fabricated observation by Anthony and other witnesses as evincing the reliability of their testimony. In 2019, ADA Keenan argued that "*[a]ny suggestion* by the defendants that [Anthony's] testimony regarding the woman being robbed *was fed to him by the detectives **or** ADA Goldstein falls flat*." (emphasis added). Keenan argued that Anthony's revelation that police told him what to say made it, "clear that [he] was testifying with an agenda **and a script**," whereas, in 1987, "he was testifying about *his own observations*, and *not* facts that were fed to him." (emphasis added). As Anthony and his cousin Andre reiterated to the PCJU in 2022, and information readily available to the DANY corroborated, as teenagers they ***were*** "given a script" **by police** and "told what [they] saw" **by police and prosecutors**. These revelations resemble those by Jermaine Robinson about conduct with teenaged witnesses in a DANY prosecution within two years of Plaintiff's.

467)     DANY prosecutors concealed that two teenagers they and their agents incentivized and/or coerced to testify (Andre Houston and James Walker) were mentally disabled.

468)     DANY prosecutors failed to disclose evidence that established the falsity of the *only* testimony that *either* defendant threatened a witness, and ADA Goldstein made knowingly false arguments based on that testimony in summation *and* at sentencing. Despite actually *possessing this same evidence*, in 2019, ADA Keenan argued that Kevin Burns' recantation of the threats he alleged at trial was "not believable. If Burns were going to lie during his trial testimony regarding threats made to him by Smokes to make the case stronger, or to say what the prosecutor wanted him to say, he would have testified that Smokes threatened to kill

him." However, this is exactly what Burns claimed when, on direct-examination, he testified that on the bus ride that morning Smokes "referred to Rakim says Peace. That means you could die."

469)    Although there was no <u>Rosario</u> training at the DANY nor, according to Goldstein, any log for <u>Rosario</u> material at the time of Plaintiff's trial, from 2018-19, Keenan repeatedly claimed that the People "turned over the <u>Rosario</u> material in accordance with the law," disclosed "more than…required," and gave the defense "everything." This was patently false, the prosecution withheld statements of testifying and non-testifying witnesses alike.

470)    Michael Goldstein was already a supervisor at the time of Plaintiff's trial, directing the actions of younger prosecutors like Susan Axelrod. Although he left the DANY in 1989, he continued to lecture new ADAs at the Office on "trial technique" for ***decades thereafter***, demonstrating to generations of new prosecutors that his conduct in the investigation and prosecution of criminal cases such as Plaintiff's was the type of behavior the Office wanted them to replicate. ADA Keenan's spirited defense of Goldstein's conduct although she joined the Office years after he left demonstrates that this message was received.

471)    Axelrod remained with the DANY until at least 2021. In her continued role, and consistent with Office policy, custom, and/or practice, she defended the conviction in <u>People v. Ennis</u>, 11 N.Y.3d 403 (2008), where the People failed to make timely disclosure of a co-defendant's admission to the crime for which the defendant was convicted. At the time of her testimony at Plaintiff's CPL 440.10 hearing, Axelrod was a "Senior Supervising Appellate Counsel." Thus, the DANY condoned Axelrod's behavior in the investigation and prosecution of criminal cases, and the defense of convictions, sufficient that she was promoted to a senior supervisory role. Upon information and belief, David Drucker remains

with the DANY and, indeed, was rehired after retiring in 2021, demonstrating that his conduct as a prosecutor is the type approved of by the Office to this day. Upon information and belief, after Plaintiff's conviction, Drucker obtained the murder conviction in <u>People v. Gantt</u>, 13 A.D.3d 204 (1st Dept. 2004), where the People's main witness was "a career criminal who…had a motive to give false testimony in an effort to obtain favorable treatment," and the People failed to disclose prior testimony that the Appellate Division found called into question the witness's claim that he was present when the victim was murdered when it reversed the conviction.

472)    The DANY encouraged the strident defense of convictions, even those that were obviously questionable, including through the failure to disclose evidence to convicted defendants, their counsels, and courts, the use of evidence and argument that would have been contradicted by undisclosed information, the unwavering defense of police and prosecutors, the refusal to acknowledge misconduct or the defense, denial, and/or diminishment of misconduct, and the suppression, manipulation, mismanagement and/or denigration of evidence undermining the reliability of convictions.

473)    Pursuant to the policies, customs, and/or practices of the DANY, when the misconduct in Plaintiff's case was revealed, the DANY ratified, defended, and/or denied the prosecutors' behavior, thereby communicating that it was consistent with the Office's constitutional obligations and policies. At all relevant times, the DANY denied that *any* misconduct had occurred, even when evidence that *was* revealed proved otherwise.

474)    Frederic Slack, <u>Novoa</u>, *supra*, <u>Curry</u>, *supra*; <u>Grice</u>, *supra*; Lemus and Hidalgo, and the Central Park Jogger case are a mere sample of the proof of the longstanding DANY policy, practice, and/or custom of encouraging the defense of questionable convictions and/or the

denial that any misconduct occurred in obtaining them, even in the rare cases where the Office ultimately agreed that a conviction should be vacated. When the Office "reinvestigated" convictions, such as those of Lemus and Hidalgo, its efforts were illusory and/or primarily concerned with ensuring that no misconduct was acknowledged.

475)    Fernando Bermudez was convicted of murder in 1992. As in Plaintiff's case, the DANY delayed disclosure of its evidence, including that a witness had a charge against him dropped by the Office, until just before trial. By 1993, five witnesses who identified Bermudez had recanted their identifications and "stated that their testimony had been manipulated by the police and prosecutors." As in Plaintiff's case, witnesses said that they were coerced into making identifications and/or threatened with charges if they did not "cooperate." Like the DANY's response to the mounting evidence of innocence in the Lemus and Hidalgo case, the Office defended Bermudez's conviction. As in Plaintiff's case, the DANY argued that multiple affidavits indicating, at minimum, that Bermudez was convicted on unreliable evidence manipulated by police and prosecutors, "were the product of *coercion or pressure by the defense*." (emphasis added). This sort of projection in response to claims that prosecution witnesses were coerced by law enforcement was Office policy and practice. In 2019, ADA Keenan argued, without any evidentiary basis, that **over a dozen sworn affidavits** in support of Plaintiff's motion were "in reality the product of *an extensive and extended effort behind the scenes*" and, it was "of course" not surprising that none of the witnesses called by Plaintiff "*admitted their fear or other motives*." (emphasis added).[59]

---

[59] This is longstanding DANY practice. In 1990, the First Department reversed the defendant's conviction in People v. Norton, 164 A.D.2d 343 (1st Dept. 1990). Although a recanting witness "unequivocally stated that he had not been coerced or threatened in any way," the prosecutor "repeatedly question[ed] [the] defendant, and [summed] up on, threats which were not only nonattributable [to the defendant], but very likely non-existent." The Court found the prosecutor's conduct to be "so egregious as to independently require a reversal."

476)    Even in denying a motion to vacate by Bermudez in 2002, Judge Kevin Fox found that the prosecutor's summation was improper and the identifications were "impermissibly suggestive and conducive to irreparable misidentification." In 2009, Justice John Cataldo ordered a hearing on another motion by Bermudez. Bermudez's previous eleven challenges to his conviction were opposed by the DANY, and this one was no different. Chief ADA Mark Dwyer stated that if a new trial was ordered, the Office "would vigorously appeal." Prosecutors had already acknowledged in court that there was "virtually no evidence to prosecute [Bermudez] again." Dwyer said the DANY would present "additional evidence" in support of the identifications that had not been seen by Judge Fox and "continue to represent the evidence that ha[d] persuaded triers of fact in the past that there [was] no merit to [Bermudez's] claim." The DANY *again* argued that witnesses "were coerced or threatened or offered benefits to recant."

477)    Justice Cataldo vacated Bermudez's conviction on grounds including actual innocence and found that the trial prosecutor *knew*, *but concealed*, that the key accomplice witness had named someone else as the killer, failed to correct this witness's false testimony, and made false summation arguments advocating his credibility including "testifying" as an unsworn witness to explain why he wasn't charged as an accessory. In Bermudez's *twelfth* challenge to his conviction the People "affirmatively conceded *for the **first** time* facts that ***unquestionably*** demonstrate [the witness] gave false testimony" but argued that this was *not* new evidence. The People took this position although they opposed all of Bermudez's prior post-conviction claims on the same ground and Justice Cataldo said, "[t]his contention is unreasonable. First, the People argued the defendant's allegations were without merit. Yet now that the People have learned [his] position is *unequivocally meritorious*, they argue it's

too late, the defendant already claimed this years ago. I find such reasoning cannot prevail." (emphasis added). Justice Cataldo was "perplexed" by the DANY's *discounting of the results of its own investigation that pointed away from Bermudez* and found the Office's attempt to minimize the false testimony "disingenuous." Condemning the continued defense of the conviction, he said "[t]he People's position that this court should uphold a conviction based [o]n materially false testimony *is untenable in our system of justice*." (emphasis added).

478)  Cyrus Vance, who participated in Plaintiff's prosecution as an ADA under Robert Morgenthau, succeeded Morgenthau as District Attorney on January 1, 2010.

479)  Vance, through his deliberate indifference, permitted the culture of misconduct that persisted at the DANY for years, and of which he was acutely aware having been an ADA under Morgenthau, to continue.[60]

480)  Upon information and belief, Vance created the CIU in response to cases like Bermudez's, where the DANY was embarrassed by its continued defense of wrongful convictions and the resulting record of repeated erroneous arguments that were proven so by belatedly disclosed or discovered information and/or evidence including of misconduct.

481)  Johnny Hincapie was one of several teenagers of color convicted of the highly-publicized Manhattan murder of a tourist. Like the Central Park Jogger case and the murder of Jean Casse, the crime was characterized by police, prosecutors, and the media as a "wolf pack" offense. The main evidence against Hincapie was his own disputed confession. ADA Thomas Schiels, a DANY prosecutor since 1979 who also reached the rank of Senior Trial Counsel

---

[60] Under Vance, the DANY was criticized for being "far more punitive toward poor and minority defendants than…other boroughs." The Office sent a disproportionate number of defendants to jail compared to other boroughs and practiced a "notoriously stingy" approach to discovery. Echoing ADA Goldstein's claims regarding the basis for withholding discovery from Plaintiff, in 2018 Vance's top assistant defended the DANY's discovery policy by stating, "[w]itness intimidation is real."

and represented George Delgrosso during his interactions with the PCJU, was Hincapie's

trial prosecutor. In 2009, the DANY agreed to "review" Hincapie's conviction and, as in

Lemus and Hidalgo, assigned Schiels to the matter.[61] Schiels found the conviction he had

obtained to be sound and the Office "refused to take any further action."

482)    In 2014, Hincapie moved for the third time to vacate his conviction. Just as the CIU

injected itself into Plaintiff's case and delayed his efforts to prove his innocence to buy time

to prepare to defend against his claims, Justice Eduardo Padro put off a hearing to give the

CIU time to investigate and submit findings although defense counsel explicitly argued that

***"the [CIU] investigation was a ploy to avoid a hearing."*** (emphasis added). Unsurprisingly,

after delaying the resolution of Hincapie's motion, CIU Chief Darrow reported, "[w]hen we

looked at the facts, the facts took us in a different direction."[62] Darrow submitted a 53-page

memo, signed by DA Vance, "casting doubt on the truth of [Hincapie's] affidavits" and

arguing that his "newly minted claims" were "demonstrably false." This delay to conduct

illusory "reinvestigations" of challenged convictions, but in reality, to prepare to defend

them, was DANY policy, practice and/or custom.

483)    Hincapie testified at the hearing before Justice Padro and was attacked by the People. A

senior DANY prosecutor said that Hincapie's "story made no sense." Such attacks on

defendants who dared to challenge their convictions were DANY policy, practice and/or

custom. After Plaintiff and his co-defendant testified at the hearing before Judge Antignani,

ADA Keenan argued, *inter alia*, that they were "playing for a payday," and the defense

---

[61] Linda Fairstein named Schiels as another DANY employee who informed her about the Office's reinvestigation of the Central Park Jogger case although she had left the Office.

[62] Fairstein named Darrow as another DANY employee who informed her about the Office's reinvestigation of the Central Park Jogger case although she had left the Office which, according to Susan Axelrod, Darrow, Charles King and Consuela Fernandez also did during the Office's review of Plaintiff's case.

arguments in support of their testimony were "effectively" a contention that "each defendant [was] capable of giving an Academy Award-worthy performance to get what he wants."

484)    Justice Padro rejected the DANY's arguments that Hincapie's witnesses were "unreliable or incredible, if not both" and that he could have called them at trial but chose not to, and vacated his conviction. Even then, and although Hincapie had "an exemplary prison record" and had already served the minimum sentence for a crime he did not even commit, Vance's spokesperson stated, "[w]e remain committed to retrying the case, if necessary." After unsuccessfully appealing Justice Padro's decision, a spokesman said the DANY was "reviewing [its] options" concerning a retrial. Even when the Office finally recommended dismissing the charges, a spokesperson stressed that the recommendation *did not* amount to a conclusion that Hincapie was innocent. Nevertheless, when Jennifer Gonnerman asked the DANY who the CIU had consented to relief for while covering Plaintiff's case, the Office provided her a list including Hincapie's name.

485)    The public dissemination of false and/or misleading information concerning the DANY's response to claims of wrongful convictions is Office policy that continues to this day. This is evinced by the Office's claim on its website concerning the independence of the PCJU, the many misrepresentations in the People's October 2023 pre-motion letter and, indeed, DA Bragg's press release that he was "inspired" by the "unyielding advocacy" of Plaintiff and his co-defendant, notwithstanding that his Office had attempted to stifle, denigrate, and manipulate that advocacy, and he has done nothing to address the misconduct of DANY employees who opposed and hindered Plaintiff's efforts to overturn what he acknowledged was an "unjust conviction."

486)    Jon-Adrian Velasquez was convicted of murder in 1999. Velasquez's counsel, a member

of DA Vance's transition team, presented his case to the CIU in 2011. Similar to ADA

King's 2017 responses to Plaintiff's counsel, Vance said "prosecutors had yet to receive

written information from the defense about the case but would review it once they did." What

DANY prosecutors actually did, as in the cases of Plaintiff and Johnny Hincapie, was prepare

to defend Velasquez's conviction.

487)    Echoing ADA Keenan's representations in Plaintiff's case, "[a]fter **_thoroughly_**

**_investigating_** the case, the People informed [Velasquez] that they would not consent to

vacatur of the judgment." (emphasis added). Like Keenan's unsupported representations

concerning Andre Houston, the DANY claimed that nearly all of Velasquez's witnesses

repudiated their statements during interviews with the People, supposedly stating that they

felt "pressured" by defense representatives and/or denying any alleged misconduct.

488)    Also in 2016, the DANY, by ADA Keenan, opposed the CPL 440.10 motions submitted

by Archie Cosey, Carl Dushain, and Danny Green, who were convicted of a 1993 murder. As

in Plaintiff's case, Keenan dutifully followed Office policy, practice, and/or custom by

defending the convictions and denying misconduct by any means necessary, including the

use of improper evidence and/or argument, and/or the suppression of favorable information.

Keenan contended that evidence of a witness's perjury "was a fact of little value," and, like

her suppression of Andre Houston's recantation and inconsistent statements, "that [the

People] did not _wrongfully_ suppress the information, but adhered to the court's ruling which

permitted them to withhold it from the defense." (emphasis added). The Court found, "[t]hat

the court granted the People's application to withhold the [witness's] perjury from the

defense _does not mean that no Giglio violation occurred_" and "_reject[ed] the argument that_

*the [witness's] perjury was not material*." (emphasis added). The Court vacated the convictions of Dushain and Green on grounds including <u>Brady</u> violations, but didn't vacate Cosey's conviction upon finding that he wasn't entitled to the evidence before his plea.

489)    In 2021, Jon-Adrian Velasquez was granted clemency by Governor Cuomo. In 2022, President Biden apologized to Velasquez for his wrongful conviction. Upon information and belief, his conviction remains under review by the DANY although, as in Plaintiff's case, as recently as 2023, previously undisclosed <u>Brady</u> and/or <u>Rosario</u> material was revealed. In line with DANY policy, practice, and/or custom to avoid acknowledging misconduct if at all possible, his conviction remains in place. Upon information and belief, members of the media covering Velasquez's case and members of his legal team were monitored by DANY agents, conduct the Office permitted during the defense of Plaintiff's conviction.

490)    Pablo Fernandez was convicted of murder in 1996. Within two weeks of his conviction, he learned that a detective who testified against him had been arrested for drug trafficking before joining the NYPD. Fernandez moved for a new trial. In another example of the DANY policy, practice and/or custom of disinclination towards looking into the backgrounds of testifying or investigating officers, a prosecutor testified that *he learned of the complaint against the detective* but was "very skeptical" and *unaware* that the detective was testifying in Fernandez's case or any other. If this was true, it was because of the DANY's indifference to its obligation to ensure that such information was disseminated to prosecutors handling cases in which the detective was a witness. Fernandez's motion was denied. In 2003, he filed a motion supported by the recantations of two teenagers who testified against him and a statement by a surviving victim that he was not the perpetrator. Again, the DANY opposed and the motion was denied. In 2019, the Second Circuit reversed the denial of Fernandez's

petition for a writ of habeas corpus and found that he had satisfied the elements for a new trial **based on prosecutorial misconduct**. Even then, the DANY offered Fernandez the "opportunity" to plead guilty in exchange for his release, only dropping the charges against him after he refused.

491)    The DANY's policy, custom, and/or practice of conducting illusory "reinvestigations," withholding evidence and/or engaging in false or misleading argument to defend a conviction at all costs or, at minimum, ensure that misconduct was not exposed and/or acknowledged was apparent in Plaintiff's case.

492)    After defending Plaintiff's conviction on direct appeal and collateral attack, the DANY offered or demanded an illusory reinvestigation *three* times, twice despite such efforts *not* being requested (first to Smokes in 2010, then to Smokes and Warren by the CIU in 2016-17, and then by ADA Keenan in 2017-18).

493)    In defense of Plaintiff's conviction, Sard, Darrow, King, Fernandez, Axelrod, Keenan, Salta, Salerno and other DANY agents, committed misconduct by, *inter alia*:

- Fabricating, suppressing, and/or failing to adequately manage evidence;

- Offering or demanding illusory review or reinvestigation of Plaintiff's conviction to buy time to defend it, and using information learned as a result to defend the conviction;

- Obtaining an unlawful subpoena for the phone records of Plaintiff's attorney and then baselessly defending that conduct;

- Suppressing evidence that supported the recantations by James Walker, Kevin Burns, Robert Anthony, and Andre Houston and impeached their 1987 testimony;

- Suppressing or delaying disclosure of evidence of police and prosecutorial misconduct;

- Suppressing, delaying disclosure of, and/or fabricating statements attributed to Andre Houston and Kevin Burns and/or information about their credibility, and/or coercing them to support Plaintiff's conviction;

- Knowingly, recklessly, or negligently presenting false and/or misleading evidence and argument;

- Usurping a judicially endorsed defense subpoena;

- Committing or suborning perjury; and

- Circumventing the rules of evidence to "impeach" Burns and "correct the record" for Delgrosso and Goldstein to avoid exposure of misconduct and perjury and then accusing *the defense* of asking "to circumvent cross-examination and the rules of evidence."

494)    ADA Keenan made numerous arguments that were false, misleading, derogatory, and/or improper, *many* of which were *only* possible because of the suppression of evidence and information in the People's control, and some of which have already been referenced. She characterized Burns's testimony as "something from a 1930's hardboiled detective novel" and "something one might see in a Hollywood comedy"; repeatedly called Terrell Davis' uncontroverted testimony that he made no material pretrial statements "ridiculous"; and said the claim that Goldstein engaged in misconduct in relation to the <u>Molineux</u> evidence was "nothing short of outrageous."

495)    Almost all of ADA Keenan's 2018-19 arguments have aged like milk.

496)    For instance, Keenan wrote that Detective Delgrosso's investigation was a demonstration of "dogged, effective, and completely proper police work" and, *while withholding documentary evidence to the contrary*, argued that "[t]he defendants simply rehash matters and materials known at the time of trial. Strident argumentation, however, *is not a substitute for **actual evidence***." (emphasis added).

497)    In August 2019, after Kevin Burns testified that he was given cigarettes after trial and Michael Goldstein testified that he would not have given any witness more than one cigarette from his own pack, Keenan argued that ADAs Goldstein and Axelrod, as well as George Delgrosso, all credibly denied giving Burns cigarettes because none of them were likely "***to***

163

*risk their careers* by giving an inmate [cigarettes]…The credible evidence proves…that neither [Goldstein nor Axelrod] would do *or* actually did *any* of what Burns claims they did. *Burns' claims sound so much like **a cheap novel** because **that is what they are—bad fiction**…Goldstein, throughout the investigation and trial…**including in his dealings with Burns**, in **no way** acted improperly*." (emphasis added).

498)     In December 2019, after evidence *she* represented was *in the People's control* (an expenditure voucher and receipt) *conclusively* demonstrated that Goldstein *did* give Burns cigarettes on the day of his trial testimony, Keenan argued that the evidence demonstrated that ***Goldstein** testified truthfully and "**did not engage in any misconduct** and belie[d] the claim that [Burns] was credible* or his recantation truthful." The voucher and receipt, Keenan claimed, "prove *the truthfulness **of ADA Goldstein's testimony and demonstrate that he acted properly**…[and] clearly* undermine the already inconsistent and incredible claims *by Burns*." (emphasis added). **Even Goldstein admitted that the evidence proved he "obviously" gave Burns cigarettes, *an act Keenan argued was career risking misconduct*. Nevertheless, the DANY has denied *any* misconduct by Keenan *or* Goldstein.**

499)     In 2022, Goldstein admitted to the PCJU that, in contrast with his 2019 testimony, he "obviously" gave Burns cigarettes but "doesn't *think* he gave him cigarettes *to testify*." (emphasis added). That Goldstein is not **certain** that he didn't give an undisclosed gift to a witness in exchange for his testimony at a murder trial *after* he denied he gave it *at all* under oath, is disturbing. Especially where he lectured DANY prosecutors on trial technique for decades after committing this misconduct. That the DANY denied he committed *any* misconduct even *after* his admission demonstrates the Office's indifference to misconduct.

500)    ADA Keenan also referenced Goldstein's testimony that "he never made a promise to a witness regarding the witness receiving a benefit in exchange for [their] testimony without disclosing it." In conceding that "the only legally correct and just outcome" was vacatur of Plaintiff's conviction, the DANY revealed that James Walker "received additional consideration beyond what the jury heard," and credited George Samuels' account that he told police and prosecutors Kevin Burns was lying. Instead of acknowledging that the prosecution committed misconduct or that Goldstein's testimony was unreliable, the People deferred to Judge Antignani's prior finding (based on false testimony and misconduct) that he testified truthfully that he found Burns credible in 1987 and "considered whether [Goldstein's] assessment of [Burns] undermined [Samuels's] statements." (emphasis added). *Even Judge Antignani acknowledged* that his 2020 decision **was wrong *because*** he did not have Robert Anthony's initial statements, which were in the DANY's control at all relevant times. In the face of evidence establishing misconduct by the trial prosecutor in violation of Plaintiff's constitutional rights, that was not recognized by the Court because of suppression and false argument by another  DANY prosecutor, the Office sought to find a way to make that evidence fit with a credibility determination that was favorable to the Office *but based on misconduct*, rather than acknowledge misconduct by DANY employees.

501)    ADA Keenan's spirited defense of Michael Goldstein is evidence of the effect of the DANY's longstanding deliberate indifference to misconduct. Goldstein left the Office six years before Keenan began working there. However, the Office continued to demonstrate its approval of Goldstein's conduct as a prosecutor by having him lecture new assistants and defending his cases for decades, including when Keenan was hired. Keenan's strident

defense of Goldstein and use of arguments and tactics against Plaintiff in 2017-19 that resembled those he used in 1987, is proof that she got the Office's message.

502)     Similarly, in responding to Burns' testimony that he was pressured by the prosecution, Keenan emphasized the supposed integrity of the DANY and argued that "[i]f any sort of pressure were applied to Burns, it certainly would not have come from [a] junior member of the office. *Most importantly*, ADA Axelrod, now a veteran prosecutor with tremendous experience, denied ever threatening Burns." (emphasis added). That is, Keenan posited that Axelrod's credibility was enhanced merely because she was a veteran DANY prosecutor.

503)     ADA Keenan and DI Salta met with George Delgrosso as early as November 2017 and Keenan was in contact with him throughout the CPL 440.10 proceedings. Although she elicited testimony from Delgrosso that "[d]uring [Robert Anthony's] *initial interview he was confronted*" by the detectives with their intent to show his photo unless he told them what he was involved in and who he was with, in a subsequent response to the defense claims of witness coercion, Keenan wrote that "[t]he *last thing* a detective *would or should do* with *a naturally reluctant witness* who is cooperative for the moment *is **to confront them*** early on with potentially embarrassing or *even seemingly* hostile questions about their general rectitude." (emphasis added). In 2023, Delgrosso told the PCJU that at first Anthony, the Houston brothers, and Tyrone Bess "denied everything" but said, "it was very typical for *kids* to come in and change their stories" but "*[w]hen they're confronted* with the fact that someone else told the cops they were there, they talk." (emphasis added).

504)     Similarly, Keenan wrote that:

"[t]he defendants argue that the witnesses who testified for the People at trial gave the police manufactured testimony because they were told that they were *potential* suspects, that their pictures would be shown around, and that they could be arrested if they were identified. These tactics are **not** coercive. Instead, the detectives were explaining to

uncooperative *witnesses* what **might** happen…it is *an unjustifiable leap in logic* to conclude that law enforcement was fabricating testimony and forcing witnesses to lie. In fact, *the evidence suggests the opposite*…police pressed a naturally reluctant Robert Anthony to tell the truth, which Anthony then did…[a]s the defense would have it, when the police are faced with a **reluctant *or* lying witness**, and they press that witness to tell the truth, they must be 'coercing' that witness to lie…Neither a court nor the police are required to accept what a witness first says, and it is *not **impermissibly** coercive* to press them to tell the truth." (emphasis added).

505)    As evinced by the testimony and conduct of other DANY prosecutors, Keenan's assessment of the evidence was a result of longstanding deficiencies in training, supervision, and discipline at the DANY and in line with Office policy, practice and/or custom.

506)    In 2023, the DANY wrote that previously undisclosed evidence, including Delgrosso's admission that detectives offered to "take care of" robberies on January 8, 1987, and the unadulterated statements of Robert Anthony, reinforced Anthony's account of an interrogation process that treated him as both a witness *and* a perpetrator, corroborated that he was fed information, and undermined the 1987 police testimony. DA Bragg said that "interviews with teenagers who testified at trial…established that *many* of them were treated *as suspects*." (emphasis added). However, the DANY characterized the evidence, which was available *since 1987*, as "new," and didn't acknowledge *any* misconduct.

507)    Although there was *no* evidence that Warren *ever* threatened *anyone*, and evidence in the People's possession demonstrated the *impossibility* of the threats Kevin Burns testified to at trial, throughout 2019 ADA Keenan wrote variously that:

> "Burns' willingness to deny…threats during the hearing exemplifie[d] his desire to mislead [the] Court in order to benefit the defendants…a witness may be uncooperative for many different reasons, including being threatened (which happened here)…*both* defendants had reached out to Walker *and* had threatened Burns…Burns not only testified about threats, he also personally told ADA Goldstein how scared he was. The record made by ADA Goldstein to the trial court detailed the verbal and physical threats made to Burns. *Burns' current assertion that those threats did not happen is **simply not believable**…*[c]learly the defendants, the attorneys, **and the jury** were aware of ADA

Goldstein's efforts to keep a threatened and very frightened Burns safe." (emphasis added).

508) Even ADA Goldstein demonstrated through his remarks at sentencing in August 1987 that any assertion Plaintiff threatened Burns was baseless.

509) The actions of the CIU, Keenan, Salta, Salerno and, indeed, the PCJU, which were encouraged, directed, and/or ratified by the DANY and in line with Office policy, practice and/or custom, caused Plaintiff's conviction to remain in place, and his constitutional injuries to continue, for *years*.

510) The PCJU process in Plaintiff's case demonstrates the DANY's continued policy, custom, and/or practice of concealing, denying, diminishing and/or declining to acknowledge misconduct and/or punishing defendants who refuse to comply with the Office practice. For instance:

- ADA Rosenblatt insisted that Smokes have independent counsel for his PCJU interview. Rosenblatt later contacted that counsel, months after Smokes' interview, in an attempt to exert pressure on counsel for Smokes and Warren.

- For months, Rosenblatt withheld material statements by Michael Goldstein and George Delgrosso so as not to "humiliate" them. Although the statements by Goldstein and Delgrosso demonstrated that they perjured themselves, she did not refer them for prosecution or inform Judge Antignani of evidence that would have impacted his prior credibility determinations.

- Despite acknowledging due process violations during the defendants' prosecution, Rosenblatt and the DANY declined to acknowledge them in the letter in support of vacating their convictions, a letter ostensibly based "on a careful review of the facts and the evidence" but **in reality, based on Office policy and an internal directive**.

- When the defense broached the subject of clear misconduct by ADA Keenan in defense of Plaintiff's conviction, Rosenblatt responded with a threat.

511) Plaintiff and his co-defendant were punished for refusing to cooperate with the DANY's suppression of constitutional violations and official misconduct. While they continued to wait for justice, in November 2023, the DANY vacated the convictions of Jabbar Walker and

Wayne Gardine. The PCJU "review" in Plaintiff's case took *nearly three years*. In Walker's case, the PCJU review took only eleven months, and the DANY's 3 ½ page filing placed the blame for his having served over twenty-five years in prison primarily on *the failures of his defense counsel*. The Office's 3-page filing in support of vacating Gardine's conviction, unsurprisingly based solely on newly discovered evidence, was submitted (like ADA Rosenblatt's email to the Court in Plaintiff's case that same month) "separately to make clear that while [the Office] joined in the motion for relief, [it did not] necessarily endorse every fact as alleged in defense counsel's affirmation." Upon information and belief, this was because Gardine's counsel wrote that his prosecutor withheld information from the jury.

512)    In the Walker, Gardine, and Steven Lopez cases, upon information and belief, the only individual cases other than Plaintiff's where the PCJU's work has resulted in relief, the DANY has refused to acknowledge *any* misconduct.[63] Upon information and belief, Walker, Gardine, and Lopez *all* made allegations of official misconduct and/or constitutional violations in prior challenges to their convictions. However, the PCJU has been "directed" to rely only on "new" evidence. **Like Daniel Bibb, ADA Rosenblatt was given an unlawful order by her superiors at the DANY and followed it.** Ironically, on the DANY's website, under a link that reads "holding the system accountable," DA Bragg is quoted as stating that "New Yorkers must know that law enforcement is acting with the utmost integrity in the pursuit of equal justice under the law."

---

[63] Like other prosecutorial offices in the City, the DANY has consented to relief in mass for defendants affected by select police officers who were convicted of crimes. Upon information and belief, Lopez, Walker, Gardine, and Plaintiff and his co-defendant are the only individuals convicted of felonies who served decades in prison that the PCJU has consented to relief for since it was established. In each case, the Unit denied misconduct.

513)   ADA Rosenblatt withheld and/or diminished evidence of official misconduct and constitutional violations in Plaintiff's case despite previously arguing that the DANY had committed some of the same sort of misconduct before the same trial court in <u>Colon</u>, *supra*.

514)   The PCJU withheld information and evidence from Plaintiff and misled him, his counsels, and the Court. The DANY continues to withhold information and evidence from Plaintiff. The PCJU refused to detail who was interviewed or to disclose requested evidence. The pre-motion letter drafted by Rosenblatt was only twelve pages long and full of inaccuracies to contour the record and evidence. *The PCJU report on Plaintiff's case is reportedly over one hundred and fifty (150) pages long*. Upon information and belief, the report contains substantial information supporting the instant Complaint, but the DANY has withheld it because disclosure would demonstrate the Office's duplicity.

515)   Other cases prove that persistent misconduct and deficiencies in training, supervision, and discipline, as well as the duplicitous culture at the DANY, persist to date.

516)   Alvin Bragg succeeded Cyrus Vance as District Attorney on January 1, 2022. Bragg's creation of the PCJU to replace the former CIU and of the Police Accountability Unit is proof that he knew he was inheriting a culture of misconduct.

517)   During Bragg's campaign, he tweeted the hashtag "Stand with Tracy," a reference to the murder charges against Tracy McCarter, and stated, "[p]rosecuting a domestic violence *survivor who acted in self-defense* is *unjust*." (emphasis added). McCarter had been charged with killing her husband while attempting to defend herself from his abuse. Upon taking Office, however, Bragg continued to prosecute McCarter *for another eleven months*, only dismissing the charges against her ten days before her trial was set to begin. It was also revealed that the DANY obtained a warrant to search McCarter's email and dating accounts

based on fabricated probable cause and without informing McCarter. Upon information and belief, no DANY employee was disciplined for the misconduct in McCarter's prosecution.

518)    Detective Joseph Franco was charged with perjury and other crimes related to his decades with the NYPD. Ironically, Stephanie Minogue, *Deputy Chief of the DANY's Police Accountability Unit*, withheld evidence from the defense, and the charges against Franco were dropped in January 2023. In a rare instance of remedial action, the Office demoted Minogue from her position. However, in line with longstanding policy, custom, and/or practice, the DANY minimized her misconduct, stating "[t]he steps taken by the office following the dismissal of this critical case after a series of errors *did not* reflect a belief that [she] acted in bad faith." (emphasis added).

519)    As of April 2024, Chrstine Keenan held the title of Senior Trial Counsel and was still prosecuting homicides at the DANY.

520)    The District Attorney's policy, custom, and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

521)    The foregoing violations of Plaintiff's constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the DANY, namely:

  a)   The institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

    i.    The duty not to use false, misleading or unreliable evidence, testimony, statements, or arguments during criminal proceedings;

    ii.    The continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, *whenever* such misconduct is discovered to have occurred;

    iii.    The continuing duty to obtain, preserve, and make timely disclosure to the appropriate parties, including the court and defense, during criminal investigations and prosecutions, of *all* material evidence or information favorable to a person suspected, accused *or* convicted of criminal conduct, including exculpatory evidence and evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

    iv.    The duty to refrain from coercing or manufacturing false or unreliable statements and testimony from witnesses;

b) The failure to adequately instruct, train, supervise, and/or discipline their employees with respect to these and other functions germane to the investigation and prosecution of criminal matters.

522) The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, including, but not limited to, the District Attorney of New York County and his delegates, who knew:

a) To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b) That such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c) That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause them constitutional injury.

523)    The aforementioned policymaking officials had the knowledge alleged in the preceding

paragraph based upon, among other circumstances:

a) Numerous credible allegations, many substantiated in judicial decisions, that prosecutors had violated their <u>Brady</u> and related disclosure obligations, had presented and/or failed to correct false or misleading testimony and/or argument, and/or had improperly coerced false or unreliable statements or testimony from witnesses, *see*, *for instance*, **Exhibit T**;

b) Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under <u>Brady</u> and the failure of prosecutors in New York State, including in New York County, to comply with <u>Brady</u>;

c) Judicial decisions putting the DANY on notice that the City could be held liable for its failure to adequately train, supervise or discipline ADAs regarding their <u>Brady</u> and related due process obligations, *see, e.g.*, <u>Walker v. City of New York</u>, 974 F.2d 293 (2d. Cir. 1992); <u>Ramos v. City of New York</u>, 285 A.D.2d 284 (1st Dept. 2001);

d) The inherent obviousness of the need to train, supervise and discipline ADAs in their constitutional obligations to counteract the inherent pressure on them to obtain convictions.

524)    Despite this knowledge, the supervisory and policymaking officers and officials of the

City perpetuated, or failed to take preventative remedial measures to terminate, said policies,

procedures, regulations, practices and/or customs and did not effectively instruct, train,

supervise or discipline their personnel regarding the proper constitutional and statutory

requirements in the exercise of their authority, but instead ratified, sanctioned or tolerated

policies, procedures, regulations, practices and/or customs described above, with deliberate

indifference to the effect of said policies, procedures, regulations, practices and/or customs

upon the constitutional rights of residents and citizens of the City and State of New York.

525)    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant

City were collectively and individually a substantial factor in bringing about the aforesaid

violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

526)   Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the investigation and prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence or information to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument.

527)   The New York County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

528)   The District Attorney of New York County at all relevant times was and is an elected officer of New York County, one of the constituent counties of Defendant City, the Office was and is funded out of the City's budget, and the Office was and is a City agency.

529)   Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including New York County), and hence Defendant City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

530) The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

531) During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and/or practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

532) By virtue of the foregoing, Defendant City is liable for having substantially caused the violations of Plaintiff's constitutional rights detailed herein and his resultant injuries.

### **FIFTH CAUSE OF ACTION**

**42 U.S.C. § 1983 and Monell. Municipal Liability for the Conduct of NYPD Officers. Defendant City of New York.**

533) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

534) The foregoing violations of Plaintiff's constitutional rights and resulting injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the City, amounting to deliberate indifference to the constitutional rights of persons, who are investigated, arrested, or prosecuted for alleged criminal activities.

535) Before, at the time of, and after Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, the risk of arresting, prosecuting and convicting innocent people, and the rights of all criminal suspects and defendants to due process and a fair trial, implemented

plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning:

a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users, juveniles, the mental disabled, and/or people fearing arrest, prosecution, or imprisonment for their own criminal behavior;

b) The determination of probable cause to make an arrest; and

c) The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (Brady material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with its constitutional obligation to disclose such information to the defense under Brady and its progeny.

536)   With respect to "a" and "c" in the preceding paragraph, before Plaintiff's arrest and prosecution, the NYPD provided no training at all.[64]

537)   Defendant City and the NYPD, by their policymaking agents, servants and employees, authorized, sanctioned, and/or ratified the police defendants' wrongful acts; and/or failed to prevent or stop them; and/or allowed or encouraged them to continue.

538)   The actions of the police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and/or manipulated allegations without adequate basis in fact and/or despite exculpatory evidence known to them and withheld from accused persons, and to substantially

---

[64] Testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including Zahrey v. City of New York, et al., 98 Civ. 4546 (DLP) (S.D.N.Y. 2009), establishes, before and at the time of Plaintiff's arrest, the NYPD provided no training concerning appropriate interrogation of witnesses and Brady compliance. Most such witnesses didn't know what "Brady" was or about their obligations to comply with it.

interfere with the accused's right to due process by impermissible means such as intimidation or coercion of witnesses, fabrication of evidence, and other abuses of authority.

539)    The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices was known to supervisory and policymaking officers and officials of the NYPD and the City before Plaintiff's arrest and prosecution.

540)    Despite knowledge of such unlawful *de facto* policies and/or practices, these officers and officials and their predecessors in interest did not take steps to terminate these policies and/or practices, did not discipline individuals who engaged in them, or otherwise properly supervise or train police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead sanctioned or ratified these policies, customs, and/or practices through their deliberate indifference to, or reckless disregard of, their effect upon the constitutional rights of persons in the City of New York.

541)    The City's policies and practices in existence at the time of the conduct complained of herein, which caused or substantially contributed to Plaintiff's injuries include, *inter alia*, the following:

    a)  The failure to properly supervise, train, instruct, and/or discipline police officers regarding:

        1.  The preparation of truthful accusatory instruments and official reports;

        2.  Adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes without probable cause;

        3.  The exercise of their authority, including, but without limitation, regarding the disclosure of exculpatory evidence; and

        4.  Proper methods of conducting interviews of potential witnesses, witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce, incentivize, and/or elicit false statements.

b) The tacit acceptance and/or encouragement of a code of silence wherein police officers regularly cover up police misconduct by declining or refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and/or falsely exonerate accused officers; and

c) Encouraging and/or failing to discipline officers for "testi-lying" and/or fabricating evidence to bring about their preconceived perceptions or determinations of guilt.

542)  The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a) To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b) That such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c) That the wrong choice by employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

543)  The NYPD's policy, custom and/or practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Plaintiff's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause and continuing throughout his pretrial proceedings, trial, incarceration, and post-conviction proceedings.

544)    The aforementioned policymaking officials had the knowledge and notice alleged in the

preceding paragraph based upon, and the need to investigate train, supervise, and/or

discipline officers by, among other circumstances:

   a) Credible allegations, many substantiated by judicial decisions, finding that NYPD
      officers had wrongfully withheld material evidence or knowingly given false or
      misleading testimony;

   b) Judicial decisions directly criticizing the NYPD for failing to train and/or supervise
      officers in their Brady obligations and failing to adopt adequate Brady disclosure
      policies, *see*, Carter v. Harrison, 612 F. Supp. 749 (E.D.N.Y., 1985)(McLaughlin, D.J.,
      adopting the Report and Recommendation of then-Magistrate Shira A. Scheindlin),
      and putting the NYPD on notice that the City could be held liable for its failure to
      adequately train police officers and investigators regarding their obligations to provide
      truthful testimony and to disclose evidence that favors defendants under Brady, *see*,
      Walker, *supra*, and Carter, *supra*.

   c) Formal reports of the New York City Comptroller's Office and the Bar Association of
      the City of New York criticizing the NYPD and the NYC Law Department for failing
      to follow up on substantial civil settlements for police misconduct with disciplinary or
      other remedial action; and

   d) The inherent obviousness of the need to train, supervise and/or discipline police
      officers in such obligations to counteract the pressure on officers and the powerful
      incentives they have to close cases and to obtain arrests and convictions.

545)    The City's policies, practices, and/or customs in existence at the time of Plaintiff's arrest

and prosecution of failing to supervise, train, instruct, and/or discipline police officers;

encouraging, tolerating, and/or acquiescing to their misconduct; and being deliberately

indifferent to misconduct, are further evinced by, *inter alia*, the following:

a) In 1970, Mayor John Lindsay created the Knapp Commission to investigate corruption in
   the NYPD. **In 1972**, the Commission issued a final report finding widespread corruption
   in the NYPD and recommending remedial measures and reforms.

b) The Report of the Commission to Investigate Allegations of Police Corruption and the
   Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated
   **July 7, 1994**, which states:

      "[A] new and often more invidious form of corruption has infected parts of this
      City…To cover up their corruption, officers created even more: **they falsified official
      reports and perjured themselves to conceal their misdeeds**…In the face of this

problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse…its corruption controls minimized, ignored and at times concealed corruption rather than rooting it out…This reluctance [to uncover corruption] manifested itself in *every* component of the department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment.

**For *at least* the past decade**, the system designed to protect the Department from corruption minimized the likelihood of uncovering it…integrity training was antiquated and *often non-existent*…Most Internal Affairs investigators and supervisors embraced a work ethic more dedicated to closing corruption cases than to investigating them…

This abandonment of effective anti-corruption efforts did more than avoid public exposure of corruption, it fueled it. *It sent a message **throughout the Department** that integrity was not a high priority* and that Department bosses did not really want to know about corruption…" <u>Mollen Commission Report</u>, Pgs. 2-3 (emphasis added).

c) The Mollen Commission concluded that police perjury and falsification of official records was probably the most common form of police corruption facing the criminal justice system:

"Regardless of the motives behind police falsifications…**it is *widely tolerated* by corrupt and honest officers alike, *as well as their supervisors***. Corrupt and honest officers alike told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them…despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful…*When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search, or other police action **and that civil rights are merely an obstacle to aggressive law enforcement**, the Department's top commanders must share the blame*…We are not aware of *a single instance* in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch." <u>Id</u>. at 36, 40-41 (emphasis added).

d) Officer Michael Dowd of the 75th Precinct, a focal point of the Mollen Commission, was one of a number of officers arrested in 1992 for participating in a conspiracy to sell narcotics and protect drug dealers. Dowd was the subject of over fifteen corruption allegations within the NYPD over a six-year period. However, *not a single complaint was substantiated* despite *abundant* evidence of his criminal activities. <u>The Mollen Commission Report: An Overview</u>, by Hon. Harold Baer Jr. & Joseph P. Armao, 40 N.Y.L. Sch. L. Rev. 73, 73-74 (1995).

e) **Since *at least 1984*, Defendant City and the NYPD were *already* on notice of inadequate training and supervision *and* a culture of misconduct and abuse of authority**. Mayor Koch commissioned a special committee ***in 1985*** after a series of cases of misconduct raised questions about the management of the NYPD. A final report was issued ***in 1987*** recommending *extensive* changes to the way the NYPD recruited, trained, promoted and managed its officers. *See, e.g.,* Mayor's Advisory Committee on Police Management and Personnel Police, Final Report, February 24, 1987.

180

f) Before July 1993, the CCRB, which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than an independent, unbiased entity.

g) During the 1980's and 1990's, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously miniscule number of cases.

h) The CCRB has failed to recommend disciplinary action in the vast majority of its cases.

i) In most police misconduct cases that result in verdicts or settlements for victims, the City imposes no discipline, either before or after resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

j) In 1991, Robert Daley, former Deputy Commissioner of the NYPD, wrote that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

546) Upon information and belief, NYPD officers receive no training regarding how to conduct interviews or interrogations in a manner that will prevent false or unreliable statements and, in fact, are indoctrinated in the use of false promises, threats, and intimidation.

547) Numerous cases demonstrate that the use of unduly suggestive identification procedures, the use of unreliable witnesses, the failure to conduct interviews or interrogations in a manner that would produce truthful or reliable statements, and the failure to draft truthful reports or give truthful testimony were among the types of police misconduct pervasive in NYPD homicide investigations at and around the time of Jean Casse's murder. There are too many to list, but a few examples include the following:

a) In 1986, 16-year-olds Willie Stuckey and David McCallum were convicted of carjacking, kidnapping, and murder in Kings County. Both gave false confessions that did not match or comport with undisputed facts, and which they recanted almost immediately, claiming they were coerced by police. The confessions served as the main evidence against them. Police concealed that they had interrogated a pair of men about a series of carjackings and the men pointed them toward Stuckey. Stuckey died in prison.

In 2015, DA Ken Thompson moved to vacate the convictions of Stuckey and McCallum, conceding that their confessions were clearly false. McCallum was released after serving nearly thirty years for a crime he did not commit.

b) In 1987, Todd Lumpkins was convicted in Kings County of a murder he did not commit in a case investigated by Defendant Stubbs. Although two alternate perpetrators were identified to Stubbs, he concealed the information from Lumpkins and gave false testimony "to justify his failure to follow up" on it. In 1988, the Trial Judge vacated Lumpkins' conviction because of the failure to disclose the tip concerning the alternate perpetrators and Stubbs' "bad faith investigation." Lumpkins was retried in 1989 and acquitted after the jury heard evidence of the alternate perpetrators.

c) In 1989, Bernie Pollard was arrested, imprisoned, and charged with a Kings County murder he did not commit. Pollard had been arrested before and was known to the police at the time of the crime. He was implicated by jailhouse informants who tried to recant but were threatened with perjury charges. An NYPD detective threatened a witness to select Pollard from a lineup at the 75th Precinct, and the detectives failed to question an obvious suspect, the victim's partner with whom she had been feuding. Pollard spent fifteen months on Riker's Island before the charges were dropped.

d) In 1989, Derrick Deacon was convicted of a Kings County murder he did not commit. NYPD officers ignored evidence pointing to Deacon's innocence, including that he did not match the description of the perpetrator, and instead pressured a witness to falsely implicate him. Though the witness did not wish to implicate Deacon, the police threatened her with the loss of custody of her children if she didn't cooperate with their false story. After his conviction was vacated, Deacon was retried but acquitted after just nine minutes of jury deliberation. He spent twenty-four years in prison.

548) There are numerous other examples of homicide investigations in the 1980's and 1990's in which NYPD officers used similar unlawful tactics to manufacture evidence. In *many* of those cases, police officers also failed to disclose exculpatory evidence or follow obvious leads to other suspects. Examples of resulting wrongful convictions include, *inter alia*, those of Clifford Jones in 1981; Scott Fappiano and Rafael Ruiz in 1985; Detroy Livingston in 1987; Barry Gibbs, Alvena Jennette, Darryl Austin and Robert Hill in 1988; Anthony Faison, Charles Shepherd and William Lopez in 1989; Mark Denny, Shabaka Shakur and Jonathan Fleming in 1990; Jeffrey Blake, Huwe Burton and Carlos Davis in 1991; and Luis Kevin Rojas and Fernando Bermudez in 1992.

549)    Upon information and belief, Defendant City and its agency, the NYPD, failed to effectively screen, hire, train, supervise, and/or discipline their police officers, including the defendant officers herein, for lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing police officers to be in a position to elicit false testimony from witnesses and fabricate evidence sufficient to secure convictions in violation of constitutional rights, and/or to permit these actions to take place with those officers' knowledge or consent.

550)    Defendant City, and its agency, the NYPD, were aware of the existence of a *de facto* policy based on a widespread and evident practice of permitting, ignoring, and/or incentivizing unconstitutional investigative techniques and widespread corruption throughout the ranks of the NYPD before, during, and after Plaintiff's arrest and unconstitutional conviction. Injuries to Plaintiff and other criminal suspects or defendants were a foreseeable result of deliberate indifference to misconduct and the obvious need for better training, supervision, and/or discipline of NYPD personnel.

551)    Defendant Chartrand was hired by the NYPD in 1954; Defendant Kennedy was hired in 1956; Defendant Cowan was hired in 1957; Defendant Bridgwood was hired in 1968; Defendants Bane, Stubbs, and Paccione were hired in 1973; Defendants Zeins, Delgrosso, and Bavolar were hired in 1974; and Defendant Cruthers was hired in 1979.

552)    Thus, most of the police defendants herein were hired within two years of the Knapp Commission's report. Chartrand, Kennedy, Cowan and Bridgwood were hired while the corruption recognized by the Knapp Commission was ongoing. *All* the police defendants herein were trained, supervised, and/or promoted during the period of widespread and unchecked misconduct recognized by Mayor Koch's committee and the Mollen Commission.

553)    Mayor Koch recognized that misconduct in the NYPD was a problem in 1985, over *a decade after* the Knapp Commission and almost two years *before* Plaintiff's arrest. The year Plaintiff was arrested and convicted, the committee he commissioned recommended extensive changes to NYPD recruitment, training, promotion, and management.

554)    Defendant Delgrosso was promoted to detective on December 10, 1985, and promoted again, to second grade detective, in 1992, the year the Mollen Commission found widespread misconduct, deficient or non-existent integrity training, and deficiencies in Internal Affairs had existed for **at least** *a decade*.

555)    T**he NYPD *already* knew of Delgrosso's corruption at the time of *both* of these promotions**. By his own account, which was clearly sanitized,[65] in 1978, just four years into his NYPD career, Delgrosso assaulted another officer, knocking him unconscious, and gave a fabricated story attributing his conduct to "kids" so he "wouldn't get arrested and suspended" and the "whole thing would go away." It wasn't until "[w]ell over a year" after his crime that Delgrosso's PBA attorney informed him that Internal Affairs investigators had learned what happened and it was in "[his] best interest…to tell the truth" that Delgrosso admitted his fabrication and was briefly suspended. In 2019, Delgrosso testified that he "didn't do anything wrong" and "was a victim." Despite testifying in close to a hundred criminal cases during his police career, Delgrosso claimed he didn't reveal his disciplinary history until he told ADA Keenan in 2018. Although he "didn't think it was important," he told her because he "didn't want her to be surprised by this in case she did find out about it."[66]

---

[65] Delgrosso testified that he could not remember: the name of his victim; the names of his PBA delegate or attorney (who he claimed fabricated the story *for him*); or the names of the superior officers from the 88th and 90th precincts who *told him* to lie. By contrast, he testified that he was in the bar for less than an hour when he assaulted the victim and was "working on [his] second mixed drink." Notably, if Delgrosso's story were credited, supervising officers from two different precincts, as well as IAB, *counseled him to lie to conceal his misconduct*.

[66] Thus, Delgrosso's disclosure was based out of a concern for Keenan, rather than Plaintiff's constitutional rights.

556)   Instead of dismissing Delgrosso from the NYPD for his violent crime, untruthfulness even to other members of law enforcement, and willingness to conceal his own wrongdoing for as long as he thought he could get away with it, the NYPD subjected him to negligible discipline (Delgrosso said he "agreed to take five days suspension"), permitted him to remain on the force, and promoted him to a position where he was allowed to participate in the investigation of approximately 400 homicides and falsely accuse another youth—Plaintiff.

557)   During his first year as a detective and before the murder of Jean Casse, Delgrosso conducted the investigation that resulted in the conviction of the defendant in Dunn, *supra*. In 1993, the First Department reversed the conviction because ***Delgrosso destroyed 40-70 pages of notes*** he had taken during his investigation after "probably" transferring the information to formal reports. Delgrosso admitted that the notes "might have" contained eyewitness descriptions. The DANY conceded that it was possible the eyewitness testimony at trial differed from the information in the notes. The First Department found that the defendant's ability to cross-examine the eyewitnesses and Delgrosso was impeded by his conduct. Delgrosso engaged in the *same* type of misconduct in the case against Plaintiff. Without limitation, he destroyed and/or concealed notes of, *inter alia*: statements made by Plaintiff and his co-defendant; unadulterated statements of the January 8th witnesses; information concerning alternate perpetrators; and statements of Kevin Burns, Jerry Sanders, George Samuels, Brandon Holmes, Terrell Davis, and Ian Woodson.

558)   In February 2019, Delgrosso relied on his previously undisclosed memo book when testifying in response to ADA Keenan in an effort to falsely claim James Walker's information was corroborated. However, on examination by defense counsel, despite

agreeing that he was obligated to fill out his memo book according to NYPD protocol, Delgrosso testified that his supervisors might rely on his entries, but he would not.

559)    Although Delgrosso was assigned to Midtown North, his interrogations of Plaintiff and his co-defendant occurred at the 75th Precinct and with the assistance of 75th Precinct officers, *at the same time Michael Dowd and other officers from that command were protecting drug dealers using their positions as police officers*. The 75th Precinct was a hotbed of corruption when Delgrosso chose to isolate Plaintiff there for interrogation.

560)    Several months after the decision in <u>Dunn</u>, *supra*, (and the year after the Mollen Commission report) Delgrosso and another detective arrested Ron Brawer at his workplace without a warrant or exigent circumstances. Brawer filed a civil suit claiming that his ex-wife had become friendly with NYPD officers and persuaded them to interfere in a custody dispute between the two by, among other things, unlawfully arresting him. The Court held that a jury could find it wasn't objectively reasonable to arrest Brawer and that the arrest was without probable cause. <u>Brawer v. Carter</u>, 937 F. Supp. 1071 (S.D.N.Y. 1996). Delgrosso was promoted *again* the year after this decision.

561)    In 2019, Delgrosso testified that Defendant Kennedy, who coerced and incentivized witnesses, concealed, manipulated and/or destroyed evidence, and gave false testimony during Plaintiff's prosecution, was his "mentor" and the "senior homicide detective" assigned to assist him in the investigation into Casse's murder and that **he stood by *any* police work Kennedy did**. In 2023, the DANY conceded that the previously undisclosed statements of Robert Anthony undermined the reliability of Kennedy's testimony and supported the proposition that Anthony was fed facts. Investigations into Kennedy's misconduct date back

to *at least* 1961, five years after he was hired by the NYPD, and include an allegation that he "use[d] a homosexual as bait to arrest others."

562)    Defendant Paccione brought James Walker to the attention of Delgrosso, prompting the focus on Plaintiff that culminated in his unconstitutional conviction. In 2023, Delgrosso acknowledged that Walker was "looking to make a deal," "wanted promises," and that police told him "they'd do what they could to help with his current case." Paccione was investigated for misconduct beginning no less than six years after he was hired by the NYPD. The allegations against him include a 1982 report that he took money and property that wasn't returned or vouchered; and a report in 1987, the year Plaintiff was prosecuted based on false evidence Paccione helped generate, that he and another officer worked as "muscle men" who abused and threatened workers at a Manhattan store and, when the victims called Midtown North officers to intervene, the officers greeted Paccione and did nothing to halt the misconduct. In 2005, an identification was suppressed in a homicide case when, despite knowing the defendant's right to counsel had attached, Paccione conducted a lineup without counsel. The Court found that the situation could have been rectified before the lineup if Paccione, "knowing [counsel] represented the defendant in the matter, had called [counsel] and let him know the defendant was at the precinct…However, [Paccione] did not make the call." The Court stated, "[i]t is unfortunate that Detective Paccione, *knowing* that the defendant was represented by counsel and *not* faced with an exigency requiring an immediate lineup…conducted the lineup in the absence of the defendant's attorney…*the legal obligation of the detective not to conduct that lineup without defense counsel being there has been the law of the state for many years*." People v. Williams, 13 Misc.3d 886 (Sup. Ct. Kings Co., 2006)(emphasis added).

563)     Defendant Stubbs brought Robert Anthony to the attention of investigators but

manipulated his DD5 on the subject to omit his relationship with Anthony's mother and that

she found news clippings about Casse's murder in his bedroom. The previous year, Stubbs

was assigned to investigate the murder of Anthony Joseph. Judge Michael Juviler found that

*Stubbs acted in bad faith* and his testimony was "*false* and *designed to justify his failure*

follow up" on exculpatory information he concealed concerning alternate perpetrators. Had

the evidence been disclosed, Judge Juviler reasoned, it might "have been in the best interest

of the defense *to cross-examine Stubbs about the bad faith of his investigation*." People v.

Lumpkins, 141 Misc.2d 581 (Sup. Ct. Kings Co., 1988)(emphasis added).

564)     Defendant Cruthers assisted Delgrosso and Kennedy, along with other officers, in

coercing Anthony and the Houston brothers to adopt fabricated statements and

identifications, and then assisted Delgrosso in taking Plaintiff and his co-defendant into

custody to stand in lineups based on fabricated probable cause. Less than two years earlier,

Cruthers was reported for assaulting a civilian, *forcing him to sign a statement*, and taking his

keys without vouchering or returning them. In 1986, Cruthers was investigated for spending

the night at the apartment of an employee of a jewelry firm he was investigating.

565)     Eight years before Plaintiff's case, after a defendant in custody for murder invoked her

right to counsel, Defendant Chartrand immediately sought an improper waiver of that right,

resulting in the suppression of her ensuing statements. People v. Vese, 100 Misc.2d 8 (Sup.

Ct. New York Co., 1979). While working on Plaintiff's case Chartrand, *inter alia*,

improperly documented the descriptions of Eloise Yellen and Dan Melkonian; inaccurately

recorded a tip naming an alternate perpetrator and threatened the tipster; concealed and/or

manipulated favorable statements by witnesses such as Patrick Denson and Reginald Grant; and gave false and misleading testimony.

566)   Defendant Bane assisted in taking Plaintiff and his co-defendant to the 75th Precinct for interrogation and participated in their interrogations. In 1994 Bane was accused of bringing a complainant to the precinct to discuss a case, *only to interrogate the complainant about a murder once they arrived at the precinct and tell the complainant he couldn't leave*.

567)   With the exception of Defendant Stubbs, Defendants Zeins and Cowan supervised the actions of the police defendants during the investigation that resulted in Plaintiff's conviction. Likewise, they supervised the actions of Defendant Bridgwood who, along with Delgrosso and/or unnamed others, concealed evidence that was favorable to Plaintiff. Zeins also gave false and misleading testimony during Plaintiff's prosecution, fabricated materials, and failed to preserve evidence.

568)   Defendant Delgrosso's misconduct in relation to Plaintiff continued after his conviction. In addition to secreting exculpatory evidence along with Bridgwood, Delgrosso conveyed favorable information about Robert Anthony, that he concealed from Plaintiff, to Robert Jackall. Then, in 2019, Delgrosso gave false testimony to keep Plaintiff's conviction in place concerning, *inter alia*: his own misconduct before, during, and after Plaintiff's arrest and conviction; deals, benefits, and promises to witnesses; the feeding of facts to and coercion of witnesses; the voluntariness and reliability of the statements and identifications he elicited; and information concerning alternate perpetrators and the failure to follow up on it.

569)   The New York City Municipal Code dictates that the NYPD Commissioner is in control of the discipline of the Department and the police force. The NYPD Commissioner, or his

designee, constitutes a final policymaker and decisions by the NYPD Commissioner or his designee, related to discipline or employment determinations are considered "policy."

570)   The NYPD Commissioner, or his designee, exhibited deliberate indifference to a risk of the violation of Plaintiff's, and others' constitutional rights, when put on notice of the widespread problem of misconduct and deficiencies in training, supervision, and/or discipline within the NYPD by, *inter alia*, the Knapp Commission, Mayor Koch's committee, the Mollen Commission, and the other aforementioned notices, as well as the conduct of the defendant officers discussed herein. For instance, the NYPD Commissioner or his designee were made aware, no later than Delgrosso's 1978 departmental discipline, that he was unsuited for police work. Instead of terminating him, the NYPD Commissioner or his designee promoted him to a position where he was able to frame Plaintiff for a crime he did not commit, "mentor [younger officers] on how to handle homicides," and become Midtown North Homicide coordinator. Delgrosso was promoted to first grade detective in 1998. Seven years later he contributed to a book celebrating his and others' violations of Plaintiff's rights.

571)   Because the decisions not to properly supervise, train, and/or discipline the defendant officers, and to retain them on active duty without having done so, were made by the NYPD Commissioner or his designee, as a final policymaker, the City is directly liable for them.

572)   The Defendant City caused or permitted the defendant officers to violate Plaintiff's constitutional rights in, *inter alia*, the following ways:

   a)  Arresting him without legitimate probable cause;

   b)  Coercing and incentivizing witnesses to falsely identify him or testify falsely against him, and feeding information to those witnesses;

   c)  Failing to preserve evidence or establish a meaningful chain of custody and, as a result, depriving Plaintiff of due process and a meaningful opportunity to challenge unreliable fabricated evidence on constitutional grounds;

d) Suppressing and destroying evidence that was favorable to Plaintiff including, but not limited to, evidence of their own violations of the law, evidence of third-party culpability, and evidence of his innocence; and

e) Failing to document statements according to departmental protocol.

573) Defendants Delgrosso, Kennedy, Zeins, and Chartrand each gave false, inaccurate, and/or misleading testimony in the Grand Jury, at the pretrial hearing, at trial, and/or during Plaintiff's post-conviction proceedings.

574) Upon information and belief, the defendant officers herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to or should have given notice to Defendant City and its agency, the NYPD, that they were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by Plaintiff herein.

575) As a result of the foregoing policies, practices, customs and/or usages, Defendant City and its agency, the NYPD, permitted and allowed the employment and retention of individuals as police officers whose individual circumstances placed the public or segments thereof at substantial risk of being the victims of preconceived determinations of guilt.

576) Plaintiff's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowledge and repeated failure of the Defendant City and the NYPD to properly supervise, train, and/or discipline police officers.

577) Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, § 1 and 6 of the New York State Constitution,

including, without limitation, Plaintiff's deprivation of freedom and liberty without due process of law.

578)    Defendant City is directly liable and responsible for the acts of the individual police defendants for State law claims under the doctrine of *respondeat superior*.

579)    As a result of the decisions made by the Defendant City, Plaintiff was deprived of his constitutional rights and suffered injuries set forth below.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 Civil Conspiracy. All Individual Defendants.

580)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

581)    Defendants all explicitly and/or implicitly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Plaintiff wrongfully arrested and convicted for crimes he did not commit.

582)    Each defendant then committed overt acts, as detailed herein, to accomplish the goal of the conspiracy, including, but not limited to:

   a) Threatening civilians Andre Houston, Alfonso Houston, Robert Anthony, and Kevin Burns that if they did not implicate Plaintiff, by way of identifying Plaintiff and testifying against him, they would themselves be implicated in the murder or face other criminal charges;

   b) Offering civilians leniency in their own criminal prosecutions in exchange for implicating Plaintiff in the crimes charged;

   c) Defendant King allowed Defendants Axelrod and Goldstein to determine what discovery should be disclosed to Plaintiff after Defendant Darrow advised them of Plaintiff's claims;

   d) Defendants Goldstein, Drucker, Axelrod, Keenan, Salta, and Salerno suppressed exculpatory material, and when Defendant Rosenblatt discovered this, she was directed by DANY not to acknowledge that any constitutional violations or misconduct had occurred, and instead frame evidence as newly discovered;

e) Defendant Keenan directed Defendants Salta and Salerno to approach Andre Houston before the CPL 440.10 hearing, and they posed as FBI agents to coerce Andre into cooperating. When Andre recanted his 1987 testimony and made inconsistent statements, Keenan concealed it from the defense;

f) Defendant Keenan obtained illegal subpoenas for defense attorneys' phone records in an attempt to explain away, distract from, and cover up the fact that other named defendants had coerced civilians to implicate Plaintiff and those civilians were attempting to tell the truth;

g) Defendant Darrow advised Defendants Axelrod and Goldstein, before the CPL 440.10 hearing, that issues with Plaintiff's conviction had been raised, and Defendants Fernandez and King regularly attending the hearing, strategized with Defendant Keenan, and kept Axelrod and Goldstein apprised of the issues raised at the hearing so they could tailor their testimony at the hearing to cover up the conspiracy;

h) To continue the constitutional injuries and maintain Plaintiff's conviction, Defendants Delgrosso, Axelrod, and Bridgwood provided information to Robert Jackall to publish a book about Plaintiff being a murderer, and Axelrod provided materials to Jackall to aid him in publishing said book;

i) Either or both Defendant Delgrosso and Bridgwood concealed exculpatory evidence in a file for an unrelated case being investigated by Bridgwood, and when Defendant Rosenblatt discovered said evidence concealed in the unrelated file, she explained it away as "misplaced" though it had been intentionally concealed for decades;

j) Defendants Goldstein and Axelrod provided benefits to Kevin Burns in exchange for his testimony implicating Plaintiff, and when Defendant Rosenblatt discovered this, she refused to admit any misconduct on behalf of DANY;

k) Defendant Keenans and Salta met with civilian Kevin Burns prior to the CPL 440.10 hearing in an attempt to coerce him to reiterate his false trial testimony, and when he didn't, they attempted to cover up their conduct by baselessly disparaging his credibility on unrelated issues including by giving false testimony;

l) Defendant Rosenblatt delayed disclosure of PCJU's interview notes of Defendants Delgrosso and Goldstein, which contained evidence of the conspiracy, because she did not want to "humiliate" them, though their statements supported Plaintiff's position that they violated his constitutional rights;

m) Defendants Delgrosso and Cruthers brought Plaintiff to the precinct to conduct lineups and coerced witnesses to implicate him, where Defendants Drucker, Goldstein, and Kennedy were present and questioned those witnesses and attempted to coerce them;

n) Defendants Zeins, Paccione, and Bavolar used civilian James Walker to locate Smokes and stopped him at gunpoint. Defendant Delgrosso then interrogated Smokes, with the

assistance of Defendants Zeins and Bane, in an attempt to elicit a false confession from Smokes and a false implication of Warren;

o) Defendant Sard indicated to Smokes that she would conduct an investigation of the case, but never contacted him again after she learned that Walker had recanted; and

p) Defendant Stubbs, being in a romantic relationship with Robert Anthony's mother, falsified a DD5 in relation to how Anthony came to the attention of police and how he became a person of interest.

583)    By virtue of the foregoing, defendants are liable for conspiring to deprive Plaintiff of his

rights:

a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of young and vulnerable witnesses who had been threatened and coerced into cooperation to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

c) To timely disclosure of all material evidence favorable to the defense pursuant to Brady, *supra*, Giglio, *supra*, and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

584)    Defendants committed the foregoing violations of Plaintiff's constitutional rights

knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or

to the effect of such misconduct upon them.

585)    By reason of the foregoing, the defendants are each liable to Plaintiff pursuant to 42

U.S.C. § 1983, for compensatory and punitive damages as detailed herein.

## **SEVENTH CAUSE OF ACTION**

**False Arrest Under 42 U.S.C. § 1983. Against Defendants Delgrosso and Does #1-10.**

586)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if

fully set forth herein.

587)    Defendant Delgrosso intended to arrest Plaintiff and caused him to be confined.

588)    Plaintiff was aware of his confinement and did not consent to it.

589)    The arrest and confinement of Plaintiff was not supported by legitimate probable cause.

Delgrosso arrested Plaintiff based on fabricated statements and identifications by James

Walker, Robert Anthony, Andre Houston, and Alfonso Houston. Delgrosso knew or should

have known this evidence was false because of his role in fabricating it.

590)    The arrest and confinement of Plaintiff was not otherwise privileged.

591)    In violation of the Fourth Amendment to the United States Constitution, probable cause

was based entirely on false statements that the defendants knew were false. Further, the

indictment of Plaintiff was secured through perjury and fraud committed by Delgrosso and

Defendants Goldstein and Drucker, who suborned false and materially incomplete testimony

in the Grand Jury and withheld exculpatory information from the Grand Jury including, *inter*

*alia*: the unadulterated statements of Anthony and the Houston brothers; the benefits to

Walker; Plaintiff's credible alibi; evidence that other individuals committed the crimes

charged; and, evidence bearing on the credibility of Delgrosso and the civilian witnesses.

592)    Plaintiff suffered substantial damage from the false arrest as set forth below.

## EIGHTH CAUSE OF ACTION

**False Arrest Under New York Law. Defendants Delgrosso, Does #1-10, and the City of New York.**

593)    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set

forth herein.

594)    Defendant Delgrosso intended to arrest Plaintiff and caused him to be confined.

595)    Plaintiff was aware of his confinement and did not consent to it.

596)    The arrest and confinement of Plaintiff was not supported by legitimate probable cause. Delgrosso arrested Plaintiff based on fabricated statements and identifications by James Walker, Robert Anthony, Andre Houston, and Alfonso Houston. Delgrosso knew or should have known this evidence was false because of his role in fabricating it.

597)    The arrest and confinement of Plaintiff was not otherwise privileged.

598)    Probable cause was based on false statements that the defendants knew were false. The indictment of Plaintiff was secured through perjury and fraud committed by Defendants Delgrosso, Goldstein, and Drucker, who suborned false and materially incomplete testimony in the Grand Jury and withheld exculpatory information from the Grand Jury including, *inter alia*: the unadulterated statements of Anthony and the Houston brothers; the benefits to Walker; Plaintiff's credible alibi; evidence that other individuals committed the crimes charged; and evidence bearing on the credibility of Delgrosso and the civilian witnesses.

599)    The City of New York is liable for the false arrest of Plaintiff under a theory of *respondeat superior*, as at all relevant times Delgrosso was acting within the scope of his employment, for the City's benefit and under its control. This does not preclude Plaintiff from pleading in the alternative, as otherwise specified.

600)    Plaintiff suffered substantial damage from the false arrest as set forth below.

## <u>NINTH CAUSE OF ACTION</u>

**Malicious Prosecution Under New York Law. Defendants Delgrosso, Kennedy, Bane, Zeins, Paccione, Cruthers, Cowan, Bavolar, Chartrand, Stubbs, Goldstein, Drucker, and Does #1-10.**

601)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

602) Defendants, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or continue criminal proceedings against Plaintiff without probable cause.

603) The Individual Defendants intentionally manufactured false evidence and coerced or otherwise incentivized witnesses to mislead prosecutors, the Grand Jury, the Suppression and Trial Courts, the trial jury, and the courts that presided over Plaintiff's post-conviction litigation.

604) The criminal proceedings terminated in Plaintiff's favor when his conviction was vacated and the charges against him were dismissed. As a direct and proximate result of the Individual Defendants' actions, Plaintiff was wrongfully prosecuted, convicted, imprisoned, and labeled a murderer for nearly thirty-seven years, and suffered other grievous and continuing injuries set forth below.

605) The Defendant City is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## TENTH CAUSE OF ACTION

**State Law False Imprisonment. Against Defendants Delgrosso, Kennedy, Bane, Zeins, Paccione, Cruthers, Cowan, Bavolar, Chartrand, Stubbs, Goldstein, Drucker, Axelrod, and Does #1-10.**

606) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

607) Defendants intended to confine Plaintiff and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned based on false evidence and without legal justification.

608) Plaintiff was conscious of the confinement and did not consent to it.

609)    As a direct and proximate result of the Defendants' actions, Plaintiff was wrongfully

arrested and falsely imprisoned, and suffered damages and injuries, during the time he was in

jail before and during trial, from his arrest on January 8, 1987, until December 19, 2007,

when he was finally released.

## ELEVENTH CAUSE OF ACTION

**State Law Negligent Infliction of Emotional Distress. Against All Defendants.**

610)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if

fully set forth herein.

611)    The Individual Defendants negligently and grossly negligently, and in breach of their

duties to Plaintiff to refrain from withholding favorable evidence, and otherwise acting to

deny Plaintiff due process of law, directly and proximately caused Plaintiff, who was

innocent, to be falsely arrested, maliciously prosecuted, wrongfully imprisoned, and defamed

as a murderer for nearly thirty-seven years.

612)    For the purposes of this cause of action, Plaintiff permissibly pleads in the alternative that

the defendants acted unintentionally (and negligently), including when, but not limited to, the

defendants did not disclose favorable evidence to Plaintiff, conducted identification

procedures under circumstances that they should have known would produce inaccurate

results, conducted interrogations of witnesses under circumstances that they should have

known would produce inaccurate results, negligently failed to investigate viable leads that

possibly could have led to the real killer, and negligently failed to verify the accuracy of

information provided by civilians that had obvious flaws.

613)    The actions of the Individual Defendants were extreme and outrageous and caused

Plaintiff to suffer mental and emotional harm, to fear for his safety, and actually caused his

safety to be in jeopardy, throughout his incarceration.

614) Plaintiff's cause of action for negligent infliction of emotional distress was unavailable to him until January 31, 2024, when the criminal proceedings against him were terminated in his favor. Furthermore, this claim is tolled as the Defendants concealed from Plaintiff, and continue to conceal, their conduct giving rise to this cause of action.

## TWELFTH CAUSE OF ACTION

**State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct of Employees of the DANY.**

615) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

616) Plaintiff permissibly pleads in the alternative, for the purposes of this cause of action, that DANY employees committed misconduct that fell outside the scope of their employment. Said misconduct includes, but is not limited to: Defendant Goldstein making himself a witness to convey fabricated information including false threats to the Court at trial and sentencing and to impeach defense witnesses at trial; Defendant Goldstein purchasing undisclosed cigarettes for Burns and keeping some for himself while obtaining reimbursement for the full amount spent; Defendants Goldstein, Drucker, and Axelrod withholding favorable evidence and permitting witnesses to testify falsely in the Grand Jury, at the pretrial hearing, and at trial; Defendants Delgrosso, Axelrod and Bridgwood conveying favorable information to Robert Jackall that they and others concealed from Plaintiff, so that Jackall could publish that information for profit; Defendants Goldstein, Axelrod, Drucker, Delgrosso, Bridgwood, Sard, Darrow, King, Fernandez, Keenan, Rosenblatt, Salta, and Salerno withholding favorable evidence from Plaintiff after his conviction; Defendant Keenan unlawfully and unethically investigating Plaintiff's legal team before the CPL 440.10 hearing; Defendants Keenan, Salta, and Salerno withholding favorable evidence and

threatening and coercing witnesses; Defendant Keenan permitting witnesses to testify falsely during the hearing; Defendant Keenan making herself a witness to falsely impeach witnesses at the hearing and convey false information including, but not limited to, statements attributed to Andre Houston, to the Court; Defendants Goldstein, Axelrod, and Salta testifying falsely at the hearing; and, Defendant Rosenblatt withholding exculpatory information from Plaintiff and the Court throughout the PCJU reinvestigation and the filing of the instant Complaint.

617)    Plaintiff permissibly pleads in the alternative, for purposes of this cause of action, that these acts were committed wholly for personal reasons including, but not limited to, obtaining promotions, raises, personal accolades, and/or positive publicity.

618)    During all times material to this Complaint, Defendant City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and/or practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

619)    Defendant City of New York is liable to Plaintiff because of its negligent failure to adequately hire, train, supervise, and/or discipline agents, servants, and/or employees of the DANY regarding the aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## THIRTEENTH CAUSE OF ACTION

**State Law Negligent Hiring, Training, and Supervision. Against Defendant City of New York Based on Misconduct by Employees of the NYPD.**

620)    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

621)    Plaintiff permissibly pleads in the alternative, for the purposes of this cause of action, that named NYPD employees committed egregious misconduct that fell outside the scope of their employment. Said misconduct included, but is not limited to, Defendants Delgrosso, Zeins, Cowan, Chartrand, Kennedy, Bane and Stubbs falsifying police documents such as memoranda, DD5's, witness statements, and memo book entries in an attempt to cover up evidence favorable to Plaintiff and/or their own illegal conduct; Defendants Delgrosso and Bridgwood secreting favorable evidence in the DANY file for the Sanders prosecution and conveying favorable information to Robert Jackall that they and others concealed from Plaintiff so that Jackall could publish that information for profit; and Defendant Delgrosso's false testimony at Plaintiff's CPL 440.10 proceedings.

622)    Plaintiff permissibly pleads in the alternative, for the purposes of this cause of action, that these acts were committed wholly for personal reasons including, but not limited to, obtaining promotions, raises, personal accolades, and positive publicity, and to cover up the officers' own violations of the law.

623)    During all times material to this Complaint, Defendant City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and/or practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

624)    Defendant City of New York is liable to Plaintiff because of its negligent failure to adequately hire, train, supervise, and/or discipline agents, servants, and/or employees of the NYPD regarding the aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries Plaintiff suffered.

## DEMAND FOR DAMAGES

**WHEREFORE**, Plaintiff hereby requests judgment against the Defendants as follows:

a)    Compensatory damages to Plaintiff in an amount to be determined at trial;

b)    Punitive damages in an amount to be determined at trial;

c)    Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and to the inherent powers of this Court;

d)    Pre- and post-judgment interest as allowed by law; and

e)    Such other and further relief as this Court deems to be just and proper.

**DATED:** July 22, 2024
         Brooklyn, New York

*/s/ James D. Henning*
**JAMES D. HENNING, ESQ.**
Law Offices of James Henning & Associates, PLLC
Attorneys for David Warren
16 Court Street, Ste. 503
Brooklyn, New York 11241
jhenning@jhenninglaw.com
(718) 717-2454

<u>VERIFICATION</u>

**DAVID WARREN**, being duly sworn, deposes and says:

     I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

 

 

                                    _____
                                      David Warren
                                        Plaintiff

 

Sworn to before me this
22ᴺᴰ day of July , 2024



_____
               Notary Public

JACOB KETTELL MUSIAL
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in New York County
01KE6396657
MY COMMISSION EXPIRES 09/26/2027